**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

BRITNEY DENTON, NYABI STEVENS,
DEIDRICK DANSBY, FAYERACHEL
PETERSON, ALEXANDER HARRIS, and JOHN
DOE,

     Plaintiffs,

v.

THE BOARD OF GOVERNORS FOR THE
STATE UNIVERSITY SYSTEM OF FLORIDA,
MARSHALL M. CRISER III, and THE STATE
OF FLORIDA,

    Defendants.

**CLASS ACTION COMPLAINT**

Jury Trial Demanded

Civil Action No. _____

## COMPLAINT

Plaintiffs Britney Denton, Nyabi Stevens, Deidrick Dansby, Fayerachel Peterson, Alexander Harris, and John Doe [1] (collectively "Plaintiffs," and each a "Plaintiff"), by and through the undersigned counsel, bring this civil action based upon personal knowledge of Plaintiffs and based upon the investigation of counsel, allege and state the following claims against Defendants The Board of Governors for the State University System of Florida, Marshall M. Criser III, and the State of Florida (collectively "Defendants," and each a "Defendant"):

## SUMMARY OF THE CASE

1.   Plaintiffs, on behalf of themselves and members of the Class defined herein, as current students of Florida Agricultural and Mechanical University ("FAMU" or "Florida A&M"), bring this civil action seeking equitable relief to require the State of Florida ("Florida" or the "State")

---

[1] John Doe will file a motion to proceed under pseudonym, setting forth the legal and factual authority for protecting his identity.

to honor its obligations to its historically black colleges and universities (HBCUs), including FAMU, as required by an agreement between Florida and the United States Department of Education Office of Civil Rights (the "Partnership Agreement"),[2] Title VI of the Civil Rights Act of 1964 ("Title VI"), the Equal Protection Clause of the Fourteenth Amendment, *United States v. Fordice*, 505 U.S. 717 (1992), and all other applicable federal and state law.

2.      Throughout its history and up to the present day, Florida has purposefully engaged in a pattern and practice of racial discrimination, principally through disparate funding, that has prevented HBCUs, including FAMU, from achieving parity with their traditionally White institution ("TWI") counterparts.

3.      In 1998, Florida and the U.S. Department of Education, Office of Civil Rights ("OCR"), entered into a five-year Partnership Agreement to increase access for minority students at all levels of education, including requiring Florida to disestablish its segregated system of higher education.  Specifically, OCR had found that Florida was deficient in access, retention/graduation, and financing for and of minority students.

4.      OCR determined that Florida faced access issues for minority students due to: (1) K-12 preparation of minority students, (2) admission standards, (3) recruitment and out-reach, (4) matriculation, (5) mission, (6) scope, level, and nature of educational programs available at predominately minority institutions, (7) access to graduate programs, and (8) access to legal education.

5.      OCR further determined that Florida faced minority student retention and graduation issues due to: (1) insufficient and ineffective student support services, (2) lack of diversity in policy boards, faculty, and staff, (3) clustering of racial minority students, and (4) campus atmosphere.

6.      In 2003, Defendants issued a report claiming that they had met all of their

---

[2] The Partnership Agreement with the United States Office for Civil Rights signed in 1998 by Governor Lawton Chiles to, *inter alia*, strengthen and improve academic programs and facilities for FAMU students.

obligations under the Partnership Agreement. In reality, Defendants have failed to meet their obligations under the Partnership Agreement and their constitutional obligations under the Equal Protection Clause, Title VI, and other applicable law. Plaintiffs bring this action seeking to enjoin Defendants from continuing their pattern and practice of discrimination against FAMU.  Plaintiffs seek to make FAMU whole and for FAMU to achieve complete parity with Florida's TWIs within the next five years. Unless this Court grants Plaintiffs' requested relief, Plaintiffs will continue to suffer discrimination in Florida's system of higher education.

## JURISDICTION

7.        Pursuant to 28 U.S.C. § 1331, 1343 (a)(3) and 1367(a), Plaintiffs seek declaratory and injunctive relief for deprivations under color of state law of their federal civil rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Equal Protection Clause of the Fourteenth Amendment.

## VENUE

8.        Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because all of the events giving rise to Plaintiffs' claims occurred in the State of Florida.

## PARTIES

*Plaintiffs*

9.        Plaintiffs bring this suit to challenge the inequitable funding of FAMU.

10.        Plaintiffs are impacted by Defendants' discrimination with respect to higher education in Florida and wish to enforce their rights under Title VI, the Equal Protection Clause of the Fourteenth Amendment, and all other applicable laws.

11.        Plaintiff Britney Denton ("Denton") is a student at FAMU. She is a first year Doctor of Pharmacy candidate.

12.        Plaintiff Nyabi Stevens ("Stevens") is a student at FAMU. She is a junior majoring

3

in Psychology, with a minor in African American Studies.

13.     Plaintiff Deidrick Dansby ("Dansby") is a student at FAMU. He is a junior majoring in Math Education.

14.     Plaintiff FayeRachel Peterson ("Peterson") is a student at FAMU. She is a first year graduate student seeking a Masters of Science degree in Chemistry.

15.     Plaintiff Alexander Harris ("Harris") is a student at FAMU. He is a junior majoring in Engineering.

16.     Plaintiff John Doe is a student at FAMU.  He is a junior majoring in Music Industry.

***Defendants***

17.     Defendant the State University System of Florida ("SUS") is an agency and instrumentality of, and created by, Defendant State of Florida, and oversees the State's public postsecondary institutions.

18.     As an agency and instrumentality of the State of Florida, the Board of Governors ("BOG") for SUS shall:

> [O]perate, regulate, control, and be fully responsible for the management of the whole university system. These responsibilities shall include, but not be limited to, defining the distinctive mission of each constituent university and its articulation with free public schools and community colleges, ensuring the well-planned coordination and operation of the system, and avoiding wasteful duplication of facilities or programs.

Fla. Const. art. IX, § 7

19.     Defendant, the State of Florida receives federal funding for its higher education system including student financial aid and research grants. Plaintiffs and the proposed Class, as current students of FAMU, are the intended recipients of this federal funding.

20.     Defendant Marshall M. Criser III ("Criser") is sued in his official capacity; is the Chancellor of the SUS; is the final policymaking authority for Florida's university systems; and is

4

responsible for the adoption and authorization of all policies and regulations for said university systems, and provides oversight of FAMU.

## RELEVANT FACTS ON BEHALF OF ALL PLAINTIFFS AND ALL OTHER SIMILARLY-SITUATED STUDENTS

21.     Throughout its history, Florida has systematically engaged in policies and practices that established and perpetuated, and continue to perpetuate, a racially segregated system of higher education.

22.     Florida first instituted its system of public higher education in 1851 by establishing the Florida State University ("FSU").  FSU originally was a White-only institution.

23.     The State of Florida had to provide educational opportunities for Black students to qualify for federal land-grant funds. Therefore, in 1887, FAMU opened as the State Normal College for Colored Students. Its name was changed in 1891 to the State Normal and Industrial College for Colored Students in concert with the Second Morrill Act. In 1909, the name of the college was changed to Florida Agricultural and Mechanical College for Negroes, and in 1953 the name was finally changed to FAMU.

24.     In 1954, the United States Supreme Court issued its decision in *Brown v. Board of Education Of Topeka*, 347 U.S. 483 (1954), holding that segregated school systems violate the Equal Protection Clause of the Fourteenth Amendment. At the time of the decision, Florida operated a segregated, dual-higher education system. A marginal number of Black students were admitted to TWIs prior to the *Brown* decision. They were only eligible for admission if the degree courses sought were not offered at one of the State's HBCUs.

25.     Following *Brown*, Florida did nothing more than lift the rule excluding Black students from admission to TWIs.

26.     Ten years after the *Brown* decision, the United States Congress passed and

enacted into law the Civil Rights Act of 1964, which included Title VI, 42 U.S.C. § 2000d, which prohibited discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance. As a result of the passage of this act, the State of Florida ended segregation in its public accommodations. Black students were thus able to utilize libraries, restaurants, and housing previously unavailable to them because of their skin color. Black enrollment in TWIs, however, remained minimal.

27.       In 1970, OCR notified the State of Florida that it was operating a racially segregated system of higher education in violation of Title VI and applicable federal law. OCR unsuccessfully sought an effective plan for dismantling this dual system and eliminating the vestiges of segregation in Florida higher education over the next few decades.

28.       In 1978, OCR accepted Florida's Plan for Equal Access and Equal Opportunity in Public Higher Education (the "Plan"). Pursuant to the Plan, Florida agreed to take specific steps to disestablish its dual system of higher education, including, *inter alia*, to further the enhancement of FAMU. In that vein, Florida agreed to allocate equitable budget resources to FAMU, construct and renovate physical facilities at FAMU, and strengthen curricular offerings at FAMU. Florida also agreed to periodically reassess the comparability of resources between FAMU and Florida's TWIs with similar missions and to continue the enhancement of FAMU.

29.       To ensure enhancement of FAMU's program offerings, Florida provided three types of actions: 1) resolution of unnecessary program duplication between FAMU and geographically proximate TWIs by such methods as program elimination/realignment and cooperative/joint programs; 2) strengthening of existing programs at FAMU; and 3) implementation of new academic programs at FAMU.

21.       In 1992, consistent with *Brown*, and enforcing Title VI, the United States Supreme Court decided *U.S. vs. Fordice*, 505 U.S. 717 (1992), which held that the State of Mississippi was in

violation of the Equal Protection Clause of the Fourteenth Amendment due to its failure to disestablish its segregated system of higher education. *Fordice* highlighted the actions States must take in order to dismantle the de jure segregation of education systems.

22.      Under *Fordice*, the State of Florida has a constitutional duty to dismantle former systems of de jure segregation in higher education.

23.      Under *Fordice*, the unnecessary duplication of academic programs at historically black institutions and non-historically black institutions of higher learning "was part and parcel of the prior dual system of higher education—the whole notion of 'separate but equal' required duplicative programs in two sets of schools—and . . . present unnecessary duplication is a continuation of that practice." *Fordice*, 505 at 738.

24.      As a result of the *Brown* decision, the *Fordice* decision, enactment of Title VI, and the Equal Protection Clause of the Fourteen Amendment of the United States Constitution, Defendants have a constitutional duty to protect Plaintiffs, and similarly situated class members, from the policies and conditions indicative of the former dual system of segregation in higher education.

25.      In 1994, OCR issued a Notice of Application of Supreme Court Decision in 59 Fed. Reg. 4271 (January 31, 1994), applying the *Fordice* standards to all pending evaluations of previously segregated systems of higher education to assess whether de jure segregation persisted. The OCR Notice purported to "strictly scrutinize . . . any . . . actions that might impose undue burdens on [B]lack students, faculty, or administrators or diminish the unique roles of those institutions."

26.      In short, the terms of the Partnership Agreement were meant to bring Florida into compliance with applicable federal law, including Title VI and the Equal Protection Clause of the Fourteenth Amendment.  The Partnership Agreement also was aimed at finally rectifying the decades-long struggles over segregation and racial discrimination in Florida's public systems of higher education.

## FLORIDA'S BREACH OF ITS CONSTITUTIONAL
## OBLIGATIONS TO FAMU

*The Partnership Agreement*

27.     Defendants made numerous commitments in the Partnership Agreement. Among other things, those commitments included to "ensure that the scope, level, and nature of educational programs at predominantly minority institutions [had] grown; that unnecessary programmatic duplication [had] not resulted in a negative effect on the course offerings of minority institutions; and that the graduate offerings within [the state of Florida] have a growing diverse student population."

28.     Defendant SUS committed to:

(a) monitor access and enrollment issues for minority students and, as necessary, enhance its outreach to increase enrollment of African-American and Hispanic students in order to reduce disparities when compared to the enrollment of majority white students;

(b) participate in the Federal TRIO programs; continue to use alternative admission criteria as a means of broadening the opportunities of students, including minorities, to attend SUS universities;

(c) seek funding levels for its financial aid programs consistent with past levels of commitment; continue or augment the system wide funding to supplement existing university-funded retention services and to monitor academic progress;

(d) enhance efforts to regularly assess each campus' atmosphere by sampling student opinions on campus life;

(e) ensure that minorities are not adversely impacted by dwindling resources which may limit full time enrollment ("FTE") and the creation or expansion of programs;

(f) provide access for minority graduate students;

(g) regularly report to the BOG and the Chancellor regarding the diversity of faculty and staff within the SUS;

(h) provide opportunities designed to increase the promotional and advancement potential of minority and other employees within the SUS;

(i) conduct a 'Glass Ceiling' survey at the universities to determine if there are barriers to advancement to executive level positions for racial minorities;

(j) request appropriate funding for projects on a schedule consistent with the SUS's established process;

(k) work with the Community Colleges to evaluate the transfer rates of African-Americans holding Associate of Arts or Associate of Science degrees in the SUS, and address any variance between these transfer rates which could be attributed to lack of access for minority students;

(l)  ensure that proposed limited access programs are subject to scrutiny to ensure that there is no inappropriate adverse impact on minority students; and

(m)    continue the review by university personnel, including equal opportunity or diversity specialists, of academic program requests.

29.    Regarding FAMU, Defendant SUS agreed to:

(a) complete construction of the FAMU Architecture Building and of the FAMU Allied Health (Ware Rhaney) building;

(b) complete the capital construction projects for the following academic departments at FAMU: Pharmacy, Journalism, Business, and Engineering;

(c) ensure that the Governor will give priority consideration to these funding requests when forwarded by SUS;

(d) request funding to augment FAMU's programs and activities in agricultural

teaching, research, and extension;

(e) request funding appropriate to enhance the core functions of the College of Arts and Sciences at FAMU, in programs including math, English, political science, and performing arts;

(f) request appropriate funding to provide faculty development resources to enable faculty in FAMU's School of Architecture to enhance their research activity, to attend national conferences and present papers, and to pursue other professional development opportunities;

(g) request appropriate funding for outreach scholarships and financial aid in the School of Architecture;

(h) develop and implement undergraduate and graduate academic programs to further strengthen and broaden the academic programing available to FAMU's students, as well as to attract a more racially diverse student population; and,

(i) request appropriate funding to change the appointments of faculty at FAMU's School of Pharmacy to twelve months.

*Defendants' Failures in Honoring the Partnership Agreement*

30.     In 2003, Florida submitted a report to OCR claiming that it had fully complied with the Partnership Agreement. This report purported to list the State's accomplishments under the Partnership Agreement; however, Defendants are not in compliance.

A.   Defendants' Failures With Respect to Program Duplication

31.     In accordance with Florida's obligations under *Fordice* and the Partnership Agreement, Defendants have an obligation to remedy all policies and practices within the State's higher education system that are traceable to the prior segregated system. This obligation specifically includes the unnecessary duplication of FAMU's academic programs at TWIs that are geographically

10

proximate to FAMU.

32.     The *Fordice* decision defined unnecessary program duplication as "[t]hose instances where two or more institutions offer the same nonessential or non-core program.  Under this definition, all duplication at the bachelor's level of non-basic liberal arts and sciences course work and all duplication at the master's level and above are considered to be unnecessary." 505 U.S. at 738. The Court reasoned that program duplication was undeniably "part and parcel of the prior dual system of higher education—the whole notion of 'separate but equal' required duplicative programs in two sets of schools—and that the present unnecessary duplication is a continuation of that practice." *Id.*

33.     Unnecessary academic program duplication is harmful, socially and economically. It harms the citizenry of the State of Florida, FAMU, its students, including Plaintiffs and the proposed Class, and the public at large because the duplication: wastes and dilutes limited State resources when programs already exist to meet the demand and thereby reduces the economic efficiencies of the higher education system, undermines the State's diversity and desegregation efforts, perpetuates segregation, impairs FAMU's enhancement efforts, impairs FAMU's enrollment growth, and discourages cooperation among institutions.

34.     Unnecessary academic program duplication is harmful because the greater the duplication the less likely it is that quality programs can be adequately supported since resources are spread out over more programs.

35.     Between 1982 to the present, Defendants duplicated FAMU's unique programs at TWIs in the State of Florida without sound educational justification for such duplication, including approving a joint program in Engineering at FSU (the "Joint College").

36.     Students in the Joint College are enrolled at either FAMU or FSU but, after completing certain undergraduate pre-requisite courses at their home institution, go on to attend Engineering degree specific courses at a shared building. However, upon information and belief, since

the Joint College was established there has been a declining population of FAMU students and an increasing population of FSU students in the Joint College.

37.     Moreover, in 2015, the nearly $13 million budget for the Joint College was removed from FAMU's general operating revenue in the State budget and moved to a sovereign line, the oversight of which is now under FSU's authority. This stripped FAMU of the Joint College's budget that it held since 1987.

38.     Defendant SUS is aware of the negative impact unnecessary program duplication has on FAMU. This is evidenced by the fact that in 2015 SUS retained the services of an independent non-Florida educational consultant, Collaborative Braintrust, to conduct an academic feasibility study of the Joint College.

39.     Among other things, the feasibility study determined that because of financial resources, FSU exerts greater influence over the scholarly pursuits of the Joint College.

40.     The Joint College serves as an example of how FAMU is forced to operate in a different role than geographically proximate TWIs—a role where HBCUs like FAMU are stripped and robbed of resources and programs for the eventual benefit of TWIs.

41.     Upon information and belief, Defendants have instituted other programs at TWIs that duplicate unique programs at FAMU, without sound educational justification for such duplication, which further perpetuates Florida's dual system of higher education.

42.     Despite OCR's *Fordice* review standard requiring strict scrutiny of any actions that might impose undue burdens on HBCUs like FAMU, including program expansion, Florida colleges and universities face a limited review for proposed new academic programs and contradict the mandates of both *Fordice* and the Partnership Agreement to avoid unnecessary program duplication.

B. Defendants' Failures With Respect to Capital Enhancements

43.     Defendants also have an obligation under the Partnership Agreement to enhance the facilities of FAMU until there is parity with TWIs.

44.     Under the Partnership Agreement, among other things, Florida committed to provide "additional resources [ ] to FAMU [to] enhance attractiveness to all students by enabling it to offer a broader stronger array of programs or activities."

45.     This commitment in the Partnership Agreement was undertaken by Florida in part to address a pre-*Fordice* decision by Defendants to restructure and "downsize" the College of Agriculture at FAMU, and to give the University of Florida ("UF") primary control over many of the research, education, and extension services in the State "resulting in a larger share of state and Federal agricultural and land grant monies going to UF, with FAMU historically receiving little or no monies to further develop or enhance its [ ] programs."

46.     Despite the promise of funding parity with TWIs, which would require significant increases in FAMU's funding, the total funding of Florida's HBCUs, including FAMU, was not affected in any way by the Partnership Agreement.

47.     Upon information and belief, the time from proposed funding to final funding for capital improvement projects at FAMU is significantly longer than that at Florida's TWIs.

48.     Moreover, the number of major building projects authorized at FAMU has been constrained.

49.     For instance, in 2020, FAMU, which had approximately 9,400 students and $111 million in facilities debt, had to plead for $33,000 in funding from the student government to reopen its 60,000-square-foot recreation center in February 2021.

50.     Upon information and belief, Florida has continually failed to provide the appropriate contracts, contractors, supplies, and appropriations for timely completion of projects at

FAMU.

51.     Upon information and belief, FAMU has an on-campus housing shortage depriving hundreds of FAMU students of on-campus University-provided housing.

52.     In or around August 2022, FAMU had to temporarily close its Palmetto Phase III student dormitory due to building problems, including significant pest issues and flood damage.  This dormitory closure forced hundreds of FAMU students to relocate to temporary housing mere weeks after returning to FAMU for the start of the new school year. Upon information and belief, other FAMU dormitory residences have been temporarily closed due to building issues.

53.     Also in or around August 2022, FAMU's football team released an open letter to FAMU President Dr. Larry Robinson expressing frustration with the University's lack of leadership and support of the FAMU football program. These students raised issues with, among other things, summer school housing availability, financial aid, and access to academic resources.

C. Further Examples of Defendants' Underfunding of FAMU

54.     In 2014, Defendant SUS implemented a Performance Based Funding Model for universities and colleges in the State of Florida, awarding both State investment and institutional investment funds for a total performance-based funding allocation.

55.     Whereas institutional funds are the cumulative recurring State appropriations that the Florida legislature has appropriated to any Florida public university, State investment funds are awarded based upon certain metrics Defendant SUS adopted to measure each public higher education institution's success.

56.     Some of the metrics that all eleven Florida public universities are rated on include their four-year graduation rate, percentage of bachelor's degrees awarded without excess hours, and the median wages of graduates employed full time one year after graduation.

57.     Defendant SUS's metric system unfairly compares schools that serve student

populations of different socioeconomic backgrounds.

58.     FAMU is far more dependent on State funding than its TWI counterparts.

59.     FAMU's $110 million in State appropriations in 2019 amounted to $11,450 per student, compared to the $785 million received by UF, which amounted to $14,984 per student.

60.     In 2018, FAMU was one of three institutions in the State University System of Florida that was allocated a total of $0 in State investment funds from Defendants based on Florida's performance-based funding metrics.

61.     Based on its 2018 Performance-Based Funding Score of 72, FAMU received a Total Performance Based Funding Allocation of $14,765,439 for the 2018-2019 school year. By comparison, UF, with its score of 93, received $110,634,475.

62.     Based on its 2019 Performance-Based Funding Score of 70, FAMU received a Total Performance Based Funding Allocation of $29,056,843 for the 2019-2020 school year. By comparison, UF, with its score of 95, received $ $99,916,894.

63.     Based on its 2020 Performance-Based Funding Score of 73, FAMU received a Total Performance Based Funding Allocation of $28,153,897 for the 2020-2021 school year. By comparison, UF, with its score of 90, received $100,799,366.

64.     Based on its 2021 Performance-Based Funding Score of 79, FAMU received a Total Performance Based Funding Allocation of $26,735,556 for the 2021-2022 school year. By comparison, UF, with its score of 87, received $106,064,786.

D. Defendants' Failures With Respect to Student Retention & Graduation

65.     FAMU is the largest single-campus HBCU in the country and produces more African American baccalaureate graduates than any other four year public university.

66.     The Partnership Agreement required Defendants to work to strengthen retention and graduation rates of Black students.

67.     Although the overall percentage of Black students graduating from Florida public colleges and universities is increasing, the gap between graduation rates for White students and Black students is widening.

68.     In 2018, the full-time, first time in college four year graduation rate (FTIC) at FAMU was reported to be 21.6%, a SUS-worst. By comparison, UF had a FTIC rate of 67.3%.

69.     FAMU's four-year graduation rates for 2019 and 2020 were 22.5% and 27.7%, respectively. By comparison, UF's FTIC rates for 2019 and 2020 were 70.9% and 74.7%, respectively.

E. Defendants' Failures With Respect to Campus Programs & Activities

70.     The Partnership Agreement required Defendants to "continue[] effort[s] on the part of Florida to provide racial minorities the opportunity (consistent with the rights of non-minorities) to participate in the benefits of higher education in Florida and to assist in providing the opportunity for access, retention, matriculation, and graduation for minority students in the State."

71.     Upon information and belief, Defendants have failed to enhance FAMU to make it as attractive and welcoming as geographically-proximate Florida TWIs.

72.     Defendants, in their Final Committee Report to OCR, claim to have met this Partnership Agreement commitment.

73.     Upon information and belief, physical improvements and capital projects at HBCUs, like FAMU, take an average of ten years longer to complete than at TWIs. This is demonstrative of Defendants' lack of good faith towards these improvements.

74.     Declining White enrollment at HBCUs is further evidence of Defendants' failure to make those campuses attractive and welcoming to students of all races.

F. Defendants' Failures With Respect to Faculty & Staff Diversity

75.     The Partnership Agreement required Florida to continue its efforts to attract, recruit, and retain racially diverse faculty and staff.

16

76.     As part of this commitment, Florida was required to "review university personnel, including equal opportunity and diversity specialists," and conduct program reviews to "include analyses [ ] of any possible negative impact upon racial minorities, and programs at FAMU."

77.     Defendants' failure to expeditiously complete capital projects already begun at FAMU as of 2000 has limited the ability of FAMU to effectively compete with TWIs.

78.     Upon information and belief, Florida's TWIs are able to recruit and retain diverse faculty and staff at a more competitive level than FAMU because of the attractiveness of their atmosphere and appearance.

## CLASS ACTION ALLEGATIONS

79.     Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of "all current students at FAMU at any time during the 2021/2022 school year through the date of class certification" (the "Class").

80.     Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveals that the Class should be expanded or otherwise modified.  Plaintiffs also reserve the right to establish sub-classes as appropriate.

### Requirements of Rule 23(a)

81.     This action is brought and properly maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and satisfies the requirements thereof. As used herein, the term "Class Members" shall mean and refer to the members of the Class.

82.     Numerosity: There are nearly 10,000 students currently enrolled at FAMU, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual Class Members are ascertainable through records maintained by Defendants.

83.     Typicality:  Plaintiffs' claims are typical of the claims of each Class Member in that all Plaintiffs, like all Class Members, are and were injured through Defendants' failures to address de jure policies that maintain a dual, segregated system of higher education within the State of Florida.  The claims of Plaintiffs and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of long-term failure to provide equal educational opportunity in Florida's higher education system. The acts and omissions of Defendants to which Plaintiffs and the Class have been subjected apply universally to all members of the Class and are not unique to any Plaintiff or Class Member.

84.     Adequacy: Plaintiffs are adequate representatives of the proposed Class. Plaintiffs' interests are coextensive with those of the members of the proposed Class that they seek to represent in this case. Plaintiffs are willing and able to represent the proposed Class fairly and vigorously. Plaintiffs have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate a class action of this size and complexity. The combined interests, experience, and resources of Plaintiffs and their counsel to litigate the claims at issue in this case competently satisfy the adequacy of representation requirement of Rule 23(a)(4).

85.     Commonality: There are numerous questions of law and fact common to the Class, including:

> (a) Whether Defendants have engaged in a pattern and practice of intentional discrimination in violation of Title VI of the Civil Rights Act of 1964 by maintaining a segregated system of higher education;
>
> (b) Whether Defendants have failed in their duty to bring FAMU into parity with Florida's TWIs, specifically by intentionally failing to provide increased funding to FAMU, by failing to make improvements in FAMU's facilities, and by perpetuating unnecessary duplication of FAMU's unique programming at geographically-

18

proximate Florida TWIs, which failures have caused FAMU to remain a segregated entity of higher learning;

(c) Whether Defendants' failure to provide parity funding to FAMU as provided to Florida's TWIs, failure to make improvements in FAMU's facilities, and duplication of programs preexisting at FAMU at TWIs disparately impacted FAMU and its students, including Plaintiffs and the Class, in a discriminatory and unfair manner because such actions impacted enrollment at FAMU;

(d) Whether Defendants have engaged in a pattern and practice of intentional discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment;

(e) Whether Defendants have continued to operate a segregated system of higher education and continue to take actions to perpetuate that segregated system in violation of the Equal Protection Clause;

(f) Whether Defendants have failed in their duty to bring FAMU into parity with Florida's TWIs by failing to provide increased funding to FAMU;

(g) Whether Defendants have allowed Florida's TWIs to duplicate unique programs at FAMU without sound educational justification for such duplication;

(h) Whether Plaintiffs, and the Class, have been harmed as a direct and proximate result of the Defendants' violation of the Equal Protection Clause and Title VI; and

(i) The scope of the injunctive relief to which the Plaintiffs and members of the Class are entitled.

**Requirements of Rule 23(b)(2)**

86.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the proposed Class such that final injunctive relief is appropriate with respect to the Class as a

whole. Such injunctive relief includes, but is not limited to, the implementation of systemic changes to prevent the perpetuation of a segregated system of higher education in violation of Title VI and the Equal Protection Clause. Defendants' common pattern of discrimination and refusal to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief for the Class as a whole.

**COUNT I**
**Violation of Title VI, 42 U.S.C. § 2000d, _et seq._**
(Intentional and/or Disparate Impact)
Against All Defendants

87.     Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

88.     All of the Plaintiffs are African American.

89.     Title VI states, in relevant part, that "[N]o person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §§ 2000d, _et seq._

90.     Defendants received and continue to receive federal funding to support Florida's higher education system.

91.     Many of the programs at the Defendants' institutions of higher learning participate in a variety of federally funded programs, ranging from research to student loans.  As a result of such participation in federally funded programs, Defendants and Florida's colleges and universities are governed by the mandate of Title VI.

92.     Federal funds to Defendant State of Florida are generally provided to colleges and universities in Florida through direct support to colleges and universities, generally for research or facilities at the educational institution, and through grants and loans made to students enrolled in

postsecondary institutions, among other ways. Moreover, Defendants receive funds from the United States Department of Education.

93.     Plaintiffs and members of the proposed Class are the intended beneficiaries of the federal funds provided to Defendants.

94.     Defendants have engaged in a pattern and practice of intentional discrimination with respect to FAMU in violation of Title VI of the Civil Rights Act of 1964. Defendants have intentionally discriminated by maintaining a segregated system of higher education at FAMU by Defendants' actions as described herein, including by Defendants' discriminatory funding practices and underfunding of FAMU, failing to make improvements in FAMU's facilities, and by creating programs at Florida's TWIs that duplicate unique programs at FAMU without sound educational justification for such duplication.

95.     Defendants have engaged in a pattern and practice of a long term failure to perform their duty to enforce state and federal laws for the provision of equal educational opportunity at FAMU.

96.     Defendants have continued to discriminate on the basis of race, including through discriminatory funding practices and underfunding of FAMU, failing to make improvements in FAMU's facilities, and by unnecessary program duplication, which actions perpetuate Florida's segregated system of higher education in violation of Title VI of the Civil Rights Act.

97.     Defendants have failed in their duty to bring FAMU into parity with Florida's TWIs by, among other things, intentionally failing to provide increased funding to FAMU, failing to make improvements in FAMU's facilities, and by perpetuating unnecessary duplication of FAMU's programming at geographically proximate Florida TWIs, which failures have caused FAMU to remain a segregated entity of higher learning.

98.     Federal funds were used by Defendants to carry out these discriminatory practices.

99.     Alternatively, in lieu of intentional discrimination, Plaintiffs allege that Defendants' discriminatory actions, including Defendants' failure to provide increased funding to FAMU, failure to make improvements in FAMU's facilities, and unnecessary duplication of programs preexisting at FAMU at Florida's TWIs, disparately impacted FAMU, and its students, including Plaintiffs and the proposed Class, in a discriminatory and unfair manner because such actions impacted enrollment at FAMU.

100.    Defendants' actions are a direct result of Defendants' failure to address de jure era policies that discriminate on the basis of race in higher education.  Such actions therefore are part of and serve to perpetuate the prior segregated system of higher education within the State of Florida.

101.    As a direct and proximate result of Defendants' utilization of federal funds in a racially discriminatory manner, which results in maintaining a de jure system of segregation in Florida's higher education system, Plaintiffs and the Class, as students of FAMU, have been and continue to be denied equal educational opportunities and are subjected to discrimination in a segregated educational environment in violation of Title VI, all because of their race.

**COUNT II – 42 U.S.C. § 1983**
**Violation of the Equal Protection Clause**
**Pursuant to the Fourteenth Amendment of the United States Constitution**
Against All Defendants

102.    Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

103.    The Equal Protection Clause of the Fourteenth Amendment provides as follows:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside.  No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

104.     All of the Plaintiffs are born or naturalized citizens of the United States and enjoy the constitutional protections of the Equal Protection Clause of the Fourteenth Amendment.

105.     Pursuant to *Fordice*:

> If the State perpetuates policies and practices traceable to its prior de jure dual system that continues to have segregative effects – whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system – and such policies are without sound educational justification and can be practicably eliminated, the policies violate the Clause, even though the State has abolished the legal requirement that the races be educated separately and has established racially neutral policies not animated by a discriminatory purpose.

106.     Defendants have engaged in a pattern and practice of intentional discrimination with respect to FAMU in violation of the Equal Protection Clause of the Fourteenth Amendment and under *Fordice*.

107.     Defendants have continued to operate a segregated system of higher education in Florida and continue to take actions to perpetuate that segregated system in violation of the Equal Protection Clause and *Fordice*.

108.     Defendants have failed in their duty to bring FAMU into parity with Florida's TWIs by failing to provide increased funding to FAMU in violation of the Equal Protection Clause and *Fordice*.

109.     Defendants have failed to make improvements in FAMU's facilities.

110.     Defendants have also allowed Florida's TWIs to unnecessarily duplicate programs at FAMU in violation of the Equal Protection Clause and *Fordice*.

111.     Specifically, Defendants have unnecessarily duplicated programs already in existence at FAMU by approving the Joint College, a joint program in Engineering with FSU, in violation of the Equal Protection Clause and *Fordice*.

112.     Upon information and belief, Defendants have permitted the implementation of

other programs at Florida's TWIs that duplicate preexisting programs at FAMU, without sound educational justification to so duplicate, also in violation of the Equal Protection Clause and *Fordice*.

113.    Defendants' policies of failing to provide increased funding to FAMU, failing to make improvements in FAMU's facilities, and of allowing Florida's TWIs to unnecessarily duplicate programs at FAMU, without sound educational justification to so duplicate, perpetuates a segregated system of higher education in Florida in violation of the Equal Protection Clause of the Fourteenth Amendment and *Fordice*.

114.    Defendants have thus violated the equal protection rights of Plaintiffs and the Class as a result of an officially promulgated policy involving the financing of higher education in the State of Florida, and Defendants acted with intent or with deliberate indifference to the rights of Plaintiffs and the Class.

115.    As a direct and proximate result of Defendants' violation of the Equal Protection Clause, Plaintiffs and the Class, as students of FAMU, were denied and continue to be denied equal educational opportunities and are subjected to discrimination in a segregated educational environment, in violation of the Fourteenth Amendment to the United States Constitution, all because of their race.

116.    Plaintiffs and all Class members similarly situated will suffer irreparable harm in the absence of preliminary relief.

117.    The balance of equities tips in the favor of Plaintiffs and the Class, and an injunction is in the public's best interest.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray the Court award the following relief:

A.  Certify the proposed Class pursuant to the Federal Rules of Civil Procedure Rule 23(a) and (b)(2);

B.  Designate Plaintiffs as representatives of the proposed Class and Plaintiffs' counsel as Class counsel;

C.  Declare that Defendants' conduct violates Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment;

D.  Preliminarily and permanently enjoin Defendants and all of their agents, representatives, and officers from continuing the abuses described herein, including acting in a manner inconsistent with the U.S. Constitution, the Florida Constitution, the Partnership Agreement, and the State of Florida's equal education opportunity obligations under state and federal law, including Title VI, the Equal Protection Clause of the Fourteenth Amendment, and *Fordice*;

E.  Appoint a special referee or mediator in order to craft and recommend a remedy to the Court in order to correct the Title VI and the constitutional violations as alleged herein;

F.  Award Plaintiffs the costs of this action together with their reasonable attorneys' fees; and,

A.  Grant Plaintiffs such other and further relief as may be appropriate or necessary, including injunctive relief as necessary.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs, individually and on behalf of the proposed Class, respectfully request a trial by jury as to all matters so triable.

Respectfully submitted this 22nd day of September, 2022.

/s/ *Barbara Hart*
Jay W. Eisenhofer, Esq.
Barbara J. Hart, Esq.
Karin E. Fisch, Esq.
Braynard Brown, Esq.
Irene R. Lax, Esq.
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Fl.
New York, NY 10017
646-722-8500

Samuel Mukiibi, Esq.
**GRANT & EISENHOFER P.A.**
123 Justison Street, 7th Floor
Wilmington, DE 19801
Tel:  (302) 622-7119

Josh Dubin, Esq.
**JOSH DUBIN, P.A.**
201 S. Biscayne Blvd. Suite 1210
Miami, Florida 33131
FL Bar Number 48865

*Attorneys for Plaintiffs*