## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| BRITNEY DENTON, NYABI STEVENS, DEIDRICK DANSBY, FAYERACHEL PETERSON, ALEXANDER HARRIS, and JACARI HESTER,<br><br>    *Plaintiffs,*<br><br>  v.<br><br>THE BOARD OF GOVERNORS FOR THE STATE UNIVERSITY SYSTEM OF FLORIDA, RAYMOND RODRIGUES, in his official capacity as the Chancellor of the State University System of Florida, THE STATE BOARD OF EDUCATION OF THE STATE OF FLORIDA, MANNY DIAZ, JR., in his official capacity as the Commissioner of Education of the State of Florida, RON DESANTIS, in his official capacity as the Governor of the State of Florida, and THE STATE OF FLORIDA,<br><br>    *Defendants.* | **CLASS ACTION**<br><br>Jury Trial Demanded<br><br><br>No. 4:22-cv-00341-RH-MAF |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Britney Denton, Nyabi Stevens, Deidrick Dansby, Fayerachel Peterson, Alexander Harris, and Jacari Hester (collectively "Plaintiffs," and each a "Plaintiff"), by and through the undersigned counsel, bring this civil action based upon the personal knowledge of Plaintiffs and based upon the investigation of counsel, against Defendants The Board of Governors of the State University System

1

of Florida, Raymond Rodrigues, in his official capacity as the Chancellor of the State University System of Florida, The State Board of Education of the State of Florida, Manny Diaz, Jr., in his official capacity as the Commissioner of Education of the State of Florida, Governor Ron DeSantis, in his official capacity as the Governor of the State of Florida, and the State of Florida (collectively "Defendants," and each a "Defendant").  In support of Plaintiffs' First Amended Complaint (the "Amended Complaint"), Plaintiffs state as follows:

## SUMMARY OF THE CASE

1.     Plaintiffs, on behalf of themselves and members of the Class defined herein, as current students of Florida Agricultural and Mechanical University ("FAMU"), bring this civil action seeking equitable relief to require the State of Florida ("Florida" or the "State") and all other Defendants to take steps to remedy Defendants' unequal treatment of, including inadequate funding to, FAMU, the State's only public historically black college and university ("HBCU"), as required by Title VI of the Civil Rights Act of 1964 ("Title VI"), the Equal Protection Clause of the Fourteenth Amendment, *United States v. Fordice*, 505 U.S. 717 (1992), and all other applicable federal and state law.

2.     Throughout its history and up to the present, Florida has intentionally and consistently engaged in racial discrimination by maintaining a dual and unequal system of higher education, including by providing disparate funding and

2

duplicating non-core FAMU programs, that has and continues to perpetuate *de jure* segregation in Florida's higher education system and has prevented FAMU from achieving parity with Florida's public Traditionally White Institutions ("TWIs" and each a "TWI").

3.　　Florida instituted its system of public higher education in 1851 when it founded Florida State University ("FSU"), which was established as a White-only institution.

4.　　In 1887, Florida established FAMU, a segregated university originally named the State Normal College for Colored Students.

5.　　The State Normal College for Colored Students (now FAMU) went without federal funds until the passage of the Second Morrill Land-Grant Act in 1890, which conditioned the receipt of federal funds to states upon requiring those states to either integrate their public universities or divide funds in a "just" – but not necessarily equal – manner.[1]  To align with the Second Morrill Act, in 1891 the State Normal College for Colored Students was renamed the State Normal and Industrial

---

[1] The Morrill Land-Grant Act of 1862 (the "First Morrill Act"), which encouraged the extension of higher education to broad segments of the U.S. population, gave states, including Florida, public lands, on the condition that those lands be sold or used for profit and those profits used to establish a college that would teach agriculture and the mechanical arts. While the First Morrill Act did not explicitly exclude African Americans, the fact that the policy assigned states with the responsibility to implement it resulted in the widespread exclusion of Black citizens from its benefits.

College for Colored Students.  In 1909, the name of the college was changed to Florida Agricultural and Mechanical College for Negroes, and in 1953 the name was changed to FAMU.

6.     FAMU is one of only two land-grant universities in the State of Florida, the other being the University of Florida ("UF" or "University of Florida"), which was established under the First Morrill Act and is a TWI.

7.     The 1964 Civil Rights Act paved the way for integration of Florida's public schools.  By 1971, FAMU was an established university institution in Florida's public higher education system, and remains the only public HBCU in Florida.

8.     In 1970, the United States Office for Civil Rights (the "OCR") "determined that the State of Florida was operating a racially identifiable higher education system in violation of Title VI of the Civil Rights Act of 1964."  1998 Florida/United States Office For Civil Rights Partnership Report and Commitments, p. 5 (hereinafter the "1998 Partnership Report").[2]   In 1978, the OCR accepted Florida's  Plan  for  Equal  Opportunity  in  Public  Higher  Education  (the

---

[2] "Racial identifiability" is a concept used to describe the relationship between the racial composition of a particular school as compared with the racial composition of a system as a whole.  *See*, *e.g.*, *Penick v. Columbus Bd. of Ed.*, 429 F. Supp. 229, 268 (S.D. Ohio 1977). Thus, for example, where the population of Black students at a particular school exceeds the system-wide percentage of Black students, accounting for statistical variations, that school is racially identifiable.  *Id.*

"Desegregation Plan"), which placed primary emphasis on eliminating the vestiges of the prior official racial segregation policy in Florida's higher education institutions.

9.     The Desegregation Plan committed the State of Florida to an array of remedial measures that were directly related to desegregation, including, among other things, "disestablishment of the structure of the dual system and enhancement of the traditionally black institution [FAMU]."  1998 Partnership Agreement, p. 5. Specifically: "To ensure enhancement of FAMU's program offerings, the Florida plan [1978-1985] provided for three types of actions: 1) resolution of unnecessary program duplication by such methods as program elimination/realignment and cooperative/joint programs; 2) strengthening of existing programs at FAMU; and 3) implementation of new academic programs at FAMU."  *Id.*

10.     In 1992, the U.S. Supreme Court in *United States v. Fordice*, 505 U.S. 717 (1992) (hereinafter "*Fordice*"), ruled that Mississippi was in violation of the Equal Protection Clause of the Fourteenth Amendment due to its failure to disestablish its segregated system of higher education.  The Court held that under Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment to the U.S. Constitution, race neutral policies alone are not sufficient to determine that a state has effectively discharged its affirmative obligation to dismantle a prior official system of higher education racial segregation.  The Court noted that present day

5

program duplication, among other factors, perpetuates policies and practices traceable to the prior *de jure* segregated system, and thus results in segregative effects in the present day. *Fordice* also analyzed the complex responses states must take to dismantle segregated education systems.

11.   In 1994, the OCR issued a Notice of Application of Supreme Court Decision in the Federal Register, 59 Fed. Reg. 4271 (Jan. 31, 1994) (the "OCR Notice"), which applied *Fordice* standards to all pending Title VI evaluations of formerly *de jure* segregated systems of higher education that had adopted OCR-accepted desegregation plans that had since expired, which included the State of Florida.   The OCR Notice committed the OCR to review Florida's then expired Desegregation Plan and, in light of the new guidance articulated by *Fordice*, ensure that Florida was in fact in compliance with *Fordice* (which decision did not exist when Florida's original Desegregation Plan was established).   That review would require the OCR's examination of a wide range of factors (as outlined in *Fordice*), to ensure that vestiges of Florida's *de jure* system were in fact eliminated, and further committed the OCR to ensure that Florida had completed all of the steps and measures agreed upon in Florida's OCR-approved Desegregation Plan. The OCR Notice purported to "strictly scrutinize . . . any . . . actions that might impose undue burdens on [B]lack students, faculty, or administrators or diminish the unique roles of those institutions." *Id.* at 4272.

12.     That analysis was undertaken and articulated in a 1998 new partnership agreement between Florida and the OCR (the "1998 Partnership Agreement").  In the 1998 Partnership Agreement, Florida and the OCR determined that challenges remained in the State's provision of equal opportunity access to Florida's higher education system, particularly when viewed in light of what *Fordice* required.

13.     The 1998 Partnership Agreement therefore articulated a new five year plan to increase minority student enrollment at all levels of education and take further steps to desegregate Florida's system of higher education so that it would comply with *Fordice*'s mandates, among other things.

14.     The 1998 Partnership Agreement also noted issues with access, retention, graduation, and financing for and of minority students.  The OCR determined that Florida faced access issues for minority students due to: (1) K-12 preparation of minority students, (2) admission standards, (3) recruitment and out-reach, (4) matriculation, (5) mission, (6) scope, (7) level, and (8) access to legal education.  1998 Partnership, p. 89 (Appendix B).

15.     The 1998 Partnership Agreement further identified that Florida faced minority student retention and graduation issues due to: (1) insufficient and ineffective student support services, (2) lack of diversity in governing boards, faculty, and staff, (3) clustering of racial minority students, and (4) unwelcoming campus environments at TWIs.  *Id.*

16.     In light of the issues identified and to be explored pursuant to *Fordice*, the 1998 Partnership Agreement laid out various commitments to be undertaken by the State of Florida over the next five years to continue the State's efforts to dismantle vestiges of *de jure* segregation in the State's public higher education system.  However, the 1998 Partnership Agreement fell short of addressing Florida's obligations to comply with *Fordice*.  For example, while the commitments in the 1998 Partnership Agreement mentioned that if there were any concerns that arose in light of the *Fordice* decision they would be addressed, the 1998 Partnership Agreement lacked any substantive recommendations for expanding and strengthening academic programs at FAMU.

17.     In 2003, the State of Florida issued a report claiming that it had met all of its obligations under the 1998 Partnership Agreement.

18.     In reality, Defendants failed, and continue to fail, to dismantle the dual system and vestiges of *de jure* segregation in higher education in Florida as required by *Fordice*, and failed to meet their commitments to FAMU not only as outlined in the Partnership Agreement, but more pointedly, as required by the U.S. Constitution.

19.     Plaintiffs bring this action seeking to compel Defendants' compliance with *Fordice* and enjoin Defendants from continuing their pattern and practice of discrimination against FAMU—including their failure to dismantle the dual and unequal system of higher education to comply with *Fordice*, Title VI, and the

Fourteenth Amendment.   This discrimination includes failing to address the continuing absence of a meaningful number of non-core unique and unique/high demand programs at FAMU.   The State of Florida has not expanded FAMU's mission nor boosted its institutional identity by introducing new programs (especially high demand programs) that are not offered at geographically proximate FSU in particular.   Moreover, Defendants have eliminated few (if any) programs at TWIs (geographically proximate FSU in particular) that unnecessarily duplicate programs at FAMU, nor have they transferred high-demand programs from TWIs (especially geographically proximate FSU) to FAMU.

20.    The absence of a meaningful number of non-core unique programs and unique high demand programs at FAMU further perpetuates FAMU's status as a racially identifiable university and results in diminishment of the attractiveness of FAMU to non-Black students.   The 1998 Partnership Agreement itself expressly notes that the overall student body population at FAMU does not look "markedly different, in terms of its diversity, than it did in the late 1970s or 1980s."   1998 Partnership Agreement, p. 41.   Statistics reported by FAMU in the past several years also confirm that there have been negligible increases, if any increase at all, in the number of other-race, especially White, students attending FAMU each subsequent year.

9

21.    These facts are inconsistent with the mandates of *Fordice*, applicable federal and state law, and the 1998 Partnership Agreement which specifies the commitment that "the SUS and FAMU will continue to develop and implement undergraduate programs to further strengthen and broaden the academic programs available to FAMU's students, as well as attract a more racially diverse student population." 1998 Partnership Agreement, p. 83.

22.    Establishing a meaningful number of non-core unique and unique high demand programs at FAMU would advance a distinct identity for FAMU that would be anchored in its program offerings, especially at both the graduate and undergraduate level.  These programmatic initiatives would contribute to eliminating the longstanding vestiges of segregation in the State of Florida, notably including a dual and unequal system of higher education.

23.    Defendants also have and continue to intentionally underfund FAMU. Among other things, Defendants have adopted a Performance Based Funding Model to determine funding allocations to Florida's public universities, which model knowingly disadvantages underrepresented minority students (especially Black students) and students from lower socioeconomic backgrounds.   Among other things, Defendants also intentionally have decided to not match federal land-grant monies given to FAMU at 100 percent, despite and in stark contrast to Defendants'

100 percent match of the federal land grant monies provided to University of Florida, the State's only other land-grant institution and a TWI.

24.    Unless this Court grants Plaintiffs' requested relief, Plaintiffs will continue to suffer racial discrimination in Florida's system of higher education.

## JURISDICTION

25.    Pursuant to 28 U.S.C. § 1331, 1343 (a)(3) and 1367(a), Plaintiffs seek declaratory and injunctive relief for deprivations under color of state law of their federal civil rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Equal Protection Clause of the Fourteenth Amendment.

## VENUE

26.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because all of the events giving rise to Plaintiffs' claims occurred in the State of Florida.

## PARTIES

### *Plaintiffs*

27.    Plaintiffs are impacted by Defendants' discrimination with respect to higher education in Florida and wish to enforce their rights under Title VI, the Equal Protection Clause of the Fourteenth Amendment, and all other applicable laws.

28.    Plaintiff Britney Denton ("Denton") is a student at FAMU.  She is a first year Doctor of Pharmacy candidate.

11

29.     Plaintiff Nyabi Stevens ("Stevens") is a student at FAMU.  She is a junior majoring in Psychology, with a minor in African American Studies.

30.     Plaintiff Deidrick Dansby ("Dansby") is a student at FAMU.  He is a junior majoring in Math Education.

31.     Plaintiff FayeRachel Peterson ("Peterson") is a student at FAMU.  She is a first year graduate student seeking a Masters of Science degree in Chemistry.

32.     Plaintiff Alexander Harris ("Harris") is a student at FAMU.  He is a junior majoring in Engineering.

33.     Plaintiff Jacari Hester ("Hester") is a student at FAMU.  He is a senior majoring in Interdisciplinary Studies.

***Defendants***

34.     Defendant the Board of Governors of the State University System of Florida ("BOG or "Board of Governors") is an agency created by Defendant the State of Florida to govern the State's public universities.  Fla. Const. art. IX, § 7(b).

35.     As an agency and instrumentality of the State of Florida, the BOG shall:

> [O]perate, regulate, control, and be fully responsible for the management of the whole university system. These responsibilities shall include, but not be limited to, defining the distinctive mission of each constituent university and its articulation with free public schools and community colleges, ensuring the well-planned coordination and operation of the system, and avoiding wasteful duplication of facilities or programs.

Fla. Const. art. IX, § 7

36.    The BOG's constitutional duties further include:

(a)    Defining the distinctive mission of each constituent university.

(b)    Defining the articulation of each constituent university in conjunction with the Legislature's authority over the public schools and Florida College System institutions.

(c)    Ensuring the well-planned coordination and operation of the State University System.

(d)    Avoiding wasteful duplication of facilities or programs within the State University System.

(e)    Accounting for expenditure of funds appropriated by the Legislature for the State University System as provided by law.

(f)    Submitting a budget request for legislative appropriations for the institutions under the supervision of the board as provided by law.

(g)    Adopting strategic plans for the State University System and each constituent university.

(h)    Approving, reviewing, and terminating degree programs of the State University System.

(i)    Governing admissions to the state universities.

(j)    Serving as the public employer to all public employees of state universities for collective bargaining purposes.

(k)    Establishing a personnel system for all state university employees; … [and]

(l)    Complying with, and enforcing for institutions under the board's jurisdiction, all applicable local, state, and federal laws.

Fla. Stat. § 1001.705(2).

37.     The BOG is comprised of standing and ad hoc committees – such as the

Audit and Compliance Committee, Budget and Finance Committee, and Facilities

Committee – which consider matters that are encompassed within the subject matters

assigned to each committee and make recommendations to the Board.  *See* Operating

Procedures of the Board of Governors of the State University System of Florida art.

VI, § A.

38.     In addition to actions constitutionally authorized, the BOG may initiate

any of the following actions if it determines that a university is unable to comply

with any law or BOG rule, regulation, or audit recommendation:

(a)     Withhold the transfer of state funds, discretionary grant
funds, discretionary lottery funds, or any other funds
appropriated to the Board of Governors by the Legislature
for disbursement to the state university until the university
complies with the law or Board of Governors' rule or
regulation.

(b)     Declare the state university ineligible for competitive
grants disbursed by the Board of Governors.

(c)     Require monthly or periodic reporting on the situation
related to noncompliance until it is remedied.

(d)     Report to the Legislature that the state university is
unwilling or unable to comply with the law or Board of
Governors' rule or regulation and recommend action to be
taken by the Legislature.

*See* Fla. Stat. § 1008.322(5).

39.     Defendant Raymond Rodrigues ("Rodrigues" or "SUS Chancellor") is

sued in his official capacity as the Chancellor of and Chief Executive Officer for the

SUS.  The SUS Chancellor may investigate allegations of noncompliance with any law or BOG rule or regulation and determine probable cause, and shall report to the BOG any findings that a university is acting without statutory authority or contrary to general law.  *See* Fla. Stat. § 1008.322(3)(b).

40.    Defendant SUS Chancellor is also responsible for regular interaction with university presidents, the Florida legislature, and the Executive Office of the Governor on issues of critical importance to the SUS.  *See* Caden DeLisa, *Board of Governors Votes to Appoint Ray Rodrigues as University System Chancellor*, The Capitalist (Sep. 14, 2022), https://thecapitolist.com/board-of-governors-votes-to-appoint-ray-rodrigues-as-university-system-chancellor/.

41.    The SUS Chancellor's responsibilities further include assessing and approving the academic need and the need to build any joint-use facilities to house approved programs.  *See* Fla. Stat. § 1013.52.

42.    Defendant State Board of Education of the State of Florida ("State Board") is a body corporate, has supervision of the State's system of free public education, and appoints the commissioner of education, among other things.  Fla. Const. art. IX, § 2.

43.    Defendant State Board has the authority to implement the provisions of law conferring duties upon it for the improvement of the State system of public education, including to adopt comprehensive educational objectives, approve plans

for cooperation with other public agencies in the development of rules and enforcement of laws for which it and such agencies are responsible, and enforce systemwide education goals and policies.  Fla. Stat. §§ 1001.02-.03, 1003.41.

44.   Defendant State Board must submit to Defendant Governor and the Florida Legislature a coordinated education budget that estimates the expenditures for the BOG and the State Board, including the Department of Education, for the ensuing fiscal year.  Fla. Stat. § 1001.02(2)(e).

45.   Defendant State Board governs issues relating to the use of property, facilities, and personal services between the Department of Education and its direct-support organization.  Fla. Stat. § 1001.03(2).

46.   Though Florida College System institution boards of trustees are "primarily responsible for compliance with law," the State Board "shall oversee the performance of… Florida College System institution boards of trustees in enforcement of all laws and rules."  Fla. Stat. § 1008.32.

47.   Defendant Manny Diaz, Jr. ("Diaz" or "Commissioner of Education") is sued in his official capacity and is the Commissioner of Education of the State of Florida.  *See* Fla. Stat. § 1008.32(2).

48.   Defendant Commissioner of Education is responsible for:

> [A]ll planning functions for the department, including collection, analysis, and interpretation of all data, information, test results, evaluations, and other indicators that are used to formulate policy, identify areas of concern and need, and serve as the basis

for short-range and long-range planning.  Such planning shall include assembling data, conducting appropriate studies and surveys, and sponsoring research and development activities designed to provide information about educational needs and the effect of alternative educational practices.

Fla. Stat. § 1008.385.

49.    As the chief educational officer of the State of Florida, the Commissioner of Education may designate selected programs, courses, services, and activities found to have disproportionate enrollment of students of a particular race, among other things, for analysis to the Florida Department of Education, and may approve any plans or strategies to overcome underrepresentation and implement the Florida Educational Equity Act, Fla. Stat. § 1000.05(1)-(3) ("FEEA"); Fla. Admin. Code r. 6A-19.010.

50.    In order to overcome underrepresentation in Florida's public higher education system, the Commissioner of Education has the power to designate selected programs, courses, services, activities, and employment data for periodic review.  Fla. Admin. Code. Ann. r. 6A-19.010.

51.    The Commissioner of Education is a permanent member of Defendant BOG, and in that role he determines allocations of performance-based funding for public universities in the State of Florida.  Fla. Stat. § 1001,70(1).

52.    The Commissioner of Education's responsibilities also include assessing and approving, alongside Defendant Rodrigues, the academic need and the

need to build any joint-use facilities to house approved programs.  *See* Fla. Stat. §

1013.52.

53.     Defendant Governor Ron DeSantis ("DeSantis" or "Governor") is the

Governor and Chief Administrative Officer of the State of Florida, is responsible for

the planning and budgeting of the State, and is sued in his official capacity. Fla.

Const. art. IV, § 1. Fla. Stat. § 1013.60.

54.     Defendant DeSantis has ultimate authority over public education in the

State of Florida, including, but not limited to, veto power over the State Legislature

for legislative decisions related to Florida higher education, and the approval of the

receipt and expenditure of funds from federal sources by State agencies.  Fla. Stat. §

1013.74; Fla. Stat. § 216.212.

55.     Defendant DeSantis also has the authority to make changes to any

originally-approved operating budgets for operational and fixed capital expenditures

relating to the legislative branch, as well as the power to ensure that any balance of

appropriations made to the legislative branch are carried forward, as directed by the

presiding officers of the legislative branch.  Fla. Stat. § 216.1811.

56.     Defendant the State of Florida ("State" or "Florida") receives federal

funding for its higher education system, including, among other things, funds

utilized for student financial aid and research grants.

57.     All Defendants are recipients of federal financial assistance, including but not limited to, the direction, control, and disbursement of federal funds.

58.     Plaintiffs and the proposed Class, as current students of FAMU, are the intended beneficiaries of this federal funding.

## RELEVANT FACTS ON BEHALF OF ALL PLAINTIFFS AND ALL OTHER SIMILARLY-SITUATED STUDENTS

59.     In 1954, the United States Supreme Court issued its decision in *Brown v. Board of Education Of Topeka*, 347 U.S. 483 (1954), holding that segregated school systems violate the Equal Protection Clause of the Fourteenth Amendment. At the time of the decision, Florida operated a dual and unequal system of higher education. A marginal number of Black students were admitted to TWIs prior to the *Brown* decision. These students were only eligible for admission if the degree programs they wished to pursue were not offered at the State's lone public HBCU, FAMU.

60.     Following *Brown*, Florida did nothing more than lift the rule excluding Black students from admission to Florida's public and private TWIs.

61.     Ten years after the *Brown* decision, the United States Congress passed and enacted into law the Civil Rights Act of 1964, which included Title VI, 42 U.S.C. § 2000d, and prohibited discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance. As a result of the passage of this act, the State of Florida ended segregation in its public

accommodations. Black students were able to utilize libraries, restaurants, and housing previously unavailable to them because of their skin color. Black enrollment in TWIs, however, remained minimal.

62. Pursuant to Florida's Desegregation Plan accepted by the OCR in 1978, Florida agreed to take specific steps to disestablish its dual system of higher education, including, *inter alia*, to further the enhancement of FAMU. In that vein, Florida agreed to allocate equitable budget resources to FAMU, construct and renovate physical facilities at FAMU, and expand and strengthen curricular offerings at FAMU—including establishing non-core, unique (not offered at geographically proximate FSU), high-demand undergraduate and graduate programs at FAMU. Florida also agreed to periodically reassess the comparability of resources between FAMU and Florida's TWIs with similar missions and to continue the enhancement of FAMU.

63. In 1992, consistent with *Brown*, and enforcing Title VI, the United States Supreme Court decided in *U.S. vs. Fordice*, 505 U.S. 717 (1992), that the State of Mississippi was in violation of the Equal Protection Clause of the Fourteenth Amendment due to its failure to disestablish its segregated system of higher education. *Fordice* highlighted the actions States must take in order to dismantle the *de jure* segregation of education systems.

64.     Under *Fordice*, and flowing from the U.S. Constitution and Title VI, the State of Florida has a duty to dismantle former systems of *de jure* segregation in higher education.

65.     Under *Fordice*, the unnecessary duplication of academic programs at historically black institutions and non-historically black institutions of higher learning "was part and parcel of the prior dual system of higher education—the whole notion of 'separate but equal' required duplicative programs in two sets of schools—and . . . present unnecessary duplication is a continuation of that practice." *Fordice*, 505 at 738.

66.     As a result of the *Brown* decision, the *Fordice* decision, enactment of Title VI, and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, Defendants have a constitutional duty to protect Plaintiffs, and similarly situated Class members, from the policies and conditions rooted in the former dual system of segregation in higher education.

## FLORIDA'S BREACH OF ITS CONSTITUTIONAL OBLIGATIONS TO FAMU

*The 1998 Partnership Agreement*

67.     The 1998 Partnership Agreement set forth areas requiring change to successfully desegregate Florida's higher education system and noted Defendants' commitments to making those changes.

68.    Among other things, those commitments included to "ensure that the scope, level, and nature of educational programs at predominantly minority institutions [had] grown; that unnecessary programmatic duplication [had] not resulted in a negative effect on the course offerings of minority institutions; and that the graduate offerings within [the state of Florida] have a growing diverse student population." 1998 Partnership Agreement, p. 38.

69.    Defendants further committed to:

(a)    monitor access and enrollment issues for minority students and, as necessary, enhance its outreach to increase enrollment of African-American and Hispanic students in order to reduce disparities when compared to the enrollment of majority white students;

(b)    participate in the Federal TRIO programs; continue to use alternative admission criteria as a means of broadening the opportunities of students, including minorities, to attend SUS universities;

(c)    seek funding levels for its financial aid programs consistent with past levels of commitment; continue or augment the system wide funding to supplement existing university-funded retention services and to monitor academic progress;

(d)    enhance efforts to regularly assess each campus' atmosphere by sampling student opinions on campus life;

(e)    ensure that minorities are not adversely impacted by dwindling resources which may limit full time enrollment ("FTE") and the creation or expansion of programs;

(f)    provide access for minority graduate students;

(g)    regularly report to the BOG and the Chancellor regarding

22

the diversity of faculty and staff within the SUS;

(h)    provide opportunities designed to increase the promotional and advancement potential of minority and other employees within the SUS;

(i)    conduct a 'Glass Ceiling' survey at the universities to determine if there are barriers to advancement to executive level positions for racial minorities;

(j)    request appropriate funding for projects on a schedule consistent with the SUS's established process;

(k)    work with the Community Colleges to evaluate the transfer rates of African Americans holding Associate of Arts or Associate of Science degrees in the SUS, and address any variance between these transfer rates which could be attributed to lack of access for minority students;

(l)    ensure that proposed limited access programs are subject to scrutiny to ensure that there is no inappropriate adverse impact on minority students; and

(m)    continue the review by university personnel, including equal opportunity or diversity specialists, of academic program requests.

70.    Regarding FAMU specifically, Defendants agreed to:

(a)    complete construction of the FAMU Architecture Building and of the FAMU Allied Health (Ware Rhaney) building;

(b)    complete the capital construction projects for the following academic departments at FAMU: Pharmacy, Journalism, Business, and Engineering;

(c)    ensure that the Governor will give priority consideration to these funding requests when forwarded by SUS;

(d)    request funding to augment FAMU's programs and activities in agricultural teaching, research, and extension;

(e)      request funding appropriate to enhance the core functions of the College of Arts and Sciences at FAMU, in programs including math, English, political science, and performing arts;

(f)      request appropriate funding to provide faculty development resources to enable faculty in FAMU's School of Architecture to enhance their research activity, to attend national conferences and present papers, and to pursue other professional development opportunities;

(g)      request appropriate funding for outreach scholarships and financial aid in the School of Architecture;

(h)      develop and implement undergraduate and graduate academic programs to further strengthen and broaden the academic programing available to FAMU's students, as well as to attract a more racially diverse student population; and,

(i)      request appropriate funding to change the appointments of faculty at FAMU's School of Pharmacy to twelve months.

*Defendants' Failure to Desegregate Florida's Higher Education System*

71.    To date, Florida continues to perpetuate its former *de jure* segregated system of higher education, including by perpetuating policies and procedures that stem from or are tied to the State's prior official segregated system of higher education.   Defendants' failures in eliminating these vestiges of the *de jure* segregative era result in violations of Title VI and the Equal Protection Clause.

A.   DEFENDANTS' FAILURES WITH RESPECT TO PROGRAM DUPLICATION

72.    In accordance with Florida's obligations under Title VI and the Equal Protection Clause, Defendants have an obligation to remedy all policies and

24

practices within the State's higher education system that are traceable to the prior official segregated system. This obligation specifically includes eliminating the unnecessary duplication of FAMU's non-core academic programs at TWIs that are geographically proximate to FAMU and the development of unique non-core and unique high demand programs at FAMU (that by definition are not offered at geographically proximate TWIs).

73.    In *Fordice*, the U.S. Supreme Court defined "unnecessary program duplication" as "[t]hose instances where two or more institutions offer the same nonessential or non-core program.   Under this definition, all duplication at the bachelor's level of non-basic liberal arts and sciences course work and all duplication at the master's level and above are considered to be unnecessary."   505 U.S. at 738.   The Court reasoned that program duplication was undeniably "part and parcel of the prior dual system of higher education—the whole notion of 'separate but equal' required duplicative programs in two sets of schools—and that the present unnecessary duplication is a continuation of that practice." *Id.*

74.    Unnecessary academic program duplication is harmful.   It harms the citizenry of Florida, FAMU, its students, including Plaintiffs and the proposed Class, and the public at large.   This duplication: perpetuates a dual and unequal system of higher education in Florida, undermines FAMU's efforts to strengthen its academic program offerings, exhausts limited State resources, and undermines FAMU's

efforts to attract more other-race, especially White, students as well as increase other-race student enrollment.

75.    Unnecessary academic program duplication is harmful not only because it perpetuates a dual system but also because the greater the duplication the less likely that non-core quality programs can be adequately supported since resources are spread out over more programs.

76.    For years Defendants have continued to unnecessarily duplicate many of FAMU's non-core unique programs and unique/high demand programs at both geographically proximate TWIs (like FSU) and at TWIs across the State of Florida without sound educational justification for such duplication.

77.    At the present time, in comparison to geographically proximate FSU, FAMU only offers a mere 5 unique (not duplicated at FSU) and high-demand, non-core programs: 1 program at the bachelor's level, 1 at the master's level, 2 at the research doctorate level, and 1 professional doctorate program.

78.    Based upon a review of the SUS Academic Program Inventory, a substantial number of FAMU programs are unnecessarily duplicated at FSU, including approximately 20 programs at the undergraduate level, 15 programs at the master's level, 7 programs at the research doctorate level, and 1 program at the professional doctorate level.

79.    Also based upon a review of SUS Academic Program Inventory, a substantial number of high-demand programs are unnecessarily duplicated at FSU, including approximately 12 programs at the undergraduate level, 7 programs at the master's level, 5 programs at the research doctorate level, and 1 program at the professional doctorate level.  Put otherwise, more than one-half of FAMU programs duplicated at FSU are high-demand programs, the duplication of which undermines FAMU's ability to attract faculty, high caliber students, and other race (non-Black) students.

80.    Using a statewide comparison between FAMU and all of Florida's TWIs, FAMU has *zero* unique, high demand programs at all levels (undergraduate, masters, research doctorate, and professional doctorate) that are not offered at any of Florida's TWIs.

81.    This evidences a complete lack of meaningful program uniqueness at FAMU which perpetuates *de jure* segregation—program duplication is part and parcel of the prior segregated dual system of higher education and Defendants' present day unnecessary duplication of non-core program offerings at FAMU is a continuation of that practice.

82.    The lack of meaningful program uniqueness further discourages non-Black students from attending FAMU, a predominantly Black institution.  A low percentage of non-Black students at a predominantly and historically Black

university like FAMU is, per *Fordice*, another recognized vestige of the prior officially segregated higher education system.  The significantly low presence of other-race, especially White students, at FAMU is thus further evidence of Defendants' perpetuation of *de jure* segregation that stems from the State's prior official segregation policy.

83.    Defendants have and, upon information and belief continue to, transfer existing non-core programs at FAMU to geographically proximate TWIs, including FSU.

84.    Based upon a review of the SUS Academic Program Inventory, Defendants have, and upon information and belief continue to, eliminate non-core programs, including unique high-demand programs, from FAMU.

85.    Defendants have, and upon information and belief continue to, create cooperative, joint, or merged programs between FAMU and TWIs, which combination of programs is detrimental to FAMU and FAMU students.

86.    By way of example, Defendants merged academic programs at FAMU with FSU, a geographically proximate TWI, to create a joint program in Engineering (the "Joint College").

87.    All Engineering programs are high demand (non-core) programs.

88.    As a land grant university with a career focused mission, professional Engineering degree programs are an important part of FAMU's curriculum and

necessary for FAMU to achieve its university mission.   FAMU's engineering technology curriculum was expanded in 1980 to include program offerings for architectural engineering technology and construction engineering technology.

89.    By way of contrast, prior to the establishment of the Joint College, FSU did not have an active School of Engineering.   In 1959, FSU had attempted to establish a School of Engineering, but that school was eliminated in 1972 due to projected financial deficits.

90.    In 1982, Florida's Board of Regents (a predecessor entity to present day Defendant BOG) approved the establishment of the Joint College based on an agreement between the then Chancellor of the Board of Regents Barbara Newell, FAMU President Walter Smith, and FSU President Bernard Sliger to develop a *single* engineering school in Tallahassee.   Students in the Joint College Program remain enrolled at their original university institution (either FAMU or FSU), and after completing core undergraduate pre-requisite courses at their home institution, go on to attend courses in their Engineering degree program at a shared building.

91.    In 2015, Defendant BOG, through the SUS, retained the services of an independent non-Florida educational consultant, Collaborative Braintrust, to conduct an academic feasibility study of the Joint College.

92.    Among other things, the feasibility study determined that because of financial resources, FSU exerts greater influence over the scholarly pursuits of the Joint College.

93.    Significantly, since the Joint College was established there has been a declining population of FAMU students and an increasing population of FSU students enrolled in the Joint College.

94.    From 2005 through 2015, FSU student enrollments in Engineering programs increased 36% while FAMU enrollments decreased 45% during the same period.   Also during this period, FAMU's enrollment of Black students in Engineering programs decreased 46%, while FSU's decreased by 36%.

95.    In 2015, the nearly $13 million budget for the Joint College was removed from FAMU's general operating revenue in the State budget and moved to a sovereign line, the oversight of which is now under FSU's authority. This stripped FAMU of the Joint College's budget which it had held since 1987.

96.    Moreover, FAMU's engineering program was a focus of the University's original mission as a land-grant school.  Consequently, given its land-grant identity, Engineering programs are essential to providing FAMU with a unique institutional identity.   That unique identity has been stripped from FAMU by Defendants' creation of the Joint College.  Students no longer need to attend FAMU

for unique high demand Engineering programs, which are similarly provided at other TWIs, like FSU.

97.    The Joint College thus serves as one example of how FAMU is forced to operate in a different role than geographically proximate TWIs—a role where HBCUs like FAMU are stripped and robbed of resources and programs for the eventual benefit of TWIs.

98.    The Joint College is only a more recent example of the State's repeated and long-term practice of unnecessary program duplication at FAMU.  In 1949, the State established a College of Law at FAMU.  The law school was located in Tallahassee.  In 1965, the State both defunded FAMU's law school and opened a new law school at FSU, the geographically proximate TWI.  In 1966, the SUS prohibited FAMU from accepting any first year law class in that same year.  Then, in 1968, FAMU's law school permanently closed and its assets were transferred by the State to FSU to be used for FSU's new law school in Tallahassee.  Over three decades later, in 2000, and only after extensive political efforts, legislation was passed to re-establish a law school for FAMU.  However, FAMU's re-established College of Law would re-open in Orlando, Florida in 2002, despite FAMU's location in Tallahassee.  Upon information and belief, FAMU's College of Law was intentionally relocated to Orlando to avoid competing with FSU's law school program.

31

99.     Defendants therefore intentionally duplicated or removed unique, non-core programs of FAMU for the benefit of geographically proximate TWIs.

100.    Defendants have and continue to institute other programs at TWIs that duplicate unique programs at FAMU, without sound educational justification for such duplication.

101.    Moreover, Defendants' review process of proposed new academic programs at colleges and universities in Florida is limited, which contradicts the mandates of *Fordice* and the State's commitments in the 1998 Partnership Agreement to avoid unnecessary program duplication.

### B.     DEFENDANTS' FAILURES WITH RESPECT TO FAMU'S FUNDING

102.    Despite their constitutional obligations, including commitments made in the 1998 Partnership Agreement, Defendants have failed to appropriately fund FAMU, including its capital projects.

103.    Under the 1998 Partnership Agreement, Defendants committed to provide "additional resources [ ] to FAMU [to] enhance its attractiveness to all students by enabling it to offer a broader stronger array of programs or activities." 1998 Partnership Agreement, p. 52.

104.    Defendants further promised to "allocate equitable budget resources to FAMU," "periodically reassess the comparability of resources between FAMU" and TWIs, and seek funding "for efforts to maintain or increase the excellence of FAMU

programs and their attractiveness to a diverse group of potential students," commitments which would require significant increases in FAMU's funding. 1998 Partnership Agreement, pp. 7, 26.

105. Despite these commitments, the total funding of Florida's HBCUs, including FAMU, was not increased or altered in any way by the 1998 Partnership Agreement.

106. Present day desegregation, pursuant to *Fordice*, also involves Defendants' support of capital enhancements at FAMU in an effort to make FAMU more attractive to students of all races.

107. Defendants also committed to enhance facilities at FAMU in the 1998 Partnership Agreement.

108. In 2020, FAMU had approximately 9,400 students and $111 million in facilities debt.

109. Upon information and belief, the time from proposed funding to final funding for capital improvement projects at FAMU is significantly longer than that at Florida's TWIs.

110. Upon information and belief, Defendants have continually failed to provide appropriate contracts, contractors, supplies, and appropriations for timely completion of capital projects at FAMU.

33

111. The number of major building projects authorized at FAMU has also been constrained.

112. By way of example of the significant restrictions in funding for FAMU facilities and other capital enhancements:

(a) FAMU's Assistant Director of Programs had to plead for a special allocation of approximately $33,000 from FAMU's Student Government Association to reopen its 60,000-square-foot Campus Recreation Center in February 2021;

(b) Upon information and belief, FAMU has an on-campus housing shortage depriving hundreds of FAMU students of on-campus University-provided housing;

(c) In or around August 2022, FAMU had to temporarily close its Palmetto Phase III student dormitory due to building problems, including significant pest issues and flood damage. This dormitory closure forced hundreds of FAMU students to relocate to temporary housing mere weeks after returning to FAMU for the start of the new school year. Upon information and belief, other FAMU dormitory residences have been temporarily closed due to building issues; and,

(d) Also in or around August 2022, FAMU's football team released an open letter to FAMU President Dr. Larry Robinson expressing frustration with the University's lack of leadership and support of the FAMU football program. These students raised issues with, among other things, summer school housing availability, financial aid, and access to academic resources.

113. Furthermore, Defendants' failure to expeditiously complete capital projects already begun at FAMU as of 2000 has limited the ability of FAMU to effectively compete with TWIs.

## C.   FURTHER EXAMPLES OF DEFENDANTS' UNDERFUNDING OF FAMU

114.   In 2014, Defendants implemented a Performance Based Funding Model for universities and colleges in the State of Florida, awarding both State investment and institutional investment funds for a total performance-based funding allocation.

115.   Whereas institutional funds are the cumulative recurring State appropriations that the Florida legislature has appropriated to any Florida public university, State investment funds are awarded based upon certain metrics Defendant BOG adopted in a misguided effort to measure each public higher education institution's success.   In fact, Defendants' performance based funding allocation system significantly disadvantages FAMU.

116.   The metrics upon which all eleven Florida public universities, including FAMU, are rated include their four-year graduation rate, percentage of bachelor's degrees awarded without excess hours, and the median wages of graduates employed full time one year after graduation.

117.   Defendants' metric system unfairly compares schools that serve student populations of different socioeconomic backgrounds, like FAMU.  The metrics used to determine the funding awarded to Florida's public universities favor students who have better access to resources and support, resources which help ensure academic success at the post-secondary education level.  This includes, by way of example,

35

college preparatory coursework and standardized testing support, allowing those students to more likely achieve higher testing scores, complete their first year of university, and ultimately graduate, among other things.  Underrepresented minority students and socioeconomically challenged students are often the first generation of college student in their family, may have social or economic barriers, may work while pursuing their course of study, and have less access to resources and support. This impacts the ability of schools, like FAMU, to properly serve these students without proper funding.

118.  The performance based funding model also ignores the significant historical disadvantages FAMU students faced at a Black-only institution under an official segregated regime, basing present-day critical State funding for FAMU on metrics that do not take into account the decades of prior system-wide official policies that disadvantaged Black and other minority students.  In turn, this results in less funding for FAMU, due to its historical disadvantages and the socioeconomic and racial background of the students it predominantly serves, which results in lower performance results for the metrics chosen in this model, like for example, student retention and graduation rates.

119.  FAMU is also far more dependent on State funding than its TWI counterparts.

120.   Moreover, as a school with a smaller student population, FAMU requires more State-allocated funding per student to service its student population, since it lacks economies of scale.

121.   As a relatively smaller institution (*i.e.*, 9,184 students enrolled for 2020-2021 academic year, including 7,402 undergraduate and 1,782 graduate students, as compared to UF, which for the 2020-2021 academic year had 53,372 students including 34,931 undergraduate and 18,441 graduate students), FAMU is adversely affected by the phenomenon of economies of scale.

122.   Economies of scale recognize the cost advantages that enterprises obtain due to their scale of operation.  In the context of university spending, institutions (like FAMU) with fewer students require more funding per student as compared to larger institutions (like UF and FSU), as the costs of the institution are spread out over less students.  Said otherwise, having a larger number of students reduces the operating cost per student, and therefore would require less spend per student for the same costs that the smaller school also pays.  This means that on-par per student funding between relatively small and relatively larger schools is not in fact equal, as fewer students are bearing the same costs that are spread out over many more students at larger schools.

123.   In 2019, State appropriations to FAMU totaled $110 million, which amounted to $11,450 per student, as compared to the total amount of $785 million received by UF, which amounted to $14,984 per student.

124.   In 2018, FAMU was one of three institutions in the State University System of Florida that was allocated a total of $0 in State investment funds from Defendants based on Florida's performance-based funding metrics.

125.   Based on its 2018 Performance-Based Funding Score of 72, FAMU received a Total Performance Based Funding Allocation of $14,765,439 for the 2018-2019 school year. By comparison, UF, with its score of 93, received $110,634,475.

126.   Based on its 2019 Performance-Based Funding Score of 70, FAMU received a Total Performance Based Funding Allocation of $29,056,843 for the 2019-2020 school year. By comparison, UF, with its score of 95, received $99,916,894.

127.   Based on its 2020 Performance-Based Funding Score of 73, FAMU received a Total Performance Based Funding Allocation of $28,153,897 for the 2020-2021 school year. By comparison, UF, with its score of 90, received $100,799,366.

128.   Based on its 2021 Performance-Based Funding Score of 79, FAMU received a Total Performance Based Funding Allocation of $26,735,556 for the

2021-2022 school year. By comparison, UF, with its score of 87, received $106,064,786.

### D. DEFENDANTS' FAILURES TO MATCH FEDERAL LAND GRANT FUNDS

129.   Florida has two land-grant institutions, UF, which was established by the First Morrill Act and is also a TWI, and FAMU, which was established by the Second Morrill Act.

130.   In 1978, Defendants downsized the College of Agriculture at FAMU and restructured it into a department, forming part of the College of Engineering Services, Technology, and Agriculture.

131.   Defendants' decision to restructure and "downsize" the College of Agriculture at FAMU also involved giving UF, the traditionally-white land-grant institution, primary control over many of the research, education, and extension services in the State.   This "resulted in a larger share of both state and Federal agricultural and land grant monies going to UF, with FAMU historically receiving little or no monies to further develop or enhance its [ ] programs." 1998 Partnership Agreement, p. 51.

132.   Defendants' actions have limited the growth and expansion of agricultural and land-grant related programs at FAMU.

133.   Federal legislation allows States to seek institutional waivers for the one-to-one match requirement for land-grant institutions established by the Second

Morrill Act, like FAMU.  In contrast, the State is required to match 100% of the federal funds given to institutions established by the First Morrill Act and cannot seek a waiver of that mandate.   Thus, Defendants have discretion in their determination of whether to allocate one-to-one matching funds to FAMU or seek a waiver from this requirement, and thereby not match 100% of those federal funds.

134.   From 2010 to the present, UF received a 100 percent one-to-one matching of funds from Defendants, and during the same period FAMU has received on average a 50 percent or less match, to its detriment.

135.   Defendants are responsible for the inequity in the State's one-to-one matching of federal funds that disadvantages FAMU.

### E.   DEFENDANTS' FAILURES WITH RESPECT TO FAMU STUDENT RETENTION & GRADUATION RATES

136.   FAMU is the largest single-campus HBCU in the country and produces more African American baccalaureate graduates than any other four year public university.

137.   The 1998 Partnership Agreement required Defendants to work to strengthen retention and graduation rates of Black students.

138.   Although the overall percentage of Black students graduating from Florida public colleges and universities is increasing, the gap between graduation rates for White students and Black students is widening.

139.   In 2018, the full-time, first time in college four year graduation rate (FTIC) at FAMU was reported to be 21.6%, a SUS-worst.  By comparison, UF had a FTIC rate of 67.3%.

140.   FAMU's four-year graduation rates for 2019 and 2020 were 22.5% and 27.7%, respectively. By comparison, UF's FTIC rates for 2019 and 2020 were 70.9% and 74.7%, respectively.

## F. DEFENDANTS' FAILURES WITH RESPECT TO FAMU CAMPUS PROGRAMS & ACTIVITIES

141.   The 1998 Partnership Agreement required Defendants to "continue[] effort[s] on the part of Florida to provide racial minorities the opportunity (consistent with the rights of non-minorities) to participate in the benefits of higher education in Florida and to assist in providing the opportunity for access, retention, articulation, and graduation for minority students in the State." 1998 Partnership Agreement, pp. 72-73.

142.   In the 2003 Final Committee report to OCR, the State of Florida claimed to have met its commitments in the 1998 Partnership Agreement.

143.   Defendants have failed to enhance FAMU to make it as attractive and welcoming as other Florida TWIs, including geographically-proximate TWIs in the State.

144.   Upon information and belief, physical improvements and capital projects at HBCUs, like FAMU, take an average of ten years longer to complete than

at TWIs.  This is demonstrative of Defendants' lack of good faith towards these improvements at FAMU.

145.   Declining, stagnant, and/or minimal increases in White-student enrollment at FAMU is further evidence of Defendants' failure to make FAMU's campuses attractive and welcoming to students of all races.

146.   More recently, in late 2022, Defendant DeSantis signed the State's Individual Freedom Act (the "Act"), also known as the "Stop WOKE" Act, which would bar public-college professors from teaching certain concepts related to sex and race.[3]  Defendant DeSantis has made clear his opposition to critical race theory, stating that "We must ensure that our institutions of higher learning are focused on academic excellence and the pursuit of truth, not the imposition of trendy ideology."[4]

147.   The Act has since been temporarily blocked by a Federal Court.

148.   Under the Act, programs such as "The Role of Race in Criminal Procedure," offered at FAMU's College of Law, would be subject to review by Defendant BOG and Defendant DeSantis, and may result in causing FAMU to be ineligible for State-allocated performance based funding if that program is not

---

[3] https://www.chronicle.com/article/its-not-clear-whether-public-college-professors-have-first-amendment-rights-when-theyre-teaching (accessed, January 6, 2023).

[4] https://apnews.com/article/business-florida-race-and-ethnicity-racial-injustice-ron-desantis-e394f2e734729bce696dca90775835d2 (accessed January 6, 2023).

discontinued.  Upon information and belief, many other FAMU programs would subject the school to the loss of State allocated performance based funding if not discontinued (should the law come into effect).

149.   On January 4, 2023, Defendant Rodrigues sent a memorandum from the Office of Defendant DeSantis to the campus president of each of Florida's four-year, public universities.  That memorandum seeks each universities' spending information related to critical race theory and diversity, equity, and inclusion.[5]

150.   Per this January 4, 2023 memorandum, for each program or activity related to discourse on race relations at Florida's public higher education institutions, university presidents are to provide the number of employees working on the program, those employees' titles, the program's overall funding, and amount of that funding that comes from the State.

### G.   DEFENDANTS' FAILURES WITH RESPECT TO FAMU'S FACULTY & STAFF DIVERSITY

151.   The 1998 Partnership Agreement required Florida to continue its efforts to attract, recruit, and retain racially diverse faculty and staff.

---

[5] https://www.chronicle.com/article/fla-governor-asked-all-public-universities-for-spending-data-on-diversity-and-critical-race-theory?utm_source=Iterable&utm_medium=email&utm_campaign=campaign_5865730_nl_Academe-Today_date_20230105&cid=at&source=&sourceid= (accessed January 6, 2023).

152.   As part of this commitment, Florida was required to "review university personnel, including equal opportunity and diversity specialists," and conduct program reviews to "include analyses [ ] of any possible negative impact upon racial minorities, and programs at FAMU." 1998 Partnership Agreement, p. 84.

153.   Faculty at FAMU receive substantially less compensation on average compared to faculty at FSU and UF.

154.   In 2020, the average faculty salary at FAMU was $81,804, as compared to $115,083 at FSU and $119,178 at UF.[6]

155.   Given the vastly different financial resources Defendants allocate to FAMU as compared to other TWIs, FAMU is less competitive in attracting faculty, which further undermines FAMU's ability to fulfill its research mission.

156.   Because FAMU is allocated less money by Defendants each fiscal year as compared to FSU and UF, FAMU is unable to compensate its faculty at rates competitive with TWIs.

## CLASS ACTION ALLEGATIONS

157.   Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Rule 23 of the Federal Rules of Civil

---

[6] https://nces.ed.gov/ipeds/, Integrated Postsecondary Education Data System (IPEDS) (accessed, January 4, 2023).

Procedure on behalf of "all current students at FAMU at any time during the 2021/2022 school year through the date of class certification" (the "Class").

158.   Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveals that the Class should be expanded or otherwise modified.  Plaintiffs also reserve the right to establish sub-classes as appropriate.

### Requirements of Rule 23(a)

159.   This action is brought and properly maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Class.

160.   Numerosity: There are nearly 10,000 students currently enrolled at FAMU, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual Class Members are ascertainable through records maintained by Defendants.

161.   Typicality:  Plaintiffs' claims are typical of the claims of each Class Member in that all Plaintiffs, like all Class Members, are and were injured through Defendants' failures to eliminate vestiges of *de jure* procedures and policies that maintain a dual, segregated system of higher education within the State of Florida. The claims of Plaintiffs and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of long-term failure to provide equal

educational opportunity in Florida's higher education system.   The acts and omissions of Defendants to which Plaintiffs and the Class have been subjected apply universally to all members of the Class and are not unique to any Plaintiff or Class Member.

162.   Adequacy: Plaintiffs are adequate representatives of the proposed Class.   Plaintiffs' interests are coextensive with those of the members of the proposed Class that they seek to represent in this case.   Plaintiffs are willing and able to represent the proposed Class fairly and vigorously.   Plaintiffs have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate a class action of this size and complexity.   The combined interests, experience, and resources of Plaintiffs and their counsel to litigate the claims at issue in this case competently satisfy the adequacy of representation requirement of Rule 23(a)(4).

163.   Commonality: There are numerous questions of law and fact common to the Class, including:

   (a)   Whether Defendants have engaged in a pattern and practice of intentional discrimination in violation of Title VI of the Civil Rights Act of 1964 by maintaining a segregated system of higher education;

   (b)   Whether Defendants have failed in their duty to eliminate vestiges of Florida's formerly *de jure* segregated system of higher education by intentionally failing to provide increased funding to FAMU, by failing to make improvements in FAMU's facilities, by perpetuating

unnecessary duplication of FAMU's non-core academic programs at geographically-proximate Florida TWIs, and by failing to establish a meaningful number of non-core, unique programs and unique high demand programs at FAMU, which failures have caused FAMU to remain a segregated entity of higher learning;

(c)     Whether Defendants' failure to provide adequate funding to FAMU (especially as compared with State funding provided to Florida's TWIs), failure to make improvements in FAMU's facilities, duplication of non-core programs preexisting at FAMU at TWIs, and failures to establish a meaningful number of non-core, unique programs and unique high demand programs at FAMU, disparately impacted FAMU and its students, including Plaintiffs and the Class, in a discriminatory and unfair manner because such actions impacted student enrollment, especially enrollment of other race (*i.e.*, non-Black) students at FAMU;

(d)     Whether Defendants have engaged in a pattern and practice of intentional discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment;

(e)     Whether Defendants have continued to operate a segregated system of higher education and continue to take actions to perpetuate that segregated system in violation of the Equal Protection Clause;

(f)     Whether Defendants have failed in their duty to eliminate the vestiges of the State's formerly *de jure* segregated system of higher education by failing to provide adequate funding to FAMU;

(g)     Whether Defendants have allowed Florida's TWIs to duplicate non-core, unique programs and unique, high demand programs at FAMU without sound educational justification for such duplication;

(h)     Whether Defendants have failed to establish a meaningful amount of unique non-core and unique high demand

programs at FAMU;

(i)     Whether Defendants have failed to attract other race, especially White, students to enroll at FAMU;

(j)     Whether Plaintiffs, and the Class, have been harmed as a direct and proximate result of the Defendants' violation of the Equal Protection Clause and Title VI; and

(k)     The scope of the injunctive relief to which the Plaintiffs and members of the Class are entitled.

### Requirements of Rule 23(b)(2)

164.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the proposed Class such that final injunctive relief is appropriate with respect to the Class as a whole.  Such injunctive relief includes, but is not limited to, the implementation of systemic changes to prevent the perpetuation of a segregated system of higher education in violation of Title VI and the Equal Protection Clause.  Defendants' common pattern of discrimination and refusal to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief for the Class as a whole.

### COUNT I
### Violation of Title VI, 42 U.S.C. § 2000d, *et seq.*
(Intentional and/or Disparate Impact)
Against All Defendants

165.    Plaintiffs hereby incorporate by reference the allegations set forth in all of the above paragraphs as if fully set forth herein.

166.    All of the Plaintiffs are African American.

48

167.   Title VI states, in relevant part, that "[N]o person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. §§ 2000d, *et seq.*

168.   All Defendants are recipients of federal financial assistance, including but not limited to, the direction, control, and disbursement of federal funds.

169.   Defendants received and continue to receive federal funding to support Florida's higher education system.

170.   Many of Florida's institutions of higher learning participate in a variety of federally-funded programs, including but not limited to funding for research and student loans.  Florida also receives federal funds for its two land-grant institutions, FAMU and UF.   As a result of Defendants' participation in federally funded programs, Defendants and Florida's colleges and universities are governed by the mandate of Title VI.

171.   Federal funds are received and then disbursed by Defendants to colleges and universities in Florida.  Defendants use those federal funds to provide direct support to the State's public colleges and universities, including for research or facility development at the educational institution, and through grants and loans made to students enrolled in postsecondary institutions, among other ways.

172.   Plaintiffs and members of the proposed Class are the intended beneficiaries of the federal funds provided to Defendants.

173.   Defendants have engaged in a pattern and practice of intentional discrimination with respect to FAMU in violation of Title VI of the Civil Rights Act of 1964.  Defendants have intentionally discriminated by maintaining a segregated system of higher education at FAMU due to Defendants' failure to eliminate vestiges of the prior *de jure* segregated system of higher education in Florida and have done so by their actions as described herein, including by Defendants' discriminatory funding practices and underfunding of FAMU, failing to make improvements in FAMU's facilities, by duplication of FAMU's non-core programs without sound educational justification, and by failing to create a meaningful number of non-core unique programs and unique high demand programs at FAMU.

174.   Defendants have engaged in a long term pattern and practice of failing to perform their duty to enforce state and federal laws for the provision of equal educational opportunity at FAMU.

175.   Defendants have continued to discriminate on the basis of race, including through discriminatory funding practices and underfunding of FAMU, failing to make improvements in FAMU's facilities, by unnecessary non-core program duplication, and by failing to establish a meaningful number of unique non-core programs and unique high demand programs at FAMU, which actions and

inactions stem from prior *de jure* segregative policies and thereby perpetuates Florida's present day segregated system of higher education in violation of Title VI of the Civil Rights Act.

176.   Defendants have also failed in their duty to eliminate the vestiges of Florida's formerly *de jure* segregated system of higher education by, among other things, intentionally failing to provide adequate funding to FAMU, failing to make improvements in FAMU's facilities, by perpetuating unnecessary duplication of FAMU's non-core programming at geographically proximate Florida TWIs, and by failing to create a meaningful number of unique non-core programs and unique high demand programs at FAMU, which failures have caused FAMU to remain a segregated entity of higher learning.

177.   Defendants are recipients of federal funds, and federal funds were used by Defendants to carry out these discriminatory practices.

178.   Alternatively, in lieu of intentional discrimination, Plaintiffs allege that Defendants' discriminatory actions, as described herein, disparately impacted FAMU and its students, including Plaintiffs and the proposed Class, in a discriminatory and unfair manner because such actions impacted student enrollment at FAMU.

179.   Defendants' actions are a direct result of their failure to eliminate *de jure* era policies that discriminate on the basis of race in higher education, like,

among other things, the duplication of FAMU's non-core programs at geographically-proximate TWIs without sound educational justification for such duplication. Such actions are part of and serve to perpetuate Florida's prior *de jure* segregated system of higher education in the present day.

180.   As a direct and proximate result of Defendants' utilization of federal funds in a racially discriminatory manner, which results in maintaining a *de jure* system of segregation in Florida's higher education system, Plaintiffs and the Class, as students of FAMU, have been and continue to be denied equal educational opportunities and are subjected to discrimination in a segregated educational environment in violation of Title VI, all because of their race.

### COUNT II – 42 U.S.C. § 1983
### Violation of the Equal Protection Clause
### Pursuant to the Fourteenth Amendment of the United States Constitution
Against Defendants BOG, Rodrigues, State Board, Diaz, and DeSantis
(the "1983 Defendants")

181.   Plaintiffs hereby incorporate by reference the allegations set forth in all of the above paragraphs as if fully set forth herein.

182.   The Equal Protection Clause of the Fourteenth Amendment provides as follows:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside.  No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

183.   All Plaintiffs are born or naturalized citizens of the United States and enjoy the constitutional protections of the Equal Protection Clause of the Fourteenth Amendment.

184.   Pursuant to *Fordice*:

> If the State perpetuates policies and practices traceable to its prior *de jure* dual system that continues to have segregative effects – whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system – and such policies are without sound educational justification and can be practicably eliminated, the policies violate the Clause, even though the State has abolished the legal requirement that the races be educated separately and has established racially neutral policies not animated by a discriminatory purpose.

*Fordice*, 505 U.S. at 732-733.

185.   The 1983 Defendants have engaged in a pattern and practice of intentional discrimination with respect to FAMU in violation of the Equal Protection Clause of the Fourteenth Amendment and under *Fordice*.

186.   The 1983 Defendants have continued to operate a segregated system of higher education in Florida that stems from policies and practices traceable to Florida's prior *de jure* system of segregated higher education, and Defendants

continue to take actions to perpetuate that segregated system in violation of the Equal Protection Clause and *Fordice*.

187.   The 1983 Defendants have failed in their duty to adequately and appropriate fund FAMU in violation of the Equal Protection Clause and *Fordice*.

188.   This underfunding is perpetuated by, among other things, the 1983 Defendants' adoption of a performance based funding model to determine the amount of State funding to FAMU, which model discriminates against FAMU, a university that is predominantly comprised of students from underrepresented minorities and/or low socioeconomic backgrounds.

189.   The 1983 Defendants have also failed to fund improvements in FAMU's facilities.

190.   The 1983 Defendants have also allowed Florida's TWIs to unnecessarily duplicate non-core, unique programs and unique high demand programs at FAMU without sound educational justification, in violation of the Equal Protection Clause and *Fordice*.

191.   Defendants have, and upon information and belief continue to, transfer existing non-core programs at FAMU to geographically proximate TWIs.

192.   Defendants have, and upon information and belief continue to, eliminate non-core-programs, including unique high demand programs, from FAMU.

193.   Defendants have, and upon information and belief continue to, create cooperative, joint, or merged programs between FAMU and TWIs, which combination of programs is detrimental to FAMU and FAMU students.

194.   Specifically, the 1983 Defendants have continued to unnecessarily duplicate programs already in existence at FAMU, such as by approving the Joint College, a joint program in Engineering with FSU, in violation of the Equal Protection Clause and *Fordice*.

195.   The 1983 Defendants have permitted the implementation of other non-core programs at Florida's TWIs that duplicate preexisting programs at FAMU, without sound educational justification to so duplicate, also in violation of the Equal Protection Clause and *Fordice*.

196.   The 1983 Defendants have also failed to establish a meaningful number of non-core unique programs and unique high demand programs at all levels at FAMU.

197.   The policies of the 1983 Defendants have also failed to provide appropriate funding to FAMU, failed to make improvements in FAMU's facilities, allowed Florida's TWIs to unnecessarily duplicate non-core programs at FAMU, without sound educational justification as to the duplication, and have failed to create a meaningful number of unique non-core programs an unique high demand programs at FAMU, and have thus perpetuated a segregated system of higher

education in Florida in violation of the Equal Protection Clause of the Fourteenth Amendment and *Fordice*.

198.   The 1983 Defendants have thus violated the equal protection rights of Plaintiffs and the Class, and the 1983 Defendants acted with intent or with deliberate indifference to the rights of Plaintiffs and the Class.

199.   As a direct and proximate result of the 1983 Defendants' violation of the Equal Protection Clause, Plaintiffs and the Class, as students of FAMU, were denied and continue to be denied equal educational opportunities and are subjected to discrimination in a segregated educational environment, in violation of the Fourteenth Amendment to the United States Constitution, all because of their race.

200.   Plaintiffs and all Class members similarly situated will suffer irreparable harm in the absence of preliminary relief.

201.   The balance of equities tips in the favor of Plaintiffs and the Class, and an injunction is in the public's best interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray the Court award the following relief:

A.   Certify the proposed Class pursuant to the Federal Rules of Civil Procedure Rule 23(a) and (b)(2);

B.   Designate Plaintiffs as representatives of the proposed Class and Plaintiffs' counsel as Class counsel;

C.     Declare that Defendants' conduct violates Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment;

D.     Preliminarily and permanently enjoin Defendants and all of their agents, representatives, and officers from continuing the abuses described herein, including acting in a manner inconsistent with the U.S. Constitution, the Florida Constitution, the 1998 Partnership Agreement, and the State of Florida's equal education opportunity obligations under state and federal law, including Title VI, the Equal Protection Clause of the Fourteenth Amendment, and *Fordice*;

E.     Appoint a special referee or mediator in order to craft and recommend a remedy to the Court in order to correct the Title VI and the constitutional violations as alleged herein;

F.     Award Plaintiffs the costs of this action together with their reasonable attorneys' fees; and,

G.     Grant Plaintiffs such other and further relief as may be appropriate or necessary, including injunctive relief as necessary.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs, individually and on behalf of the proposed Class, respectfully request a trial by jury as to all matters so triable.

Respectfully submitted this 9th day of January, 2023.

Respectfully submitted,

/s/ *Barbara J. Hart*
Jay W. Eisenhofer, Esq.
Barbara J. Hart, Esq.
Karin E. Fisch, Esq.
Braynard Brown, Esq.
Irene R. Lax, Esq.
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Fl.
New York, NY 10017
646-722-8500

Samuel Mukiibi, Esq.
**GRANT & EISENHOFER P.A.**
123 Justison Street, 7th Fl.
Wilmington, DE 19801
302-622-7119

Josh Dubin, Esq.
**JOSH DUBIN, P.A.**
201 S. Biscayne Blvd, Suite 1210
Miami, FL 33181
FL Bar Number 48865

*Attorneys for Plaintiffs*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 9th day of January, 2023, a copy of the First Amended Complaint was filed electronically through the CM/ECF system which will automatically send email notification of such filing to all the attorneys of record in this case.

/s/ *Barbara J. Hart*
Barbara J. Hart, Esq.