## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

BRITNEY DENTON, NYABI
STEVENS, DEIDRICK DANSBY,
FAYERACHEL PETERSON,
ALEXANDER HARRIS, and JACARI
HESTER,

        *Plaintiffs*,

   v.

THE BOARD OF GOVERNORS FOR
THE STATE UNIVERSITY SYSTEM
OF FLORIDA, RAYMOND
RODRIGUES, in his official capacity as a
member of the Board of Governors for the
State University System of Florida,
MANNY DIAZ, JR., in his official
capacity as the Commissioner of
Education of the State of Florida, BRIAN
LAMB, ERIC SILAGY, TIMOTHY M.
CERIO, AUBREY EDGE, PATRICIA
FROST, EDWARD HADDOCK, JACK
HITCHCOCK, KEN JONES, DARLENE
LUCCIO JORDAN, ALAN LEVINE,
CHARLES H. LYDECKER, CRAIG
MATEER, DEANNA MICHAEL, JOSE
OLIVA, STEVEN M. SCOTT, all of
whom are named in their official capacity
as a member of the Board of Governors
for the State University System of Florida,
and THE STATE OF FLORIDA,

        *Defendants*.

**CLASS ACTION**

Jury Trial Demanded

No. 4:22-cv-00341-RH-MAF

# <u>TABLE OF CONTENTS</u>

**PAGE**

SUMMARY OF THE CASE ................................................................................ 2

JURISDICTION ............................................................................................... 18

VENUE ........................................................................................................... 19

PARTIES ......................................................................................................... 19

      *Plaintiffs* ..................................................................................................... 19

      *Defendants* ................................................................................................. 20

I.     RELEVANT FACTS ON BEHALF OF ALL PLAINTIFFS AND ALL OTHER SIMILARLY-SITUATED STUDENTS ......................................................... 29

     A.    The State's Obligation to End and Dismantle Its Separate and Unequal Higher Education System .......................................................................... 29

II.    FAMU'S PROGRAM INEQUALITY AS COMPARED TO FLORIDA'S TWIS ........ 38

     A.    FAMU's Lack Of Program Uniqueness Is Due To Defendants' Conduct .......... 38

     B.    Regional Comparison of FAMU with FSU ........................................................ 44

     C.    Statewide Comparison of FAMU with Florida's 11 Traditionally White Institutions ...................................................................................................... 51

     D.    Unfavorable Merger And Transfer Of FAMU's Unique Programs ..................... 52

III.   DEFENDANTS' CHRONIC UNDERFUNDING OF FAMU ....................................... 57

     A.    Defendants' Failure To Match Federal Land Grant Funds ................................. 59

     B.    Defendants' Failure to Equitably Fund FAMU ................................................... 62

     C.    Defendants' Performance Based Funding Model Shows FAMU Lagging .......... 65

IV.   DEFENDANTS' FAILURES WITH RESPECT TO FAMU'S FACULTY & STAFF DIVERSITY AND FAILURE TO DIVERSIFY THE BOG ........................................ 71

V.    DEFENDANTS' FAILURE TO SUPPORT FAMU UNDERMINED ITS ABILITY TO BROADEN ITS MISSION STATEMENT AND IDENTITY ........................................ 74

VI.   DEFENDANTS' FAILURES WITH RESPECT TO FAMU'S CAMPUS, FACILITIES, AND INFRASTRUCTURE .................................................................................... 77

i

VII.    DEFENDANTS' FAILURES WITH RESPECT TO FAMU STUDENT RETENTION AND GRADUATION RATES.................................................................. 82

CLASS ACTION ALLEGATIONS ....................................................................... 83

    A.    Requirements of Rule 23(a) ............................................................... 83

    B.    Requirement of Rule 23(b)(2)............................................................ 86

COUNT I  Violation of Title VI, 42 U.S.C. § 2000d, *et seq*. ........................... 87

COUNT II – 42 U.S.C. § 1983  Violation of the Equal Protection Clause ................................. 91

COUNT III  Violation of the Equal Protection Clause: Disparate Impact Discrimination .......... 95

PRAYER FOR RELIEF ........................................................................................ 99

DEMAND FOR TRIAL BY JURY ..................................................................... 100

## SECOND AMENDED COMPLAINT

Plaintiffs Britney Denton, Nyabi Stevens, Deidrick Dansby, Fayerachel Peterson, Alexander Harris, and Jacari Hester (collectively "Plaintiffs," and each a "Plaintiff"), on behalf of themselves and members of the Class defined herein, by and through the undersigned counsel, bring this civil action based upon the personal knowledge of Plaintiffs and based upon the investigation of counsel, against Defendants The Board of Governors of the State University System of Florida (the "BOG"), Raymond Rodrigues, in his official capacity as the Chancellor of the State University System of Florida, Manny Diaz, Jr., in his official capacity as the Commissioner of Education of the State of Florida and thereby as a member of the BOG, Brian Lamb, Eric Silagy, Timothy M. Cerio, Aubrey Edge, Patricia Frost, Edward Haddock, Jack Hitchcock, Ken Jones, Darlene Luccio Jordan, Alan Levine, Charles H. Lydecker, Craig Mateer, Deanna Michael, Jose Oliva, and Steven M. Scott, all of whom are named in their official capacity as members of the BOG, and the State of Florida (collectively "Defendants," and each a "Defendant").

Plaintiffs, on behalf of themselves and members of the Class defined herein, seek equitable relief to require the State of Florida's ("Florida" or the "State") and all other Defendants to take steps to make Florida Agricultural and Mechanical University ("FAMU") "equal" and remedy Defendants' separate and unequal treatment of FAMU, the State's only public HBCU, as required by Title VI of the

Civil Rights Act of 1964 ("Title VI"), the Equal Protection Clause of the Fourteenth Amendment, *United States v. Fordice*, 505 U.S. 717 (1992), and all other applicable federal and state law.

In support of Plaintiffs' Second Amended Complaint (the "Amended Complaint"), Plaintiffs state as follows:

## SUMMARY OF THE CASE

1. The longstanding history of practices that have consistently embraced official segregation remain deeply embedded in Florida's public system of higher education. Florida instituted its system of public higher education in 1851 when it founded what is presently Florida State University (FSU), followed by what is presently The University of Florida ("UF") in 1853, both as White-only institutions. For more than thirty years after the creation of its system of public higher education, Florida denied its Black citizens access to college-level public higher education and did so for the purpose of maintaining the social, economic, and political subordination of Black people in the State.

2. Florida did not open a public institution for African Americans until 1887 when FAMU (originally named the State Normal College for Colored Students), began classes with 15 students and two instructors.

3.     Following the Second Morrill Act of 1890[1, 2] which was intended to promote equality and forbade awarding federal land-grants to states where a distinction of race or color was made in the admission of students to public colleges, Florida, rather than allow its Black citizens to attend FSU or UF, designated FAMU as its Black land-grant institution and renamed it the State Normal and Industrial College for Colored Students in 1891[3], thereby maintaining state-sponsored segregation in Florida's public colleges and universities. The Second Morrill Act contained the requirement that states practicing segregation, such as Florida, "equitably" divide federal land-grant funds awarded to each state between their White and Black land-grant institutions. The determination of whether the division of funds was "equitable" was left to the states.[4]

4.     In 1905, Florida passed the Buckman Act[5], which reorganized higher education in the State, and the three resulting state institutions (UF, FSU, and FAMU) all adopted 1905 as their founding date.  Until 1956, UF, FSU, and FAMU

---

[1] 7 U.S.C. § 321, *et seq*.
[2] The Morrill Land-Grant Act of 1862 ("First Morrill Act"), which was designed to extend public higher education to broad segments of the U.S. population, gave states, including Florida, public lands, on the condition that those lands be sold or used for profit and those profits used to establish a college that would teach agriculture and the mechanical arts. With the profit derived from selling 30,000 acres of land granted by the First Morrill Ac, Florida established UF, its White only land-grant institution, in 1884.
[3] In 1909, the name of the college was changed to Florida Agricultural and Mechanical College for Negroes, and in 1953 the name was changed to FAMU.
[4] *See* 7 U.S.C. § 323.
[5] House Bill No. 361 (1905).

remained the only public universities in Florida.  The Buckman Act is significant because it created the Florida Board of Control, a statewide governing body for the State University System ("SUS") of Florida, which included all public universities in the State.[6]  Since 1905, Florida has collectively overseen UF, FSU, and FAMU and adopted policies and practices which have allowed UF and FSU to flourish and grow over the years into the State's flagship institutions, while simultaneously underfunding and undermining FAMU's ability to create a non-race based identity.

5.      Florida shortchanged FAMU following the Buckman Act.  Although, FAMU initially received the same amount of federal funding under the land-grant program as UF, it received far less money from the State.  In 1920, both schools received $25,000 in federal funds under the Morrill Act, but UF received $146,000 from the State of Florida while FAMU received only $25,937.[7]  By the end of the Second World War (1945), both schools received $25,000 in federal land-grant money, but UF's appropriation from the State had risen to $1,035,000 while FAMU's was only $201,097.[8]

6.      Additionally, FAMU faculty and administration were underpaid and their salaries a fraction of those at UF.  For example, in 1922 UF paid English

---

[6] The Board of Control was replaced by the Florida Board of Regents in 1965, which existed until 2001 before its powers were transferred to and are now held by the Florida Board of Governors.

[7] Johnson, Larry, et. al., *African American and the Struggles for Opportunity Florida Public Higher Education , 1947 – 1977*, (Aug. 2007), https://eric.ed.gov/?id=EJ813349.

[8] *Id.*

professors $2,700 while FAMU only paid $800.[9]   The State further barred FAMU from offering graduate and professional programs until the mid-20[th] century.  FAMU only received a law school due to the pressure of a lawsuit initiated by Virgil Hawkins to create a public law school for Black students at FAMU (which at the time remained officially segregated), as he was denied admission to UF's Whites-only law school.[10]

7.      Facing the demand to desegregate UF, Florida elevated FAMU to "university" status in 1953.  While as a university FAMU received some graduate and professional programs, they were never (and have never become) as extensive as those offered at UF and FSU.  Still, Black colleges, like FAMU, were inferior to White colleges with respect to funding, the availability of academic programs, the quality of instruction, the research facilities, and virtually every other objective measure.[11]  This distinction was created and perpetuated by Defendants' practices and policies.

8.      When the Supreme Court handed down the *Brown v. Board of Education* decisions in 1954 and 1955, Florida's dual higher education system was firmly in place.  Prior to *Brown*, no African American had been allowed to enroll in

---

[9] *Id.*
[10] *State ex rel Hawkins v. Bd. of Control of Florida*, 47 So.2d 608 (Fla. 1950).
[11] Leland Ware, "The Most Visible Vestige: Black Colleges After Fordice," B. C. L. Rev., Vol. 35, Issue 3, Article 5 (May1, 1994).

either undergraduate or graduate programs at UF or FSU.  In contrast, with very limited programs offered and suffering from chronic State underfunding, FAMU lagged behind Florida's Traditionally White Institutions' ("TWI") in all respects.

9.    *Brown* "held that the concept of 'separate but equal' had no place in the field of education."  *Brown*, 347 US. At 495 ("Brown I").  The following year, in 1955, "the Court ordered an end to segregated public education 'with all deliberate speed.'"

10.    *Brown* aimed to eliminate segregation which had been touted as "separate but equal": institutions for Black students and institutions for White students.  In reality, segregation established and sustained a "separate and unequal" system of education, relegating Black students to separate and underfunded schools.  With *Brown*, the legality of the prior system of segregation ended in 1954, but segregation did not disappear.  In many states, including Florida, the vestiges of prior decades of separate and unequal treatment remain in effect to this day.

11.    Despite the decisions in *Brown*, many states, including Florida, continued in their public university systems practices of *de jure* segregation, which is segregation by law or official segregation and the formal operation of a dual system for Black and White, or in this instance for Historically Black Universities and Colleges ("HBCU") and TWIs.

6

12.     In response to the Civil Rights Act of 1964, Florida political and educational leaders who had argued for decades that separate was in fact equal suddenly discovered irreparable dilapidation and irredeemable inferiority in Black institutions, such as FAMU.  Their solution was not to fix those facilities but to close them. Within four years, they closed FAMU's hospital; FAMU's law school. Florida's Board of Control and its successor Board of Regents floated proposals to close FAMU, merge it with traditionally White FSU, or reduce its status possibly converting it to a two-year school.  While, the most damaging proposal to merge FAMU with FSU was not implemented, proposals to reduce the scope of programs and confine FAMU to undergraduate education began to surface soon and have continued to surface periodically. Throughout this time, FAMU remained underfunded.

13.     In 1970, the United States Office for Civil Rights ("OCR") "determined that the State of Florida was operating a racially identifiable[12]  higher education system in violation of Title VI of the Civil Rights Act of 1964."  *See* Florida's

---

[12] "Racial identifiability" is a concept "used to describe the relationship between the racial composition of a particular school" as compared with "the racial composition of a system as a whole." *See*, *e.g.*, *Penick v. Columbus Bd. of Ed.*, 429 F. Supp. 229, 268 (S.D. Ohio 1977). Thus, for example, where the population of Black students at a particular school exceeds the system-wide percentage of Black students, accounting for statistical variations, that school is racially identifiable. *Id.*

Commitment to Equal Access and Equal Opportunity in Public Higher Education, p. 7 (hereinafter "1978 Plan" or "Desegregation Plan").

14.     OCR determined that Florida had failed to eliminate its separate and unequal system of education and continued to engage in practices that originated during official segregation, including: (1) the chronic underfunding of Black institutions as compared to White institutions; (2) failing to offer unique (not duplicated at White institutions) academic programs at Black institutions outside of traditional core educational programs, thereby impeding the capabilities of those institutions to become magnets for diverse faculty and students; (3) duplicating unique programs and courses[13] at nearby White institutions; (4) limiting the academic mission statements of Black institutions to be defined exclusively on the basis of race; (5) having fewer professors who have PhDs and disparities in the caliber of teaching faculty at Black colleges and universities as compared to White institutions; (6) insufficiently resourcing research at Black institutions; (7) failing to maintain or upgrade the physical condition of the plant and buildings/facilities at

---

[13] As explained in further detail herein, *see* Section II, the concept of "unnecessary program duplication" refers to the acknowledged practice during segregation of offering non-core programs at both a Black school and at any nearby, **"geographically proximate"** White school. *See U.S. v. Fordice*, 505 U.S. 717, 738-739 (1992) ("it can hardly be denied that such duplication was part and parcel of the prior dual system of higher education—the whole notion of 'separate but equal' required duplicative programs in two sets of schools—and the present unnecessary duplication is a continuation of that practice."). A "non-core" program refers to programs that are not essential to providing a basic liberal arts and sciences education at the Bachelors level.

Black institutions; and (8) failing to address student enrollment/admissions disparities between Black and White colleges and universities.[14]

15. In response to Florida's failure to desegregate, in 1978 OCR approved an extensive five year Desegregation Plan for Florida to address the vestiges of pre-*Brown* segregation that remained in 1978. The OCR-approved 1978 Plan required Florida to: (1) disestablish the dual system and enhance FAMU; (2) desegregate the student body at FAMU; and (3) increase minority employment and representation on Boards of Governance.

16. With respect to objective number one, Florida identified the following (among others) as vestiges of official segregation that remained in Florida's higher education system in 1978, and in turn committed to their remediation: (1) racially defined mission statements: ensure that the mission statements for all state institutions of higher education were defined on a foundation other than race; (2) underfunding: allocate equitable budget resources to FAMU that recognized the prior chronic underfunding of FAMU during official segregation as compared to White institutions; (3) poor facilities and small campuses: construct and renovate the physical facilities at FAMU that are disparately small and of poorer quality than at

---

[14] *See e.g.*, *United States v. Fordice*, 505 U.S. 717, 718-721 (1992) (summary of findings); 1998 Partnership Agreement, referenced *infra*, at ¶¶ 85-90, pp. 33-37; *see generally* Leland Ware, "The Most Visible Vestige: Black Colleges After Fordice," B. C. L. Rev., Vol. 35, Issue 3, Article 5 (May1, 1994).

public White institutions in Florida; (4) the lack of unique, high demand programs: to attract other-race students to attend FAMU[15]

17.   All of the foregoing was specifically identified by both OCR and Florida as maintaining unlawful segregation stemming from prior official segregation policies.  These policies are "traceable" to segregation, because they were and are policies and practices similar to those originally implemented during segregation to ensure that Black institutions remained separate and unequal.

18.   In 1994, OCR issued a Notice of Application of Supreme Court Decision[16] (the "OCR Notice") revisiting Florida's 1978 Plan in light of the U.S. Supreme Court's pivotal decision in *U.S. v. Fordice*, 505 U.S. 717 (1992).  After noting that *Fordice* ratified the Department of Education's longstanding position that States have an affirmative duty to dismantle their formerly *de jure* segregated systems of higher education, OCR's 1994 Notice to Florida determined that many of the previously identified vestiges of Florida's now unlawful segregation policies and practices, as identified in the 1978 Plan, remained in practice in Florida in 1994. As a consequence, OCR approved a new five year plan outlining what prior and new obligations Florida would undertake to dismantle its separate and unequal system of higher education.   *See* 1998 Florida/United States Office For Civil Rights

---

[15] 1998 Partnership Report, p. 5.
[16] Federal Register, 59 Fed. Reg. 4271 (Jan. 31, 1994).

Partnership Report and Commitments, p. 5 (hereinafter the "1998 Partnership Report").

19.     The *Fordice* decision identified policies and practices in Mississippi that continued to fail to eliminate all prior vestiges of former official segregation in that state.  In *Fordice*, the U.S. Supreme Court rejected the notion that race neutral policies were sufficient and recognized that practices traceable to official segregation, such as the chronic underfunding to Black institutions, and extensive duplication of non-core programs at public HBCUs by White institutions, were violations of *Brown*.  *Id.* at 728.

20.     *Fordice* makes clear that "[i]f the State perpetuates policies and practices traceable to its prior *de jure* dual system that continue to have segregative effects—whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system—and such policies are without sound educational justification and can be practicably eliminated, the policies violate the Clause." *Fordice*, 505 U.S. at 731.  Thus, in *Fordice*, the Supreme Court rejected an analytical framework that would have permitted states to simply comply with race-neutral policies, and instead obligated states to do more.

21.     To comply with *Fordice*, Florida was to establish a distinct academic identity at FAMU and attract a racially diverse student body.  *Fordice*, 505 U.S. at 740-741.  Consequently, Florida was required to eradicate unnecessary program

duplication, which in this instance meant to no longer: (1) transfer existing unique programs from FAMU to Florida's TWIs; (2) eliminate unique programs from FAMU altogether; (3) force FAMU into cooperative programs with TWIs; or (4) merge FAMU or its unique programs with Florida's TWIs.

22.    Part and parcel of eliminating unnecessary program duplication is to create unique and/or high demand programs at FAMU, thus giving it the ability to have its own distinctive academic identity.  A program is only "unique" to FAMU if it is not offered at FSU, the only TWI that is geographically proximate to FAMU. Once a "unique" program is duplicated, it is no longer unique. A "high demand" program is one that a disproportionately large number of students are likely to choose as their major program(s) of study.

23.    In 2003, Florida issued a report claiming that it had met all of its obligations under the 1998 Partnership Agreement.  In reality the Defendants failed, and continue to fail, to dismantle the dual and unequal system and eliminate segregation in higher education in Florida as required by *Fordice.* Moreover, Defendants have failed to meet their commitments to FAMU not only as outlined in the Partnership Agreement but also as required by the U.S. Constitution.

24.    Significantly, OCR has never confirmed that Florida has eliminated all prior vestiges of its segregated system.  FAMU remains separate and unequal to Florida's TWIs.

12

25.    Instead, as had been the case during segregation, Florida failed to elevate FAMU as a university with a distinctive identity anchored in unique and high demand programs.  FAMU currently has a total of only 4 unique (*i.e.*, not offered at regionally proximate FSU) "high demand" programs. These programs include only 1 unique high demand program offered at the bachelor's level (Public Relations/Image Management), 1 unique high demand program at the master's level (Social Work), and two programs at the doctoral level (Pharmacy and Pharmacy/Pharmaceutical Sciences & Administration).  This compares with FSU's 10 unique (not offered at FAMU) high- demand programs.[17]



_____

[17] FSU's unique high demand programs include only 3 offered at the bachelor's level (Natural Resources Conservation and Research, Digital Communication and Media/Multimedia and Special Education and Teaching, General) and seven programs at the doctoral level (Computer and Information Curriculum and Instruction, Counselor Education / School Counseling / Guidance, Biology/Biological Sciences, General, Public Administration, Social Work and Business / Commerce).

13

26.    FAMU has not one unique (not offered at any TWI in Florida) high demand program in a statewide comparison to the White public universities in Florida.

27.    Since its founding in 1887, the "racial identity" of FAMU continues to be FAMU's brand.  This branding fails to satisfy Defendants' obligations under *Fordice*.  In light of the enduring and widespread unnecessary duplication of non-core programs and high demand non-core programs offered across degree levels at FAMU by neighboring FSU and other Florida TWIs, FAMU does not have an institutional identity based on its university mission and program offerings that distinguish it from FSU and the other public TWIs in Florida.  FAMU continues to offer relatively few programs – especially non-core programs that are both: (1) in high demand by students and (2) unique to FAMU.

28.    Florida has also failed to address disparities in recruitment of high caliber and racially diverse faculty.  For example, FAMU faculty salaries are approximately 25-35% less than faculty salaries at TWIs.  *See also* Section IV, *infra* for a discussion of Florida's failures with respect to FAMU faculty caliber and diversity.

29.    To remedy the past effects of segregation, and in addition to developing FAMU's non-race based academic identity, Florida should fund FAMU at a level where FAMU can reach equity with Florida's TWIs and support its operations,

educational programs, infrastructure, and endowments.[18]  For example, for the 2018-2019 academic year, State Appropriations to FAMU amounted to $10,300 per student compared to UF, which received $14,574 per student.  In fact, from 1987 to 2020, the per student State funding appropriation to FAMU to be 67.5% of the per student appropriation to UF.

30.     Public HBCUs, such as FAMU, rely on federal, state, and local funding more heavily than their non-HBCU counterparts.[19]  As further set forth in Section III, *infra*, for the 2020-2021 academic year, FAMU received a State Appropriation[20] from Florida of $122,766,288 for which it had an approved State budget for $396,933,478.[21]  This appropriation from the State accounted for roughly 30.9% of FAMU's budget. By comparison, UF received $783,386,000 in State appropriations,

---

[18] Florida has implemented a Performance Based Funding Model ("PBFM").  While the model uses "facially neutral" metrics to award the State's public institutions State funds for higher education, the metrics have a significant disproportionate impact on FAMU as a predominantly Black school.  The results of this funding model show FAMU repeatedly in the bottom tier on its criteria confirming that *Fordice* has not been complied with and allocating to FAMU insufficient monies under those metrics for FAMU to be brought to par with FSU or UF; the White schools founded in the same era as FAMU.

[19] Krystal L. Williams, BreAnna L. Davis, *Public and Private Investments and Divestments in Historically Black Colleges and Universities,* ACE (Jan. 2019), https://www.acenet.edu/Documents/public-and-private-investments-and-divestments-in-hbcus.pdf.

[20] Plaintiffs adopt the definition for "State Appropriation" from Integrated Postsecondary Education Date System ("IPEDS"), a division of the National Center for Education Statistic, part of the U.S. Department of Education,  that state appropriations are amounts received by the institution through acts of a state legislative body, except grants and contracts and capital appropriations. Funds reported in this category are for meeting current operating expenses, not for specific projects or programs.   Here data collected herein regarding state appropriations is compiled from IPEDS and accessible here: https://nces.ed.gov/ipeds/use-the-data (last accessed, June 30, 2023).

[21] *Id.*

15

which amounted to 14.11% of its budget of $5,548,135,463.[22]  Consequently, FAMU is more reliant on State funding.

31.     HBCU endowments lag behind those of non-HBCUs and this gap jeopardizes an HBCU's ability to supplant shortfalls in public funding from other sources.[23] There is no greater sign of the disparity than comparing economic growth of FAMU to UF and FSU.  In the 118 years since the Buckman Act, UF and FSU have grown into institutions that rival any other in the United States.  In 2020, FAMU's endowment was reported at $95.6 million.[24] By comparison, as of June 30, 2018, total assets held for the UF's endowment foundation were $2.04 billion.[25]

32.     As a result of the aforementioned failures and others described herein, in present day Florida in violation of *Fordice*, "the student bodies at the white universities [are] still predominantly white, and the racial composition at the black institutions remain[s] largely black."  *Fordice*, 505 U.S. at 718.  As of the fall of 2021, FAMU's student body racial composition was 83.4% Black/African American followed by 8.1% White/Caucasian.  By way of comparison, traditionally White

---

[22] *Id.*
[23] *Id.*
[24] As of June 30, 2020. U.S. and Canadian Institutions Listed by Fiscal Year 2020 Endowment Market Value and Change in Endowment Market Value from FY19 to FY20 (Report). National Association of College and University Business Officers and TIAA. February 19, 2021. Retrieved February 20, 2021
[25]*Endowment & Total Assets,* UF Advancement, https://www.uff.ufl.edu/documents/donor-resources/endowment/.

16

FSU remains racially identifiable with a majority (56.3%) of White students and a minority (9.2%) of Black students.

**FAMU Student Body (Fall 2021)**[26]     **FSU Student Body (Fall 2021)** [27]



*The most common ethnicity is Black/African American (83.4%) followed by White/Caucasian (8.1%.)*

*The most common ethnicity is White/Caucasian (56.3%) followed by Hispanic/Latino (20.7%.)*

33.    Accordingly, Plaintiffs seek to enjoin Defendants from continuing discrimination against them as students at FAMU—including Defendants' failure to dismantle the dual and unequal system of higher education to comply with *Fordice*, Title VI, and the Fourteenth Amendment.  This discrimination includes Defendants' failure to address FAMU's lack of program offerings, including the continuing absence of a meaningful number of non-core unique and non-core unique, high demand programs at FAMU, and Defendants' failure to eliminate unnecessarily

---

[26] *See* Florida A&M University Profile – Florida Shines, https://courses.flvc.org/College/Florida-A-And-M, (last accessed, June 27, 2023).
[27] *See*  Florida State University Profile – Florida Shines, https://courses.flvc.org/College/Florida-State, (last accessed, June 27, 2023).

17

duplicated non-core programs at FSU.  The State has also not expanded FAMU's mission nor framed its institutional identity as tethered to something other than race, which would be achieved by anchoring FAMU's identity in new unique program offerings that are in high demand by students and are not offered at nearby FSU.

34.    Plaintiffs also seek to enjoin Defendants' current underfunding of FAMU, and compel appropriate funding for FAMU, including ensuring Defendants award adequate State funds to FAMU that redress the school's historic underfunding.  As compared with TWIs across the State, FAMU has significantly fewer total students, and therefore cannot be compared to larger TWIs solely on a basis of per student funding.  Per student funding overlooks the economies of scale benefitting these larger schools and FAMU's historical underfunding, which is not captured when only per student funding amounts are reviewed.

35.    Unless this Court grants Plaintiffs' requested relief, Plaintiffs will continue to suffer racial discrimination in Florida's system of higher education.

## <u>JURISDICTION</u>

36.    Pursuant to 28 U.S.C. § 1331, 1343 (a)(3) and 1367(a), Plaintiffs seek declaratory and injunctive relief for deprivations under color of state law of their federal civil rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Equal Protection Clause of the Fourteenth Amendment.

18

## VENUE

37.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because all of the events giving rise to Plaintiffs' claims occurred in the State of Florida.

## PARTIES

### *Plaintiffs*

38.    Plaintiffs and the putative class they seek to represent are impacted by Defendants' discrimination with respect to higher education in Florida and wish to enforce their rights under Title VI, the Equal Protection Clause of the Fourteenth Amendment, and all other applicable law.

39.    Plaintiff Britney Denton ("Denton") is a student at FAMU.  She is a first year Doctor of Pharmacy candidate.

40.    Plaintiff Nyabi Stevens ("Stevens") is a student at FAMU.  She is a junior majoring in Psychology, with a minor in African American Studies.

41.    Plaintiff Deidrick Dansby ("Dansby") is a student at FAMU.  He is a junior majoring in Math Education.

42.    Plaintiff FayeRachel Peterson ("Peterson") is a student at FAMU.  She is a first-year graduate student seeking a Master's of Science degree in Chemistry.

43.    Plaintiff Alexander Harris ("Harris") is a student at FAMU.  He is a junior majoring in Engineering.

19

44.    Plaintiff Jacari Hester ("Hester") is a student at FAMU.  He is a senior majoring in Interdisciplinary Studies.

***Defendants***

45.    Defendant the Board of Governors of the State University System of Florida ("BOG or "Board of Governors") is an agency created by Defendant the State of Florida to govern the State's public universities.  Fla. Const. art. IX, § 7(b).

46.    As an agency and instrumentality of the State of Florida, the BOG shall:

> [O]perate, regulate, control, and be fully responsible for the management of the whole university system. These responsibilities shall include, but not be limited to, defining the distinctive mission of each constituent university and its articulation with free public schools and community colleges, ensuring the well-planned coordination and operation of the system, and avoiding wasteful duplication of facilities or programs.

Fla. Const. art. IX, § 7(d)

47.    The BOG's constitutional duties include:

    (a)    Defining the distinctive mission of each constituent university.

    (b)    Defining the articulation of each constituent university in conjunction with the Legislature's authority over the public schools and Florida College System institutions.

    (c)    Ensuring the well-planned coordination and operation of the State University System.

    (d)    Avoiding wasteful duplication of facilities or programs within the State University System.

    (e)    Accounting for expenditure of funds appropriated by

the Legislature for the State University System as provided by law.

(f)     Submitting a budget request for legislative appropriations for the institutions under the supervision of the board as provided by law.

(g)     Adopting strategic plans for the State University System and each constituent university.

(h)     Approving, reviewing, and terminating degree programs of the State University System.

(i)     Governing admissions to the state universities.

(j)     Serving as the public employer to all public employees of state universities for collective bargaining purposes.

(k)     Establishing a personnel system for all state university employees; … [and]

(l)     Complying with, and enforcing for institutions under the board's jurisdiction, all applicable local, state, and federal laws.

Fla. Stat. § 1001.705(2).

48.    The BOG is comprised of standing and ad hoc committees – such as the Audit and Compliance Committee, Budget and Finance Committee, and Facilities Committee – which consider matters that are encompassed within the subject matter assigned to each committee and make recommendations to the Board.  *See* Operating Procedures of the Board of Governors of the State University System of Florida art. VI, § A.

Case 4:22-cv-00341-RH-MAF   Document 66   Filed 07/03/23   Page 25 of 124


49.   "In addition to actions constitutionally authorized, [the BOG] may initiate any of the following actions" if it determines that a university is unable to comply with any law or BOG rule, regulation, or audit recommendation:

(a)   Withhold the transfer of state funds, discretionary grant funds, discretionary lottery funds, or any other funds appropriated to the Board of Governors by the Legislature for disbursement to the state university until the university complies with the law or Board of Governors' rule or regulation.

(b)   Declare the state university ineligible for competitive grants disbursed by the Board of Governors.

(c)   Require monthly or periodic reporting on the situation related to noncompliance until it is remedied.

(d)   Report to the Legislature that the state university is unwilling or unable to comply with the law or Board of Governors' rule or regulation and recommend action to be taken by the Legislature.

*See* Fla. Stat. § 1008.322(5).

50.   Defendant Raymond Rodrigues ("Rodrigues" or "Chancellor") is sued in his official capacity as the Chancellor and Chief Executive Officer of the SUS and of the BOG.  The SUS Chancellor "may investigate allegations of noncompliance with any law or BOG rule or regulation and determine probable cause," and shall report to the BOG any findings that "a university is acting without statutory authority or contrary to general law."  *See* Fla. Stat. § 1008.322(3)(a)(b).

51.     Defendant SUS Chancellor is also responsible for regular interaction with university presidents, the Florida legislature, and the Executive Office of the Governor on issues of critical importance to the SUS.[28]

52.     The SUS Chancellor's responsibilities further include assessing and approving the academic need and the need to build any joint-use facilities to house approved programs.  *See* Fla. Stat. § 1013.52.

53.     Defendant Manny Diaz, Jr. ("Diaz" or "Commissioner") is sued in his official capacity as a member of the BOG.  Diaz is the Commissioner of Education of the State of Florida.  *See* Fla. Stat. § 1008.32(2).  The Commissioner of Education is a permanent member of the BOG, and in that role determines allocations of performance-based funding for public universities in the State of Florida.  Fla. Stat. § 1001.70(1).

54.     Defendant Brian Lamb ("Lamb") is sued in his official capacity as a member of the BOG.  Lamb serves as the Chair of the BOG, a role elected by the BOG's seventeen members. Lamb also serves as chair of the BOG's Nomination and Governance Committee and Tuition Appeals Committee. He is also a participating member of the BOG's Budget and Finance Committee, Facilities Committee, and Task Force on Academic and Workforce Alignment.

---

[28] Caden DeLisa, *Board of Governors Votes to Appoint Ray Rodrigues as University System Chancellor*, The Capitolist (Sep. 14, 2022), https://thecapitolist.com/board-of-governors-votes-to-appoint-ray-rodrigues-as-university-system-chancellor/.

55.     Defendant Eric Silagy ("Silagy") is sued in his official capacity as a member of the BOG.  Eric Silagy serves as the Vice-Chair of the BOG, a position in which he was elected to serve by the BOG's seventeen members.  Silagy also serves as chair of the BOG's Budget and Finance Committee and as vice-chair of the BOG's Nomination and Governance Committee and Tuition Appeals Committee. He is also a participating member of the BOG's Facilities Committee and the Task Force on Academic and Workforce Alignment.

56.     Defendant Timothy M. Cerio ("Cerio") is sued in his official capacity as a member of the BOG.  In that role, he serves as chair of the BOG's Academic and Student Affairs Committee, and is a participating member of the BOG's Budget and Finance Committee, Nomination and Governance Committee, Task Force on Academic and Workforce Alignment, and Tuition Appeals Committee.

57.     Defendant Aubrey Edge ("Edge") is sued in her official capacity as a member of the BOG.  In that role, she serves as chair of the BOG's Audit and Compliance Committee and as vice-chair of the BOG's Academic and Student Affairs Committee and Strategic Planning Committee. She is also a participating member of the BOG's Academic and Research Excellence Committee, Innovation and Online Committee, Nomination and Governance Committee, and Tuition Appeals Committee.

58.     Defendant Patricia Frost ("Frost") is sued in her official capacity as a member of the BOG.  In that role, she is a participating member of the BOG's Academic and Student Affairs Committee, Audit and Compliance Committee, and Strategic Planning Committee.

59.     Defendant Edward Haddock ("Haddock") is sued in his official capacity as a member of the BOG.  In that role, he serves as chair of the BOG's Innovation and Online Committee, and is a participating member of the BOG's Academic and Student Affairs Committee, Audit and Compliance Committee, Facilities Committee, and Tuition Appeals Committee.

60.     Defendant Jack Hitchcock ("Hitchcock") is sued in his official capacity as a member of the BOG.  In that role, he is a participating member of the BOG's Academic and Student Affairs Committee, Budget and Finance Committee, Innovation and Online Committee, and Strategic Planning Committee.

61.     Defendant Ken Jones ("Jones") is sued in his official capacity as a member of the BOG.  In that role, he serves as chair of the BOG's Task Force on Academic and Workforce Alignment, as vice-chair of the BOG's Budget and Finance Committee, and is a participating member of the BOG's Academic and Research Excellence Committee, Audit and Compliance Committee, Facilities Committee, and Nomination and Governance Committee.

62.    Defendant Darlene Luccio Jordan ("Jordan") is sued in her official capacity as a member of the BOG.  In that role, she serves as chair of the Academic and Research Excellence Committee and as vice-chair of the BOG's Innovation and Online Committee.  She is also a participating member of the BOG's Nomination and Governance Committee, Strategic Planning Committee, Task Force on Academic and Workforce Alignment, and Tuition Appeals Committee.

63.    Defendant Alan Levine ("Levine") is sued in his official capacity as a member of the BOG.  In that role, he serves as chair of the BOG's Strategic Planning Committee, and is a participating member of the BOG's Academic and Research Excellence Committee, Audit and Compliance Committee, Nomination and Governance Committee, and Tuition Appeals Committee.

64.    Defendant Charles H. Lydecker ("Lydecker") is sued in his official capacity as a member of the BOG.  In that role, he serves as chair of the BOG's Facilities Committee and as vice-chair of the BOG's Academic and Research Excellence Committee.  He is also a participating member of the BOG's Budget and Finance Committee, Innovation and Online Committee, Nomination and Governance Committee, and Tuition Appeals Committee.

65.    Defendant Craig Mateer ("Mateer") is sued in his official capacity as a member of the BOG.  In that role, he serves as vice-chair of the BOG's Audit and

Compliance Committee and Tuition Appeals Committee.  He is also a participating member of the BOG's Facilities Committee and Innovation and Online Committee.

66.    Defendant Deanna Michael ("Michael") is sued in her official capacity as a member of the BOG.  In that role, she is a participating member of the BOG's Academic and Student Affairs Committee, Facilities Committee, Innovation and Online Committee, and Strategic Planning Committee.

67.    Defendant Jose Oliva ("Oliva") is sued in his official capacity as a member of the BOG.  In that role, he is a participating member of the BOG's Academic and Research Excellence Committee, Audit and Compliance Committee, and Strategic Planning Committee.

68.    Defendant Steven M. Scott ("Scott"), along with BOG members Rodrigues, Diaz, Lamb, Silagy, Cerio, Edge, Frost, Haddock, Hitchcock, Jones, Jordan, Levine, Lydecker, Mateer, Michael, and Oliva is sued in his official capacity as a member of the BOG.  In that role, Scott serves as vice-chair of the BOG's Facilities Committee, and is a participating member of the BOG's Academic and Research Excellence Committee, Academic and Student Affairs Committee, Budget and Finance Committee, and Strategic Planning Committee.

69.    There is no FAMU graduate on the BOG, despite there being three UF graduates (Cerio, Levine, and Jones) and three FSU graduates (Jones, Mateer and

27

Hitchcock). No member of the BOG has a connection to FAMU and only one member of the BOG is African American.



Top Row: Chancellor Raymond Rodrigues, Timothy Cerio, Manny Diaz, Aubrey Edge, Ken Jones, Craig Mateer
Middle Row: Jack Hitchcock, Edward Haddock, Jose Oliva, Patricia Frost, Deanna Michael
Bottom Row: Darlene Luccio Jordan, Brian Lamb, Alan Levine, Steven Scott, Eric Saligy, Charles Lydecker

70. Defendant the State of Florida ("State" or "Florida") receives federal funding for its higher education system, including funds utilized for student financial aid and research grants.

71. All Defendants are recipients of federal financial assistance, including but not limited to, the direction, control, and disbursement of federal funds.

72. Plaintiffs and the proposed Class, as current students of FAMU, are the intended beneficiaries of this federal funding.

I.   **RELEVANT FACTS ON BEHALF OF ALL PLAINTIFFS AND ALL OTHER SIMILARLY-SITUATED STUDENTS**

A.   *THE STATE'S OBLIGATION TO END AND DISMANTLE ITS SEPARATE AND UNEQUAL HIGHER EDUCATION SYSTEM*

73.   The Supreme Court's decision in *Brown* held that segregated school systems violate the Equal Protection Clause of the Fourteenth Amendment.  At the time of the decision, Florida's dual and unequal system of higher education was firmly in place.  A marginal number of Black students were admitted to TWIs prior to the *Brown* decision.  These students were only eligible for admission if the degree programs they wished to pursue were not offered at the State's lone public HBCU: FAMU.

74.   Following *Brown*, Florida did nothing more than lift the rule excluding Black students from admission to Florida's public and private TWIs.

75.   The 1964 Civil Rights Act opened a floodgate of desegregation litigation in states that had previously operated *de jure* systems of segregation. Courts began to determine that those states had an obligation to take affirmative steps to eliminate segregation "root and branch" until all vestiges of the dual system had been eliminated including the affirmative duty to eliminate the racial identity of schools.[29]

---

[29] *Green v. County Sch. Bd.*, 391 U.S. 430, 437-38 (1968) (determining, in the context of public elementary and high schools, that states have an affirmative duty to eliminate segregation); *Hunnicutt v. Burge*, 356 F.Supp. 1227, 1230, 1238 (M.D. Ga. 1973) (extending the *Green* decision to public higher education and finding that the state of Georgia violated its obligation to

76.     Following its 1970 determination that "the State of Florida was operating a racially identifiable higher education system in violation of Title VI of the Civil Rights Act of 1964," OCR accepted Florida's 1978 Desegregation Plan, which placed primary emphasis on eliminating the vestiges of the prior official racial segregation policy in Florida's higher education institutions.

77.     The Desegregation Plan committed the State to an array of remedial measures that were directly related to desegregation, including, among other things, "disestablishment of the structure of the dual system and enhancement of the traditionally black institution [FAMU]."   1998 Partnership Agreement, p. 5. Specifically: "To ensure enhancement of FAMU's program offerings, the Florida plan [1978-1985] provided for three types of actions: 1) resolution of unnecessary program duplication by such methods as program elimination/realignment and cooperative/joint programs; 2) strengthening of existing programs at FAMU; and 3) implementation of new academic programs at FAMU."   *Id.*

78.     Pursuant to the Desegregation Plan, Florida agreed to allocate equitable budget resources to FAMU, construct and renovate physical facilities at FAMU, and expand and strengthen curricular offerings at FAMU—including establishing non-

---

desegregate its colleges and universities by allowing its HBCU to continue to offer a marginal level of instruction, based on the court's determination that the HBCU's academic programs were demonstrably inferior to the programs available at nearby white colleges). The *Hunnicutt* Court specifically held that the adoption of race-neutral policies was insufficient to meet the state's affirmative duty to eliminate the racial identity of the HBCU and further ordering the state to develop and implement a desegregation plan for its HBCU. *Burge*, 356 F.Supp. 1227 at 1230.

core, unique (not offered at geographically proximate FSU) and unique/high demand

undergraduate and graduate programs at FAMU.  Florida also agreed to periodically

reassess the comparability of resources between FAMU and Florida's TWIs with

similar missions.[30]

79.     *Fordice*, decided in 1992, highlighted the actions states must take in

order to dismantle the *de jure* segregation in higher education.  The *Fordice* decision

held that where a state has, in the past, operated a *de jure* segregated system of higher

education, it must take affirmative measures to eliminate those policies and practices

traceable to its prior segregated system.  Even though a state may have abolished the

legal requirement that White and Black students be educated separately and may

have established policies that were "racially neutral" and not animated by a

discriminatory purpose: "policies run afoul of the Equal Protection Clause" if they

continue to have segregative effects.[31]

80.     In so doing, *Fordice* identified some examples of policies and practices

considered to have the character or effect of prior official racially segregated policies

and practices, and the affirmative responses that states must take to address those

_____

[30] This also supports why mission statements are critical and important because they make an impact on the amount of funding and determine what other higher education institutions FAMU will be compared to.  The importance of mission statements in  dismantling de jure segregation is discussed, *supra*, at Section V.
[31] *United States v. Fordice*, 505 U.S. 717, 731 (1992).

31

vestiges of official segregation and thereby work toward dismantling the continual segregation of their education systems.

81.     Among other identified vestiges of official segregation, the *Fordice* Court held that the present-day unnecessary program duplication of non-core unique courses perpetuates policies and practices traceable to the prior *de jure* segregated system, which results in segregative effects in the present day.

82.     Under *Fordice*, the unnecessary duplication of academic programs at historically black institutions and non-historically black institutions of higher learning "was part and parcel of the prior dual system of higher education—the whole notion of 'separate but equal' required duplicative programs in two sets of schools—and . . . present unnecessary duplication is a continuation of that practice." *Fordice*, 505 U.S. at 738.

83.     As a result of the *Brown* decision, the *Fordice* decision, enactment of Title VI, and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, Defendants have a constitutional duty to dismantle former systems of *de jure* segregation in higher education.

84.     The 1994 OCR Notice applied *Fordice*'s standards to all pending Title VI evaluations of formerly *de jure* segregated systems of higher education that had adopted OCR-accepted desegregation plans that had since expired, which included Florida.   The OCR Notice committed OCR to review Florida's then expired

Desegregation Plan and, in light of the new guidance articulated in *Fordice*, to ensure that Florida was in compliance with *Fordice*, which was decided after Florida's original Desegregation Plan was approved in 1978.  That review required OCR's examination of a wide range of factors (as outlined in *Fordice*) to ensure that vestiges of Florida's *de jure* system were in fact eliminated, and further committed OCR to ensure that Florida had completed all of the steps and measures agreed upon in Florida's OCR-approved Desegregation Plan.  The OCR Notice purported to "strictly scrutinize . . . any . . . actions that might impose undue burdens on [B]lack students, faculty, or administrators or diminish the unique roles of those institutions."  *Id.* at 4272.

85.    Pursuant to that review, OCR determined that Florida was not in compliance with *Fordice* and had not eliminated all vestiges of segregation.  Thus, in 1998, OCR and Florida entered into a new partnership agreement (the "1998 Partnership Agreement") which identified remaining vestiges of segregation existing in Florida and articulated a new five year plan with specific measures Florida would take to desegregate and comply with *Fordice*.

86.    The 1998 Partnership Agreement identified many vestiges of segregation which remained in Florida in 1998, including among others: (a) low minority student enrollment at all levels of education and issues with education access, retention, graduation, and financing for and of minority students; (b) lack of

racial diversity in governing boards, faculty, and staff; (c) unwelcoming campus environments for minorities at TWIs; (d) underfunding of FAMU; (e) unnecessary program duplication of FAMU's non-core program offerings; (f) lack of unique programs at FAMU; (g) lack of development of FAMU's campus, facilities, and infrastructure at FAMU; (h) lack of development of FAMU's agricultural program offerings; and (i) failure of FAMU to attract a more racially diverse student population.

87. The 1998 Partnership Agreement thus set forth areas requiring change to successfully desegregate Florida's higher education system and noted Defendants' commitments to making those changes. The areas identified as in need of change are identified precisely because they are policies and practices of the State in 1998 that are traceable to prior official segregation, and therefore were perpetuating a dual and unequal system of higher education.

88. Among other things, those commitments included to "ensure that the scope, level, and nature of educational programs at predominantly minority institutions [had] grown; that unnecessary programmatic duplication [had] not resulted in a negative effect on the course offerings of minority institutions; and that the graduate offerings within [the State of Florida] have a growing diverse student population." 1998 Partnership Agreement, p. 38.

34

89.     In light of these identified vestiges of segregation, the 1998 Partnership Agreement laid out commitments to be undertaken by the State over the next five years to dismantle segregation in Florida's public higher education system, including:

      (a)      monitor access and enrollment issues for minority students and, as necessary, enhance its outreach to increase enrollment of African-American and Hispanic students in order to reduce disparities when compared to the enrollment of majority white students;

      (b)      participate in the Federal TRIO programs; continue to use alternative admission criteria as a means of broadening the opportunities of students, including minorities, to attend SUS universities;

      (c)      seek funding levels for its financial aid programs consistent with past levels of commitment; continue or augment the system wide funding to supplement existing university-funded retention services and to monitor academic progress;

      (d)      enhance efforts to regularly assess each campus' atmosphere by sampling student opinions on campus life;

      (e)      ensure that minorities are not adversely impacted by dwindling resources which may limit full time enrollment ("FTE") and the creation or expansion of programs;

      (f)      provide access for minority graduate students;

      (g)      regularly report to the BOG and the Chancellor regarding the diversity of faculty and staff within the SUS;

      (h)      provide opportunities designed to increase the promotional and advancement potential of minority

35

and other employees within the SUS;

(i)      conduct a 'Glass Ceiling' survey at the universities to determine if there are barriers to advancement to executive level positions for racial minorities;

(j)      request appropriate funding for projects on a schedule consistent with the SUS's established process;

(k)      work with the Community Colleges to evaluate the transfer rates of African Americans holding Associate of Arts or Associate of Science degrees in the SUS, and address any variance between these transfer rates which could be attributed to lack of access for minority students;

(l)      ensure that proposed limited access programs are subject to scrutiny to ensure that there is no inappropriate adverse impact on minority students; and

(m)      continue the review by university personnel, including equal opportunity or diversity specialists, of academic program requests.

90.    Regarding FAMU specifically, Defendants agreed to:

(a)      complete construction of the FAMU Architecture Building and of the FAMU Allied Health (Ware Rhaney) building;

(b)      complete the capital construction projects for the following academic departments at FAMU: Pharmacy, Journalism, Business, and Engineering;

(c)      ensure that the Governor will give priority consideration to these funding requests when forwarded by SUS;

(d)      request funding to augment FAMU's programs and activities in agricultural teaching, research, and extension;

36

    (e)      request funding appropriate to enhance the core functions of the College of Arts and Sciences at FAMU, in programs including math, English, political science, and performing arts;

    (f)      request appropriate funding to provide faculty development resources to enable faculty in FAMU's School of Architecture to enhance their research activity, to attend national conferences and present papers, and to pursue other professional development opportunities;

    (g)      request appropriate funding for outreach scholarships and financial aid in the School of Architecture;

    (h)      develop and implement undergraduate and graduate academic programs to further strengthen and broaden the academic programing available to FAMU's students, as well as to attract a more racially diverse student population; and,

    (i)      request appropriate funding to change the appointments of faculty at FAMU's School of Pharmacy to twelve months. 1998 Partnership Agreement pp 79-84

91.    However, the 1998 Partnership Agreement fell short of addressing Florida's obligations to comply with *Fordice*. For example, while the commitments in the 1998 Partnership Agreement mentioned that if there were any concerns that arose in light of the *Fordice* decision they would be addressed, the 1998 Partnership Agreement lacked substantive recommendations for expanding and strengthening academic programs at FAMU that would ensure that FAMU has a distinctive institutional identity (beyond race) anchored in program offerings that are not only unique programs (not offered at TWIs, including at geographically proximate FSU)

37

but also in high demand by students. Nonetheless, Defendants have not complied with the Partnership Agreement.

92.     The primary indicators of continuing segregation in Florida remain, all of which Florida has failed to remedy: (1) FAMU's lack of program distinctiveness, which is anchored in the extensive unnecessary program duplication of FAMU programs such that there is a conspicuous absence of an institutional identity at FAMU that is anchored in a meaningful number of unique and high demand programs; (2) Defendants' chronic underfunding of FAMU; (3) the failure to enlarge FAMU's brand beyond its race-based identity; (4) failure to diversify FAMU's student body, staff and faculty boards; (5) failure to diversify the BOG; (6) failure to develop FAMU's campus, facilities, and infrastructure; and (7) failure to increase FAMU's student retention and graduation rates.

93.     Defendants' failure to eliminate vestiges of segregation in present day Florida result in violations of Title VI and the Equal Protection Clause.

II.    **FAMU'S PROGRAM INEQUALITY AS COMPARED TO FLORIDA'S TWIS**

     A.    *FAMU'S LACK OF PROGRAM UNIQUENESS IS DUE TO DEFENDANTS' CONDUCT*

94.     Defendants' failures to eliminate vestiges of segregation in FAMU's programmatic offerings are twofold: (1) Defendants have failed to ensure that

FAMU has meaningful program uniqueness; and (2) Defendants have failed to stop unnecessary program duplication.

95.    For the past several decades, Defendants have not elevated FAMU's institutional identity by introducing new programs (especially high demand programs that are not offered at geographically proximate FSU in particular). Moreover, Florida has eliminated few programs at Traditionally White Institutions (FSU in particular) that unnecessarily duplicate non-core programs at FAMU, nor have they transferred high demand programs from the Traditionally White Institutions (especially FSU) to FAMU.  Such initiatives are imperative to advancing a distinctive identity at FAMU that is anchored in a meaningful number of unique, high demand programs that would contribute to the elimination of longstanding vestiges of segregation.

96.    Instead, Defendants have continued to take away FAMU's uniqueness by duplicating its non-core programs, shuttering high demand offerings like the FAMU medical school and law school, or merging its high demand programs to become unfavorable joint initiatives with FSU.

97.    Under the 1998 Partnership Agreement, Defendants committed to provide "additional resources [ ] to FAMU [to] enhance its attractiveness to all students by enabling it to offer a broader stronger array of programs or activities." 1998 Partnership Agreement, p. 52.

98.    However, Defendants' have failed to rid Florida of vestiges of segregation and have instead maintained FAMU's "brand" and "institutional identity" as defined by race.

99.    Defendants' acts and omissions in determining what programs FAMU can and cannot offer and which of these programs are also offered or only offered at neighboring TWIs, perpetuates the segregation era policy of defining an institution by race rather than by its programmatic offerings.  FAMU has always been and remains the "Black School."  Its identity as an institution of higher learning is not based on what programs it offers (or other academic criteria such as the strength of its facilities, professors, and faculty research productivity).

100.    The 1998 Partnership Agreement notes that the overall student body population at FAMU does not look "markedly different in terms of its diversity than it did in the late 1970s or early 1980s."  1998 Partnership Agreement, p. 41. Statistics reported by FAMU in the past several years also confirm that there have been negligible increases, if any at all, in the number of other-race, especially White, students attending FAMU.

101.    Without meaningful program uniqueness, other-race students predominantly choose to attend higher education institutions other than FAMU. Thus, the lack of meaningful program uniqueness fails to attract non-Black students to attend FAMU.  A low percentage of non-Black students at a predominantly and

historically Black university like FAMU is, per *Fordice*, recognized as a vestige of segregation.  The significantly low presence of other-race, especially White students, at FAMU is thus further evidence of Defendants' perpetuation of the State's prior official segregation policy.

102.   Florida's system of public education thus remains segregated, with FAMU continuing to be branded as a public Black land-grant university, a brand that is closely tethered to the absence of an institutional identity at FAMU based on its mission and programmatic offerings.  FAMU's program offerings are overwhelmingly duplicated by Florida's TWIs and therefore do not meaningfully distinguish FAMU from Florida's TWIs in both a regional and statewide comparison.  *Fordice* recognized that this undermines other-race (*i.e.*, non-Black) students deciding to attend historically black institutions.

103.   FSU is the only geographically proximate traditionally White institution near FAMU.  FSU unnecessarily duplicates the majority of high demand programs offered at FAMU.  Amplifying the effects of this unnecessary program duplication is that FSU is not only geographically proximate to FAMU, it is literally next door.

104.   The widespread unnecessary duplication of undergraduate and graduate degree programs at FAMU (both in the regional comparison with FSU and a statewide comparison), and the inequality with respect to program offerings at

41

FAMU across degree levels, evidences that Defendants perpetuate a dual and unequal system of higher education.

105.   Meaningful program uniqueness at FAMU means ensuring that FAMU has a meaningful number of high demand non-core programs that are "unique" to FAMU (not also offered at, and therefore not duplicated at, geographically proximate and traditionally White FSU).

106.   A "core" program is defined as all "bachelor's level of non-basic liberal arts and sciences course work." *Fordice*, 505 U.S. at 738.   Any programs that are not essential to providing general and specialized education in the basic liberal arts and sciences at the undergraduate level, and all master's programs and doctoral programs are considered "non-core." *Id.*   The inquiry regarding unnecessary program duplication between FAMU and nearby FSU focuses only on the duplication of non-core programs between the two institutions.

107.   A "high demand program" is defined as a program that a disproportionately large number of students can be expected to choose as their major field of study.

108.   A program is "unique" to a college or university where it is not offered at the institution that it is being compared with.   To illustrate, a program is only "unique" to FAMU if it is not offered at FSU, the only traditionally White institution that is geographically proximate to FAMU.

42

109.   "Unnecessary program duplication" is defined by *Fordice* as "those instances where two or more institutions offer the same nonessential or noncore program.  Under this definition, all duplication at the bachelor's level of non-basic liberal arts and sciences course work and all duplication at the master's level and above are considered to be unnecessary." *Fordice*, 505 U.S. at 738.

110.   The Supreme Court recognized that unnecessary program duplication is a traceable vestige of segregation: "[I]t can hardly be denied that such duplication was part and parcel of the prior dual system of higher education -- the whole notion of 'separate but equal' required duplicative programs in two sets of schools—and that the present unnecessary duplication is a continuation of that practice." *Fordice*, 505 U.S. at 738.[32]

111.   Defendants exert significant control over what programs are offered at FAMU and other public universities in the State of Florida.  Through this control, including by requiring FAMU to have all proposed new programs approved by Defendants; merging programs at FAMU to create "joint" programs at FSU; and eliminating unique, high demand programs (such as FAMU's law school), Defendants perpetuate segregation in Florida.

---

[32] *Fordice* further emphasized that "*Brown* and its progeny, however, established that the burden of proof falls on the *State*, and not the aggrieved plaintiffs, to establish that it has dismantled its prior *de jure* segregated system.  The [district] court's holding that petitioners could not establish the constitutional defect of unnecessary [program] duplication, therefore, improperly shifted the burden away from the State." *Fordice*, 505 U.S. at 738-739.

## B.   *REGIONAL COMPARISON OF FAMU WITH FSU*

112.   At the present, in comparison to geographically proximate FSU, FAMU has 34 unique programs not offered at FSU (16 at the bachelor's level, 12 at the master's Level, and 6 at the doctoral level).   Of those 34 unique programs, only 4 are unique, high demand programs not offered at FSU (1 at the bachelor's level, 1 at the master's level, and 2 at the doctoral level).   And of those 4 unique high demand programs, *only 1* unique, high demand program is offered at the bachelor's level (Public Relations / Image Management CIP 09.0902).[33]   *See* **Appendix A**, annexed hereto, for a list of unique (not offered at FSU) non-core FAMU programs and unique/high demand FAMU programs.

113.   By way of comparison, FSU has a total of 174 unique programs not offered at FAMU (53 at the bachelor's level, 76 at the master's level, and 45 at the doctoral level).   This is five times the number of unique programs at FAMU.   Of those 174 unique programs, 10 are unique high demand programs not offered at FAMU (3 at the bachelor's level, 0 at the master's level, and 7 at the doctoral level). *See* **Appendix B**, annexed hereto, for a list of unique (not offered at FAMU) non-core FSU programs and unique/high demand FSU programs.

---

[33] The other 3 unique high demand programs at FAMU are: Social Work (masters), Pharmacy (doctorate), and Pharmacy/Pharmaceutical Sciences & Administration (doctorate).

114.   By way of further comparison, below is a list of unique high demand programs offered at FAMU (total of 4) as compared to FSU (total of 10):

**Bachelor's Level:**

*FAMU (1)*
Public Relations / Image Management (9.0902)

*FSU (3)*
Natural Resources Conservation and Research, General (3.0101)
Digital Communication and Media/Multimedia (9.0702)
Special Education and Teaching, General (13.1001)

**Master's Level**:

*FAMU (1)*
Social Work (44.0701)

*FSU (0)*

**Doctorate Level:**

*FAMU (2):*
Pharmacy (51.2001)
Pharmacy, Pharmaceutical Sciences, and Administration (51.2099)

*FSU (7):*
Computer and Information Sciences (11.0101)
Curriculum and Instruction (13.0301)
Counselor Education / School Counseling / Guidance (13.1101)
Biology/Biological Sciences, General (26.0101)
Public Administration (44.0401)
Social Work (440701)
Business / Commerce (52.0101)

## Unique High Demand CIPs Offered at FAMU and FSU

| FAMU | | | FSU | | |
|---|---|---|---|---|---|
| CIP | Description | Level Offered | CIP | Description | Level Offered |
| 9.0902 | Public Relations/Image Management | Bachelor's | 3.0101 | Natural Resources Conservation and Research, General | Bachelor's |
| 44.0701 | Social Work | Master's | 9.0702 | Digital Communication and Media/Multimedia | Bachelor's |
| 51.2001 | Pharmacy | Doctorate | 11.0101 | Computer and Information Sciences | Doctorate |
| 51.2099 | Pharmacy, Pharmaceutical Sciences, and Administration | Doctorate | 13.0301 | Curriculum and Instruction | Doctorate |
| | | | 13.1001 | Special Education and Teaching, General | Bachelor's |
| | | | 13.1101 | Counselor Education/School Counseling/Guidance | Doctorate |
| | | | 26.0101 | Biology/Biological Sciences, General | Doctorate |
| | | | 44.0401 | Public Administration | Doctorate |
| | | | 44.0701 | Social Work | Doctorate |
| | | | 52.0101 | Business/Commerce | Doctorate |

115. The lack of program uniqueness at FAMU as compared to geographically proximate FSU is stark:





116. Based upon a review of the SUS Academic Program Inventory, a substantial number of FAMU programs are unnecessarily duplicated at geographically proximate FSU. A total of 50 non-core FAMU programs are duplicated at FSU, including 21 non-core programs duplicated at the bachelor's level (including 13 high demand programs), 19 programs at the master's level (including 7 high demand programs), and 10 programs at the doctoral level (including 7 high demand program).[34] Put otherwise, more than one-half of FAMU programs duplicated at FSU are high demand programs:

---

[34] With respect to unnecessary program duplication, which is *per se* traceable to *de jure* segregation, it is Defendants "to establish that [the State] has dismantled its prior *de jure* segregated system." *Id.* If defendants fail to make this showing, then they must show that those policies have a "sound educational justification" and cannot be "practicably eliminated," which carries a heavy burden—"a court should consider the full range of . . . alternative remedies . . . when determining which would achieve the greatest [] reduction in the identified segregative effects." *Fordice*, 505 U.S. at 739, 743.

## **Bachelor's Level**

21 non-core bachelor's programs at FAMU, including 13 high demand programs at FAMU, are unnecessarily duplicated at FSU:

1.    Information Technology **(High-Demand)**
2.    Elementary Education and Teaching **(High-Demand)**
3.    Secondary Education and Teaching **(High-Demand)**
4.    Music Teacher Education
5.    Bioengineering and Biomedical Engineering **(High-Demand)**
6.    Chemical Engineering
7.    Civil Engineering **(High-Demand)**
8.    Computer Engineering **(High-Demand)**
9.    Electrical and Electronics Engineering **(High-Demand)**
10.   Mechanical Engineering **(High-Demand)**
11.   Industrial Engineering
12.   Criminal Justice/Safety
13.   Social Work **(High-Demand)**
14.   Sociology
15.   Drama and Dramatics/Theater
16.   Fine/Studio Arts **(High-Demand)**
17.   Music, General **(High-Demand)**
18.   Health Services, Allied Health, Health Sciences
19.   Registered Nursing/Registered Nurse **(High-Demand)**
20.   Business Administration and Management **(High-Demand)**
21.   Accounting

## **Master's Level**

19 master's programs at FAMU, including 7 high demand programs, are unnecessarily duplicated at FSU

1.    Curriculum and Instruction **(High-Demand)**
2.    Educational Leadership and Instruction **(High-Demand)**
3.    Bioengineering & Biomedical Engineering
4.    Chemical Engineering
5.    Civil Engineering
6.    Electrical and Electronics Engineering **(High-Demand)**
7.    Mechanical Engineering **(High-Demand)**
8.    Systems Engineering **(High-Demand)**

48

9.     Industrial Engineering
10.    General Studies
11.    Biology/Biological Sciences **(High-Demand)**
12.    Sports and Fitness Admin/Management
13.    Chemistry
14.    Physics
15.    Community Psychology
16.    Public Health
17.    Registered Nursing/Registered Nurse
18.    Business Administration and Management **(High-Demand)**

### Doctoral Level (Doctorate)

10 doctoral programs at FAMU, including 7 high demand programs, are unnecessarily duplicated at the doctoral level at FSU:

1.    Educational Leadership & Instruction
2.    Bioengineering & Biomedical Engineering **(High-Demand)**
3.    Chemical Engineering
4.    Civil Engineering **(High-Demand)**
5.    Electrical and Electronics **(High-Demand)**
6.    Mechanical Engineering **(High-Demand)**
7.    Industrial Engineering **(High-Demand)**
8.    Law **(High-Demand)**
9.    Physics **(High-Demand)**
10.   Materials Science

117.   Again, the extent of unnecessary program duplication between FSU and

FAMU is significant:





## C.   STATEWIDE COMPARISON OF FAMU WITH FLORIDA'S 11 TRADITIONALLY WHITE INSTITUTIONS

118.   In the statewide comparison between FAMU and all 11 of Florida's traditionally White schools, FAMU has *zero* unique high demand programs at all levels (undergraduate, master's, doctorate) that are not offered at any of Florida's TWIs.

119.   This evidences a complete lack of meaningful identity of FAMU at the statewide level.  FAMU's institutional identity is thus explicitly and solely tied to FAMU as a historically black university—an identity based on race, which originates from segregation.

120.   A total of 73 programs offered at FAMU are unnecessarily duplicated at one or more of Florida's traditionally white institutions, including: 33 programs at the bachelor's level, 26 programs at the master's level, and 14 at the doctoral level. *See* **Appendix C**, annexed hereto, for a list of FAMU programs that are unnecessarily duplicated by one or more TWIs across the entire state.

51



**D.   UNFAVORABLE MERGER AND TRANSFER OF FAMU'S UNIQUE PROGRAMS**

121.   Defendants have and continue to create unfavorable cooperative, joint, or merged programs between FAMU and TWIs.  The combination of programs is a further example of Defendants' failure to create a distinctive "brand" for FAMU based on its programmatic offerings rather than on "race."

122.   By way of example, Defendants merged academic programs at FAMU with FSU, a geographically proximate TWI, to create a joint program in Engineering (the "Joint College").

123.   All Engineering programs are high demand (non-core) programs.

124.   As a land-grant university, professional Engineering degree programs are a very important part of FAMU's curriculum and necessary for FAMU to achieve an institutional identity based on its program offerings. FAMU's engineering

52

technology curriculum was expanded in 1980 to include program offerings for architectural engineering technology and construction engineering technology.

125.   These programmatic offerings and related degrees of study made FAMU unique and distinguished from next door FSU, which is not a land-grant institution and whose mission statement is not grounded in industrial and other agricultural related development like FAMU.  *See* Section V, *supra*.

126.   FAMU's Engineering program was a major focus in the University's original mission as a land-grant school.  Given its land-grant mission,  engineering programs are essential to providing FAMU with a distinct institutional identity.  That unique identity has been stripped from FAMU by Defendants' creation of the Joint College.  Many non-minority students no longer need to attend FAMU to enroll in unique high demand Engineering programs.

127.   By way of contrast, prior to the establishment of the Joint College, FSU did not have an active School of Engineering.  In 1959, FSU had attempted to establish a School of Engineering, but that school was eliminated in 1972 due to projected financial deficits.

128.   In 1982, Florida's Board of Regents (a predecessor entity to present day Defendant BOG) approved the establishment of the Joint College based on an agreement between the then Chancellor of the Board of Regents Barbara Newell, FAMU President Walter Smith, and FSU President Bernard Sliger to develop a

*single* engineering school in Tallahassee.  Students in the Joint College Program

remain enrolled at their original university institution (either FAMU or FSU), and

after completing core undergraduate pre-requisite courses at their home institution,

go on to attend courses in their Engineering degree program at a shared building.

Thus, what previously was a unique and very high demand degree solely offered at

FAMU (and related course offerings), became unfavorably merged with FSU as

"shared." Combined with the fact that FSU already has better faculty, more

developed infrastructure, and a much broader selection of course offerings generally,

students no longer have any incentive to attend FAMU for engineering related

programs which are now equally offered at better and more developed FSU.

129.   In 2015, Defendant BOG, through the SUS, retained the services of an

independent non-Florida educational consultant, Collaborative Braintrust, to

conduct an academic feasibility study of the Joint College.[35]  The negative impact of

this merger to FAMU was explicitly noted by the feasibility study.  FSU now exerts

predominant control over the Joint College that arose from an engineering program

was formally unique and only offered at FAMU.

---

[35] Collaborative Braintrust Consulting Firm, *FAMU-FSU Joint College of Engineering Study, Final Report*, January 12, 2015, accessible here: https://www.famu.edu/about-famu/leadership/board-of-trustees/pdf-archives/Final%20Report.pdf (last  accessed July 2, 2023).

130.   Significantly, since the Joint College was established there has been a declining population of FAMU students and an increasing population of FSU students enrolled in the Joint College.

131.   From 2005 through 2015, FSU student enrollments in Engineering programs increased 36% while FAMU enrollments decreased 45% during the same period.[36]

132.   In 2015, the nearly $13 million budget for the Joint College was removed from FAMU's general operating revenue in the State budget and moved to a sovereign line, the oversight of which is now under FSU's authority. This stripped FAMU of the Joint College's budget which, it had held since 1987.

133.   The Joint College serves as one example of how FAMU is forced to operate in a different role than geographically proximate TWIs—a role in which HBCUs like FAMU are stripped and robbed of resources and programs for the benefit of TWIs.

134.   The Joint College is only a more recent example of the State's repeated and long-term practice of unnecessary duplication of unique and high demand programs at FAMU.  In 1949, the State established a College of Law at FAMU.  The law school was located in Tallahassee.  In 1965, the State defunded FAMU's law school and opened a new law school at FSU.  In 1966, the SUS prohibited FAMU

---

[36] *Id.*

from accepting any first-year law class in that same year.  Then, in 1968, FAMU's law school was permanently closed and its assets were transferred by the State to FSU to be used for FSU's new law school in Tallahassee.  Over three decades later, in 2000, and only after extensive political efforts, legislation was passed to re-establish a law school for FAMU.

135.   However, FAMU's re-established College of Law was re-opened in Orlando, Florida in 2002, despite FAMU's location in Tallahassee.  FAMU's College of Law was intentionally relocated to Orlando to avoid competing with FSU's law school.

136.   The historical context in which FAMU had its law school stolen should not be lost.  Florida handed over an HBCU's law school to a neighboring White institution during the height of the Civil Rights Movement, and only after forty years of activism and lobbying did Defendants consider re-opening a law school for FAMU, and when they finally did, FAMU's law school was placed 260 miles away so as not to compete with FSU's law school.

137.   Similarly, in 1978, Defendants downsized the College of Agriculture at FAMU and restructured it into a department, forming part of the College of Engineering Services, Technology, and Agriculture.

138.   Defendants' decision to restructure and "downsize" the College of Agriculture at FAMU also involved giving UF, the traditionally-white land-grant

institution, primary control over many of the research, education, and extension services in the State.  This "resulted in a larger share of both state and Federal agricultural and land grant monies going to UF, with FAMU historically receiving little or no monies to further develop or enhance its [ ] programs." 1998 Partnership Agreement, p. 51.

139.   In downsizing the College of Agriculture at FAMU, Defendants' actions have limited the growth and expansion of agricultural and land-grant related programs at FAMU.  This has resulted in less money to support academic research programs, student support, faculty capacity and badly needed technology and infrastructure upgrades, and also affect FAMU's ability to develop a mission statement as a research institution and impacted the attraction of non-black students.

140.   Defendants therefore have historically and continue in the present day to merge, combine, duplicate, or otherwise remove non-core unique high demand programs existing at FAMU for the benefit of geographically proximate and traditionally White FSU and to the significant detriment of FAMU, stripping away any identity it may have had based on something other than race, and in further contravention of *Fordice*.

## III.   DEFENDANTS' CHRONIC UNDERFUNDING OF FAMU

141.   As part of the 1998 Partnership obligations, Defendants promised to "allocate equitable budget resources to FAMU," "periodically reassess the

comparability of resources between FAMU," and TWIs, and seek funding "for efforts to maintain or increase the excellence of FAMU programs and their attractiveness to a diverse group of potential students," commitments which would require significant increases in FAMU's funding. 1998 Partnership Agreement, pp. 7, 26.

142.   Despite these commitments, Defendant's funding of Florida's single public HBCU, FAMU, was not increased or altered in any way by the 1998 Partnership Agreement.

143.   Defendants have perpetuated a dual and unequal education system by: (1) failing to match FAMU's federal land grant funds at a one-to-one match, a practice which Court has found is traceable to *de jure* segregation;[37] (2) chronically underfunding FAMU, which as a smaller institution, requires more per student funding due to economies of scale and due to its dependence on State funding from years or past underfunding and its competitive disadvantage in seeking funding from private gifts, grants and contracts; (3) funding FAMU at a per-student allocation less than Florida TWIs; and (4) implementing the PBFM, which relies on metrics skewed by *de jure* segregative practices, unfairly compares schools that serve populations of different socioeconomic backgrounds, like FAMU, and is traceable to *de jure*

---

[37] *Ayers v. Fordice*, 111 F.3d 1183, 1215-17, 1221-25 (5th Cir. 1997); *Knight v. Alabama*, 14 F.3d 1534, 1546-52 (11th Cir. 1994).

segregation because it perpetuates the same cycle from the *de jure* era of underfunding FAMU.

144.   The lack of investment in FAMU, since the time of official segregation and continuing to this day, translates into fewer resources for students and faculty and perpetuates the vestiges of *de jure* segregation.

A.   **DEFENDANTS' FAILURE TO MATCH FEDERAL LAND GRANT FUNDS**

145.   Florida has two land-grant institutions, UF, which was established by the First Morrill Act of 1862 (or "1862 land-grant institutions") and is a TWI, and FAMU, which was established by the Second Morrill Act of 1890 ("1890 land-grant institutions").

146.   The First Morrill Act was designed to foster the development, in each state, of "at least one college where the leading object shall be, without excluding other scientific and classical studies and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislatures of the States may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life." *See* 7 U.S.C. § 304.

147.   The First Morrill Act did not explicitly exclude African Americans, but allowed segregated states, like Florida, to exclude Black citizens from its benefits.

59

148.   Prior to the Second Morrill Act, people of color were excluded from educational opportunities at land-grant institutions established by the First Morrill Act. The Second Morrill Act required states to establish separate land-grant institutions for Black students or demonstrate that admission to the state's 1862 land-grant institution was not restricted by race.

149.   Thus, FAMU was designated as an 1890 land-grant institution by Florida precisely to maintain *de jure* segregation.  Florida's intent was to continue receiving federal funding for UF, its White only land-grant institution, without having to admit Black students to that institution.

150.   The U.S. Department of Agriculture ("USDA") provides federal funding to 1862 and 1890 land-grant institutions to help support their research. Public land-grant institutions can apply for federal grants for this purpose. Federal legislation stemming from the First Morrill Act obligates states, including Florida, to match federal land-grant funding received by 1862 land-grant institutions (like UF) on a dollar-to-dollar basis.  However, states, like Florida, are only required to provide at least 50% in matching funds to land-grant institutions established pursuant to the Second Morrill Act in 1890, such as FAMU.  Federal legislation also allows Florida to seek institutional waivers of its requirement to match at least 50% of the federal funding granted to land-grant institutions established by the Second Morrill Act, like FAMU, but not a waiver for the State's obligation to 100% match

federal funds given to land-grant institutions established under the First Morrill Act, like UF.  Thus, Florida is permitted to seek a waiver for any fiscal year it decides to withhold even its required 50% match of federal funds provided to FAMU.

151.   Defendants have discretion in their determination of whether to allocate one-to-one matching of federal land grant funds to FAMU.

152.   Historically, Florida has consistently decided to provide less than 100% matching of federal funds to FAMU.  From 2011 to the present, the State has matched at 100% the federal funds granted to UF, and during the same period, the State has decided to invoke its discretion and only match federal funds given to FAMU at an average of 50% or less.[38]  This is to FAMU's significant detriment and is despite the State's obligation to ensure adequate funding to FAMU per its various commitments to OCR and pursuant to *Fordice*.

153.   Specifically, for the 12-year period from FY2011 through FY2022, Defendants chose to withhold a total of $24.4 million[39] to FAMU.

154.   Defendants are responsible for the inequity in the State's one-to-one matching of federal funds granted to FAMU with State funds, which significantly disadvantages FAMU, which is also more reliant on the State's funding than UF. *See* Section III, *infra*.

---

[38]   National Institute of Food and Agriculture, https://www.nifa.usda.gov/grants/programs/capacity-grants (last accessed, June 27, 2023).
[39] This amount has not been adjusted for inflation.

61

155.   The State's failure to match at 100% the federal funds granted to FAMU, as the State has consistently done for UF, is within the State's sole discretion and is not in any way caused by the federal government or the U.S. Department of Agriculture.

156.   Florida has made the intentional decision to not match FAMU's land grant funds at 100% match, which is consistent with its intention to not equitably fund FAMU.

### B.   DEFENDANTS' FAILURE TO EQUITABLY FUND FAMU

157.   From its inception, Florida's higher education system was not built on equality or accessibility, but on educating—and prioritizing—White students. FAMU and its Black students have always been an afterthought.

158.   As previously noted, in 1920, UF received $146,000 from the State in appropriations, while FAMU received only $25,937.[40]  By the end of the Second World War 1945, UF's State appropriation had risen to $1,035,000 while FAMU's was only $201,097.[41]

159.   Funding to FAMU has historically and significantly lagged behind that of UF, Florida's sole other land-grant university, and the same echoes today.  During the time of *de jure* segregation, FAMU was supposed to be separate and equal but

---

[40] Johnson, Larry, et. al., *African American and the Struggles for Opportunity Florida Public Higher Education, 1947 – 1977*, (Aug. 2007), https://eric.ed.gov/?id=EJ813349.
[41] *Id.*

was unequal in every way and funded unequally by the Defendants disproportionally to Florida's TWIs.   Post *Brown*, in which dual systems were recognized as unconstitutional, FAMU has remained underfunded relative to Florida's TWI's.

160.   For the 2008-2009 academic year, State Appropriations[42] to FAMU were $124,324,821[43] for which it had an approved State budget for $323,905,549[44]. FAMU's State appropriation accounted for roughly 38.3% of its budget. By comparison, UF received $662,574,000 in State appropriations, which amounted to 22.1% of its budget of $2,990,260,089.[45]

161.   For the 2020-2021 academic year, State Appropriations to FAMU were $122,766,288 for which it had an approved State budget for $396,933,478.  FAMU's appropriation from the State accounted for roughly 30.9% of its budget. By comparison, UF received $783,386,000 in State Appropriations, which amounted to 14.11% of its budget of $5,548,135,463.

162.   To put this in perspective; FAMU, when compared with the other two public universities that were founded in Florida in 1905: for the 2020-2021 academic

---

[42] As mentioned, *supra*, Plaintiffs adopt the definition for "State Appropriation" from IPEDS, that State Appropriations are amounts received by the institution through acts of a state legislative body, except grants and contracts and capital appropriations. Funds reported in this category are for meeting current operating expenses, not for specific projects or programs.
[43] Data collected herein regarding State Appropriations is compiled from IPEDS and accessible here: https://nces.ed.gov/ipeds/use-the-data (last accessed, June 30, 2023).
[44] Data states herein regarding institution budgets is collected from https://www.flbog.edu/finance/university-budget-information/operating-budget-summaries/ (last accessed, June 30, 2023).
[45] *Id.*

year, FAMU collected $43,673,923 from student tuition from full time equivalent students, UF collected $398,791,000 from same, and FSU collected $206,515,827.[46]

163.   To put this in further perspective, FAMU is also at a competitive disadvantage because its private gifts, grants and contracts make up a small percentage of overall revenue.  For instance, for the 2022-2023 academic year, UF generated athletic revenue of $190,417,139 from its collegiate sports. [47] FSU had a total athletic revenue of $161,141,884.[48]  FAMU on the other hand, only had a total athletic revenue of $13,172,315. [49]

164.   FAMU is also a relatively smaller institution, 10,021 students enrolled in the 2018-2019 academic year, as compared to UF; 52,218 students.  As a school with a smaller student population, FAMU requires more State-allocated funding per student to service its student population, since it lacks economies of scale. Therefore, FAMU is adversely affected by the phenomenon of economies of scale.

165.   Economies of scale recognizes the cost advantages that enterprises obtain due to their scale of operation.  In the context of university spending, institutions (like FAMU) with fewer students require more funding per student as compared to larger institutions (like UF), as the costs of the institution are spread

---

[46] Tuition and fees data compiled from IPEDS and accessible here https://nces.ed.gov/ipeds/use-the-data  (last accessed, June 30, 2023).
[47] NCAA Finances: Revenue and Expenses by school, https://sports.usatoday.com/ncaa/finances, (last accessed, June 27, 2023).
[48] *Id.*
[49] *Id.*

out over less students.  Said otherwise, having a larger number of students reduces the operating cost per student, and therefore would require less spend per student for the same costs that the smaller school also pays.  This means that on-par per student funding between relatively small and relatively larger schools is not in fact equal, as fewer students are bearing the same costs that are spread out over many more students at larger schools.

166.   To eliminate the vestiges of segregation, as required by *Fordice*, FAMU requires more per student funding than Florida's TWIs, especially because FAMU lacks economies of scale, lacks other sources of revenue and have been historically deprived of equity in funding.  Nonetheless, for the 2018-2019 academic year, State Appropriations to FAMU amounted to $10,300 per student compared to UF, which received $14,574 per student.

C.   *DEFENDANTS' PERFORMANCE BASED FUNDING MODEL SHOWS FAMU LAGGING*

167.   In 2014, Defendants implemented a Performance Based Funding Model ("PBFM") for public universities and colleges in the State of Florida, which accounts for approximately 20% of aggregate State Appropriations to Florida's SUS institutions.

168.   The PBFM allocates funds to SUS institutions based on points earned, with a maximum of 100 points possible.  Points are awarded to each SUS institution, including FAMU, on metrics skewed by *de jure* segregation, such as retention rates,

65

post-graduation education rates, degree production, affordability, prospective employment and salaries, access rate, 4-year graduation rates for first-in-time college students, 3-your graduation rates for associates and or transfer students, and 6-year graduation rates.

169.   Defendants' metric system in the PBFM unfairly compares schools that serve student populations of different socioeconomic backgrounds, like FAMU. The metrics used to determine the funding awarded to Florida's public universities favor students who have more resources and support that help ensure academic success at the college level.  This includes, by way of example, college preparatory coursework and standardized testing support, thereby supporting these students to more likely achieve higher testing scores, complete their first year of university, and ultimately graduate, among other things.  Underrepresented minority students and socioeconomically challenged students are often the first-generation college student in their family, may have social or economic barriers, may work while pursuing their course of study, and have less access to resources and support.  These challenges have an impact on institutions such as FAMU, who need the funding that will enable them to adequately serve students facing these challenges.

170.   The PBFM also ignores the significant historical disadvantages FAMU students faced at a Black-only institution under an official segregated regime, basing present-day critical State funding for FAMU on metrics that do not consider the

decades of prior system-wide official policies that disadvantaged Black and other minority students.  In turn, this continues to result in less funding for FAMU, due to its historical disadvantages and the socioeconomic and racial background of the students it predominantly serves, which results in lower performance results for the metrics used by the model, such as student retention and graduation rates.

171.  For instance, in 2021, FAMU reported that more than 60% of its students were Pell grant eligible, the highest proportion among SUS institutions, meaning that they were low-income and that a third of FAMU students are first generation college students, while the average student comes from a family whose annual household income is less than $50,000.[50]

172.  A number of academic researchers who have studied performance-based funding have argued that these systems work to the disadvantage of institutions that are either minoritized or serve a greater share of students who are less well prepared to succeed in college.  For instance, in their 2016 study of Florida's Performance-Based Funding plan, Luke M. Cornelius and Terence W. Cavanaugh found that the performance scores in Florida's plan favored larger institutions, and thus worked to the disadvantage of FAMU which was among the smallest SUS institutions.  They concluded the following:

---

[50] Andrew Serritt, *FAMU Provides $41.5M in Student Tuition Assistance this School Year*, FAMU (Sept. 15, 2021), https://www.famu.edu/about-famu/news/famu-provides-41-5m-in-student-tuition-assistance-this-school-year.php.

> For example, Florida A&M with its historic mission of serving underserved minority students, including many first generation undergraduates, is at an obvious disadvantage in areas such as 2nd Year Retention and Graduation Rates, but is a clear leader in University Access, based on the number of students eligible for the need-based federal Pell grant program. Unfortunately, as will be discussed individually, these off-sets are not really equal. [51]

173.   Cornelius and Cavanaugh also found a strong negative association between the institution performance scores and the percentage of black students at an institution.[52]

174.   Additionally, Rosinger, et al. (2020) produced a report that summarized the current state of Performance-Based Funding ("PBF") models in the US and what research tells us about these programs, concluding the following:

> A growing body of academic research that examines the impact of PBF policies demonstrates that they typically have had little to no effect on degree completion outcomes. While doing little to improve college completion, PBF policies have raised a host of equity concerns. For instance, research indicates that PBF policies have led to restricted enrollment among low-income and minority students who have been found to be less likely to graduate on time relative to their peers.[53]

---

[51] Cornelius, L., & Cavanaugh, T., *Grading the Metrics: Performance-Based Funding in the Florida State University System*. Journal of Education Finance (2016), Vol. 42, No. 2, pp. 153-187. 170,Grading the Metrics: Performance-Based Funding in the Florida State University System on JSTOR.

[52] *Id.* at 179.

[53] Rosinger, K., Ortagus, J., Kelchen, R., Cassell, A., & Voorhees, N., *The Landscape of Performance Based Funding in 2020*, Policy Brief for InformEd States (Jan. 2020), https://static1.squarespace.com/static/5d9f9fae6a122515ee074363/t/60dc8d5d1e22da2407d19649/1625066845646/IS_Brief_LandscapeofPBF-2020.pdf.

175.   A recent study assessing Florida's PBFM has found that changes in the graduation rates are slow and small, and retention rates seem to be unaffected by the implementation of PBFM. [54]   Further, student to faculty ratio is unaffected by the adoption of the PBFM.[55]

176.   FAMU received scores of 72, 70 and 73, respectively for its 2018, 2019 and 2020 Performance-Based Funding Scores.  By comparison, UF, received scores of 93, 95 and 90 for those respective years, and FSU respectively received scores 86, 88, and 85 for same.  For both 2018 and 2020, FAMU was the lowest performing institution in the SUS. [56]

177.   Florida's PBFM has disproportionately benefited the University of UF and FSU, flagship schools with selective admission policies that result in less diverse student populations than Florida's other public universities.

178.   Furthermore, the PBFM includes within its allocation system $21.9 million dollars for National Ranking Enhancement, for which UF and FSU are only eligible.

---

[54]   Madelyn Cintron, *An Analysis of Performance-Based Funding Measures in Florida*, FIU Electronic Theses and Dissertations (March 26, 2019) https://digitalcommons.fiu.edu/cgi/viewcontent.cgi?article=5270&context=etd.
[55] *Id.*
[56]   *Performance Funding*, FL BOG (June 21, 2018), https://www.flbog.edu/wp-content/uploads/2023/04/PBF-Information-2018-19.pdf;*Performance Funding,* FL BOG (May 21, 2019), https://www.flbog.edu/wp-content/uploads/2023/04/PBF-Information-2019-20.pdf; *2020 Performance-Based Funding,* FL BOG (May 28, 2020), https://www.flbog.edu/wp-content/uploads/2023/04/PBF-Information-2020-21.pdf.

179.   Thus, Defendants' PBFM is a policy and practice which provides greater funding to historically white universities than to the historically black universities which effectively eliminates the black universities as viable choices for attendance by white students.

180.   Defendants' PBFM is a policy and practice in which the level of funding turns upon factors shaped by racial discrimination (e.g., the mission statements and limited curricular offerings), historically and presently weaker for FAMU due to segregation and vestiges of segregation.

181.   Defendants' PBFM is a policy and practice which does not provide additional funds to either any university admitting large numbers of students from lower income families who need financial assistance, or any university admitting concentrations of students needing programs of academic/social support.

182.   The performance-based results which resulted in FAMU being in the bottom three of SUS institutions are a function of discrimination and Defendants' failure to meet Defendants' affirmative obligations under *Fordice*; but also, are evidence of the failure to do what *Fordice* requires.

183.   In light of the foregoing, Florida's PBFM requires reevaluation and modification to account for the historical underfunding of FAMU, including but not limited to additional incentives or premiums for historically disadvantaged students,

who are born into families with lesser social capital, have faced historical barriers to higher education, and are consequently less likely to graduate.

## IV.  DEFENDANTS' FAILURES WITH RESPECT TO FAMU'S FACULTY & STAFF DIVERSITY AND FAILURE TO DIVERSIFY THE BOG

184.  The level of faculty pay is very important for institutions.  It enables the institution to compete and retain faculty who are excellent teachers and productive scholars, which helps to attract students and research grants.  For instance, the 1998 Partnership Agreement recognized this by requiring the SUS to "request appropriate funding to provide faculty development resources to enable faculty in FAMU's school of Architecture to enhance their research activity, to attend select national conferences and present papers, and to pursue other developmental opportunities." 1998 Partnership Agreement, pg. 82-83.

185.  The 1998 Partnership Agreement recognized the need to provide faculty development resources at FAMU because historically, faculty salaries at FAMU have consistently been very low relative to other system schools and precisely because the low caliber of faculty at FAMU traces to segregation.

186.  Statistical data from 1961 shows that average faculty compensation (salary + benefits) at FAMU was notably lower than at UF and FSU.  At that time, these were the only three public 4-year institutions in the SUS.  Average

71

compensation at UF was 33% higher than at FAMU, and average compensation at FSU was 35% higher than at FAMU.[57]

187.   In 1980, when there were nine institutions with data for the SUS, FAMU ranked 9th in average pay for full-time professors and associate professors, and 8th for assistant professors. The gap has only widened over time. In 1980, average salaries for full-time professors at FAMU were 14% below the median for the SUS and 24% below the level for UF.[58]

188.   The 1998 Partnership Agreement required Florida to continue its efforts to attract, recruit, and retain racially diverse faculty and staff, precisely to eliminate vestiges of segregation.

189.   As part of this commitment, Florida was required to "review by university personnel, including equal opportunity or diversity specialists," and conduct program reviews to "include analyses [ ] of any possible negative impact upon racial minorities, and academic programs at FAMU." 1998 Partnership Agreement, p. 84.

190.   Currently, faculty salaries at FAMU are still among the lowest in the SUS. [59]

---

[57]   The Economic Status of the Profession, 1960-61: Annual Report by Committee Z Source: AAUP Bulletin , Jun., 1961, Vol. 47, No. 2 (Jun., 1961), pp. 101-134. Published by: American Association of University Professors. Stable URL: https://www.jstor.org/stable/40222643.
[58]   *Id.*
[59]   Collected from IPEDS,  https://nces.ed.gov/ipeds/use-the-data  (last accessed, June 27, 2023).

191.   In 2020, the average faculty salary at FAMU was 11th for full-time professors, 12th for associate professors, and 11th for assistant professors (out of the 12 SUS institutions). [60]

192.   In 2020, the average faculty salary at FAMU was $81,804, as compared to $115,083 at FSU and $119,178 at UF.[61]

193.   Furthermore, the average full-time professor pay at FAMU was 27% below the median for SUS institutions, and 52% below that of UF, the other public land grant institution in Florida.[62]

194.   Given the relatively low financial resources Defendants allocate to FAMU as compared to Florida's TWIs, FAMU is less competitive in attracting faculty, which further undermines FAMU's ability to attract faculty needed for FAMU to become a premier research institution.

195.   Because FAMU is allocated less money by Defendants each fiscal year as compared to FSU and UF, FAMU is unable to compensate its faculty at rates competitive with TWIs.

196.   Moreover, in the 1998 Partnership Agreement, Defendants committed to "maintaining black representation on all appointive statewide and institutional higher education governing boards to approximate the percentage of [B]lacks in the

---

[60] *Id.*
[61] *Id.*
[62] *Id.*

73

population."  The SUS further "agreed to make efforts towards the goal of having [B]lack representation on every appointive institutional or intra-system advisory committee or council." 1998 Partnership Agreement, p. 8.

197.   The BOG's lack of diversity hinders its ability to see the effects of FAMU's continued underfunding and of the dual segregative system, which functions to FAMU's detriment.

## V.   DEFENDANTS' FAILURE TO SUPPORT FAMU UNDERMINED ITS ABILITY TO BROADEN ITS MISSION STATEMENT AND IDENTITY

198.   Mission statements are widely-considered a condensed representation of an institution's identity, a description that conveys to the world why the institution exists and who it is. The message conveyed by a mission statement communicates to its major stakeholders that the institution's decisions align with the institution's purpose.[63]

199.   Mission statements are often highly influential in attracting students and even faculty to attend or seek employment at a particular college or university.

200.   Universities that are highly ranked as providing the highest return on investment clearly tend to be mission-specific schools with strong identities.[64]

---

[63] Dr. Rick N. Bolling, *The Importance of a School Mission Statement*, Graduate Programs for educators (June 16, 2022),https://www.graduateprogram.org/2022/06/the-importance-of-a-school-mission-statement/.
[64] *Ranking ROI of 4,500 US Colleges and Universities,* Center on Education and the Workforce at Georgetown University, https://cew.georgetown.edu/cew-reports/collegeroi/.

201.   The Supreme Court's 1992 decision in *Fordice* made clear that policies and practices traceable to its prior system – including mission statements that influence "student enrollment decisions" – that continue to have segregative effects are without sound educational justification and can be practicably eliminated.[65]

202.   FAMU, originally founded as the State Normal College for Colored Students, was created as a school for Black students in the state of Florida.[66] FAMU's land-grant designation further decreed FAMU as a Black-only institution, maintaining a "separate but equal" system of public higher education until the 1964 Civil Rights Act forced the State to integrate its public schools.  As a land-grant institution, FAMU should be uniquely distinguished from neighboring FSU, offering unique courses related to agriculture, industry, and similar areas that enhance this specific mission.   But Defendants have restricted FAMU from developing this unique identity.

203.   FAMU's present-day mission statement acknowledges the university's "historic mission of educating African Americans," despite the decades that have passed since the end of Florida's state-mandated *de jure* segregation.

204.   The mission statement of FAMU currently reads:

> Florida Agricultural and Mechanical University (FAMU)
> is an 1890 land grant, doctoral/research institution devoted
> to student success at the undergraduate, graduate, doctoral

---

[65] *United States v. Fordice*, 505 U.S. 717, 731–32 (1992).
[66] House bill 133 in 1884.

and professional levels. FAMU enhances the lives of its constituents and empowers communities through innovative teaching, research, scholarship, partnerships, and public service. The University continues its rich legacy and historic mission of educating African Americans and embraces all dimensions of diversity.[67]

205.   The mission statement fails to set out a vision or aspiration for FAMU; that it is or is becoming a prestigious or competitive university in some distinct academic field or research.

206.   FAMU's mission statement, as it stands today, falls short of creating a unique and distinct identity separate from its identity as an HBCU.

207.   FAMU's mission statement, when viewed in combination with Defendants' practices of unnecessary program duplication, lack of unique program availability, and chronic underfunding of FAMU, as required by *Fordice*, significantly influences the decisions of non-Black students to attend FAMU.  This is evidenced by the fact that non-White attendance at FAMU has not increased, and has in fact declined in recent years.

208.   Due to the continued segregative conduct as set forth above, FAMU's mission statement is clearly traceable to segregation and its identity as a Black school.

---

[67] *Mission & History*, FAMU, https://www.famu.edu/administration/sacs/mission-and-history.php (last accessed, July 1, 2023).

## VI.   DEFENDANTS' FAILURES WITH RESPECT TO FAMU'S CAMPUS, FACILITIES, AND INFRASTRUCTURE

209.   Despite their constitutional obligations, including commitments made in the 1998 Partnership Agreement, Defendants have failed to appropriately fund FAMU, including its capital projects.

210.   Defendants are obligated to racially integrate higher education institutions under *Fordice*.  To achieve that goal, it is known that enhanced facilities; and capital improvements; can help to attract a diverse student population.[68]

211.   The differentiation which exists between FAMU and geographically-proximate FSU in facilities and equipment are disparities causally related to the former *de jure* system since in these areas "normal administrative practice should produce schools of like quality, facilities and staffs."[69]

212.   At its inception in 1887, FAMU was housed in a single building that was also home to Lincoln Academy, a high school designated for Black students. The FAMU-Lincoln Academy building sat in an area that is now the present day campus of FSU.[70]

213.   Six years later, in 1893, FAMU was relocated to where it sits today, atop a hill that once served as the 40-acre antebellum Highwood plantation of former

---

[68] *See United States v. Fordice*, 505 U.S. 717, 726–27 (1992).
[69] *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 18-19 (1971).
[70][70]Gerald Ensley, *Little known history: FAMU founded on FSU campus,* Tallahassee Democrat (May 20, 2017), https://www.tallahassee.com/story/news/2017/05/27/little-known-history-famu-founded-fsu-campus/346157001/

Florida territorial governor William Pope DuVal, under whom Florida became the heart of the region's slave trade.  By the nineteenth century, Tallahassee was the epicenter of the cotton industry, attributable primarily to DuVal's vast plantation.[71]

214.   When FAMU was relocated in 1893 – less than three miles away from its original location and from FSU's campus –former plantation buildings remained scattered throughout the largely rural site.  Those same plantation buildings, including DuVal's mansion and a small handful of barns, were repurposed as academic buildings to establish FAMU's campus.  Additional wood-frame structures were also built for FAMU's curriculum in agriculture, manual training, music, and teacher instruction.

215.   When instruction began on the former plantation grounds, FAMU's Black students were attending school on a landscape that had once been home to racial oppression, separation, and bondage.

216.  In the 1998 Partnership Agreement, Defendants committed to "ensur[ing] that their HBCUs are comparable and competitive with the TWIs in all facets of their operations and programs," including the "enhancement of campus environments at HBCUs… with respect to the physical characteristics of landscape, ambiance, and appearance as well as the availability, quality, and adequacy of

---

[71]   J.  Philip  Gruen,  *buildings,*  Society  of  Architectural  Historians,  https://sah-archipedia.org/buildings/FL-01-073-0300 (last accessed, June 27, 2023).

facilities necessary to support the missions and programs of the institutions."  This commitment was identified precisely because of the recognition that FAMU's facilities were subordinate to those of TWIs due to segregative era policies, including the stark fact that FAMU's campus was built (and remains situated) upon a slave plantation.

217.   Defendants failed to complete any capital construction projects for FAMU's Architecture, Business, and Engineering programs between 1998-2003 and to date, these programs have been awarded little, if any, enhancements at all.

218.   Defendants have failed to enhance FAMU to make it as attractive and welcoming as Florida's TWIs, including geographically-proximate TWIs in the State, leaving FAMU to have to fend and obtain financing for its own capital improvements.

219.   In 2019, FAMU had to obtain a $123 million dollar loan from the U.S. Department of Education's HBCU Capital Financing Program to build a 700-bed residence hall and dining facility.  FAMU's trustees determined a federal loan program was the best option to obtain money for FAMU's building project and debt restructuring requests.[72]

---

[72]      https://www.tallahassee.com/story/news/2019/02/20/florida-a-m-expects-close-loan-new-residence-hall-march/2922321002/ (last accessed July 2, 2023).

220.   More recent examples of FAMU's significantly inferior campus, facilities, and infrastructure, problems which stem from and have not been fixed since the former segregative era, include:

(a)    FAMU's Assistant Director of Programs had to plead for a special allocation of approximately $33,000 from FAMU's Student Government Association to reopen its 60,000-square-foot Campus Recreation Center in February 2021;[73]

(b)    FAMU has an on-campus student housing shortage depriving hundreds of FAMU students of on-campus University-provided housing;[74]

(c)    In or around August 2022, FAMU had to temporarily close its Palmetto Phase III student dormitory due to building problems, including significant pest issues and flood damage.  This dormitory closure forced hundreds of FAMU students to relocate to temporary housing mere weeks after returning to FAMU for the start of the new school year. Other FAMU dormitory residences have been temporarily closed due to building issues;[75] and,

(d)    Also in or around August 2022, FAMU's football team released an open letter to FAMU President Dr. Larry Robinson expressing frustration with the University's lack of leadership and support of the FAMU football program. These students raised issues with, among other things, summer school housing availability,

---

[73] Susan Adams, Hank Tucker, *How America Cheated its Black Colleges,* Forbes (Feb. 1, 2022), https://www.forbes.com/sites/susanadams/2022/02/01/for-hbcus-cheated-out-of-billions-bomb-threats-are-latest-indignity/?sh=4152d38f640c.

[74] Savannah Kelley, *FAMU turns students away from dorms with campus housing at capacity*, WCTV (July 13, 2022), https://www.wctv.tv/2022/07/13/famu-turns-students-away-dorms-with-campus-housing-capacity/.

[75] Micah Cho, *Over 290 Florida A&M Students relocated due to temporary closure of Palmetto Phase III*, WTXL (Aug. 27, 2022), https://www.wtxl.com/news/local-news/over-290-florida-a-m-students-relocated-due-to-temporary-closure-of-palmetto-phase-iii.

financial aid, and access to academic resources.[76]

221.   Meanwhile, in December 2022, neighboring TWI FSU broke ground on a football-only facility, complete with lockers and facilities on par with the National Football League, a project expected to cost $100 million and expected to be completed within 18 to 24 months.[77] Notably, FSU's new 150,000-square-foot football facility will expand the perimeter of FSU's campus, which is already more than 50 acres bigger than FAMU's campus just two miles south.

222.   The operational funding levels and the condition of FAMU's campus, facilities, and infrastructure undoubtedly have a direct impact on students' choice of which institution to attend.[78] Defendants' neglect of FAMU's facilities, infrastructure, general campus, and the capital enhancements needed by FAMU is merely a continuation of their centuries-long practice of relegating FAMU to a subpar separate and unequal status.   Since the end of official segregation, the declining, stagnant, or minimal increases in White-student enrollment at FAMU is further evidence of Defendants' failure to make FAMU's campus, facilities, and infrastructure as attractive and welcoming to students of all races.

---

[76] HBCU Sports, *FAMU football players publish letter criticizing school president, administrators*, HBCU Sports (Aug. 29, 2022), https://hbcusports.com/2022/08/29/famu-football-players-publish-letter-criticizing-school-president-adminstrators/.

[77]   *Logan Robinson, Florida State reveals new renderings for football-only facility and locker room, Sports Illustrated (Dec. 17, 2022),* https://www.si.com/college/fsu/football/florida-state-reveals-new-renderings-for-football-only-facility-and-locker-room.

[78] *See Knight*, 787 F.Supp. at 1209, 1272.

## VII.   DEFENDANTS' FAILURES WITH RESPECT TO FAMU STUDENT RETENTION AND GRADUATION RATES

223.   FAMU is the largest single-campus HBCU in the country and produces more African American baccalaureate graduates than any other four-year public university.

224.   The 1998 Partnership Agreement required Defendants to work to strengthen retention and graduation rates of Black students.  The 1998 Partnership Agreement identified this commitment precisely because low retention and graduation rats of Black students are traceable vestiges of segregation.

225.   Although the overall percentage of Black students graduating from Florida's public colleges and universities is increasing, the gap between graduation rates for White students and Black students is widening.

226.   In 2018, the full-time, first time in college four-year graduation rate (FTIC) at FAMU was reported to be 21.6%, a SUS-worst.  By comparison, UF had a FTIC rate of 67.3%.

227.   FAMU's four-year graduation rates for 2019 and 2020 were 22.5% and 27.7%, respectively. By comparison, UF's FTIC rates for 2019 and 2020 were 70.9% and 74.7%, respectively.

## CLASS ACTION ALLEGATIONS

228.   Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of "all Black students at FAMU at any time during the 2021/2022 school year through the date of class certification" (the "Class").

229.   Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveals that the Class definition should be expanded or otherwise modified.   Plaintiffs also reserve the right to establish sub-classes as appropriate.

### A.   REQUIREMENTS OF RULE 23(A)

230.   This action is brought and properly maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and satisfies the requirements thereof.   As used herein, the term "Class Members" shall mean and refer to the members of the Class.

231.   Numerosity: There are nearly 8,000 Black students enrolled at FAMU, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual Class Members are ascertainable through records maintained by Defendants.

232.   Typicality:  Plaintiffs' claims are typical of the claims of each Class Member in that all Plaintiffs, like all Class Members, are and were injured through

Defendants' failures to eliminate vestiges of *de jure* procedures and policies that maintain a dual, segregated system of higher education within the State of Florida. The claims of Plaintiffs and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of Defendants' long-term failure to provide equal educational opportunity in Florida's higher education system. The acts and omissions of Defendants to which Plaintiffs and the Class have been subjected apply universally to all members of the Class and are not unique to any Plaintiff or Class Member.

233.   Adequacy: Plaintiffs are adequate representatives of the proposed Class.   Plaintiffs' interests are coextensive with those of the members of the proposed Class that they seek to represent in this case.   Plaintiffs are willing and able to represent the proposed Class fairly and vigorously.   Plaintiffs have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate a class action of this size and complexity.   The combined interests, experience, and resources of Plaintiffs and their counsel to litigate the claims at issue in this case competently satisfy the adequacy of representation requirement of Rule 23(a)(4).

234.   Commonality: There are numerous questions of law and fact common to the Class, including:

> (a)   Whether the State and the BOG have engaged in a pattern and practice of intentional discrimination in

84

violation of Title VI of the Civil Rights Act of 1964 by maintaining a segregated system of higher education;

(b)     Whether Defendants have failed in their duty to eliminate vestiges of Florida's formerly *de jure* segregated system of higher education by intentionally failing to provide increased funding to FAMU, by failing to make improvements in FAMU's facilities, by perpetuating unnecessary duplication of FAMU's non-core academic programs at geographically-proximate Florida TWIs, and by failing to establish a meaningful number of non-core, unique programs and unique high demand programs at FAMU, which failures have caused FAMU to remain a segregated entity of higher learning;

(c)     Whether Defendants' failure to provide adequate funding to FAMU (especially as compared with State funding provided to Florida's TWIs), failure to make improvements in FAMU's facilities, duplication of non-core programs preexisting at FAMU at TWIs, and failures to establish a meaningful number of non-core, unique programs and unique high demand programs at FAMU, disparately impacted FAMU and its students, including Plaintiffs and the Class, in a discriminatory and unfair manner because such actions impacted student enrollment, especially enrollment of other race (*i.e.*, non-Black) students at FAMU;

(d)     Whether Defendants BOG Members, Diaz, and Rodriguez have engaged in a pattern and practice of intentional discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment;

(e)     Whether Defendants BOG Members, Diaz, and Rodriguez have continued to operate a segregated system of higher education and continue to take actions to perpetuate that segregated system in violation of the Equal Protection Clause;

(f)     Whether Defendants have failed in their duty to

85

eliminate the vestiges of the State's formerly *de jure* segregated system of higher education by failing to provide adequate funding to FAMU;

(g)     Whether Defendants have allowed Florida's TWIs to unnecessarily duplicate non-core, unique programs and unique, high demand programs at FAMU without sound educational justification for such duplication;

(h)     Whether Defendants have failed to establish a meaningful amount of unique non-core and unique high demand programs at FAMU;

(i)     Whether Defendants have failed to attract other race, especially White, students to enroll at FAMU;

(j)     Whether Plaintiffs, and the Class, have been harmed as a direct and proximate result of the Defendants' violation of the Equal Protection Clause and Title VI; and

(k)     The scope of the injunctive relief to which the Plaintiffs and members of the Class are entitled.

## B.     *REQUIREMENT OF RULE 23(B)(2)*

235.   Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the proposed Class such that final injunctive relief is appropriate with respect to the Class as a whole.  Such injunctive relief includes, but is not limited to, the implementation of systemic changes to prevent the perpetuation of a segregated system of higher education in violation of Title VI and the Equal Protection Clause.  Defendants' common pattern of discrimination and refusal to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief for the Class as a whole.

## COUNT I
## Violation of Title VI, 42 U.S.C. § 2000d, *et seq*.
(Intentional and/or Disparate Impact)
Against Defendants State of Florida and BOG
(the "Title VI Defendants")

236.   Plaintiffs hereby incorporate by reference the allegations set forth in all of the above paragraphs as if fully set forth herein.

237.   All of the Plaintiffs are African American.

238.   Title VI states, in relevant part, that "[N]o person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

239.   The Title VI Defendants are recipients of federal financial assistance, including but not limited to, the direction, control, and disbursement of federal funds.

240.   The Title VI Defendants received and continue to receive federal funding to support Florida's higher education system.

241.   Many of Florida's institutions of higher learning participate in a variety of federally-funded programs, including but not limited to funding for research and student loans.  Florida also receives federal funds for its two land-grant institutions, FAMU and UF.  As a result of the Title VI Defendants' participation in federally funded programs, the Title VI Defendants and Florida's colleges and universities are governed by the mandate of Title VI.

87

242.  Federal funds are received and then disbursed by the Title VI
Defendants to colleges and universities in Florida.  The Title VI Defendants then use
those federal funds to provide direct support to the State's public colleges and
universities, including for research or facility development at the educational
institution, and through grants and loans made to students enrolled in postsecondary
institutions, among other ways.

243.  Plaintiffs and members of the proposed Class are the intended
beneficiaries of the federal funds provided to the Title VI Defendants.

244.  The Title VI Defendants have engaged in a pattern and practice of
intentional discrimination with respect to FAMU in violation of Title VI of the Civil
Rights Act of 1964.  The Title VI Defendants have intentionally discriminated by
maintaining a segregated system of higher education at FAMU due to the Title VI
Defendants' failure to eliminate vestiges of the prior *de jure* segregated system of
higher education in Florida and have done so by their actions as described herein,
including by the Title VI Defendants perpetuating unnecessary duplication of
FAMU's non-core programming at geographically proximate Florida TWIs, failing
to create a meaningful number of unique non-core programs and unique high
demand programs at FAMU, intentionally failing to provide adequate funding to
FAMU, failing to match at 100% the federal land-grant funds provided to FAMU,
failing to make improvements in FAMU's facilities, failing to diversify FAMU's

student body, staff and faculty boards, and limiting FAMU's academic mission statement to be defined exclusively on the basis of race, which failures have caused FAMU to remain a segregated entity of higher learning.

245. The Title VI Defendants have engaged in a long-term pattern and practice of failing to perform their duty to enforce State and federal laws for the provision of equal educational opportunity for Black students at FAMU.

246. The Title VI Defendants have continued to discriminate on the basis of race, including through discriminatory funding practices and underfunding of FAMU, perpetuating unnecessary duplication of FAMU's non-core programming at geographically proximate Florida TWIs, failing to create a meaningful number of unique non-core programs and unique high demand programs at FAMU, failing to match at 100% the federal land-grant funds provided to FAMU, failing to make improvements in FAMU's facilities, failing to diversify FAMU's student body, staff and faculty boards, and limiting FAMU's academic mission statement to be defined exclusively on the basis of race, which actions and inactions stem from prior *de jure* segregative policies and thereby perpetuates Florida's present day segregated system of higher education in violation of Title VI of the Civil Rights Act.

247. The Title VI Defendants have also failed in their duty to eliminate the vestiges of Florida's formerly *de jure* segregated system of higher education by, among other things, by perpetuating unnecessary duplication of FAMU's non-core

programming at geographically proximate Florida TWIs, failing to create a meaningful number of unique non-core programs and unique high demand programs at FAMU, intentionally failing to provide adequate funding to FAMU, failing to match at 100% the federal land-grant funds provided to FAMU, failing to make improvements in FAMU's facilities, failing to diversify FAMU's student body, staff and faculty boards, and limiting FAMU's academic mission statement to be defined exclusively on the basis of race, which failures have caused FAMU to remain a segregated entity of higher learning.

248.   The Title VI Defendants are recipients of federal funds, and federal funds were used by the Title VI Defendants to carry out these discriminatory practices.

249.   Alternatively, in lieu of intentional discrimination, Plaintiffs allege that the Title VI Defendants' discriminatory actions, as described herein, disparately impacted Plaintiffs and the proposed Class as students of FAMU in a discriminatory and unfair manner because such actions negatively impacted other Race student enrollment at FAMU.

250.   The Title VI Defendants' actions are a direct result of their failure to eliminate *de jure* era policies that discriminate on the basis of race in higher education, like, among other things, perpetuating unnecessary duplication of FAMU's non-core programming at geographically proximate Florida TWIs, failing

to create a meaningful number of unique non-core programs and unique high demand programs at FAMU, intentionally failing to provide adequate funding to FAMU, failing to match at 100% the federal land-grant funds provided to FAMU, failing to make improvements in FAMU's facilities, failing to diversify FAMU's student body, staff and faculty boards, and limiting FAMU's academic mission statement to be defined exclusively on the basis of race.  Such actions are traceable to and serve to perpetuate Florida's prior *de jure* segregated system of higher education in the present day.

251.   As a direct and proximate result of the Title VI Defendants' utilization of federal funds in a racially discriminatory manner, which results in maintaining a *de jure* system of segregation in Florida's higher education system, Plaintiffs and the Class, as students of FAMU, have been and continue to be denied equal educational opportunities and are subjected to discrimination in a segregated educational environment in violation of Title VI, all because of their race.

## COUNT II – 42 U.S.C. § 1983
### Violation of the Equal Protection Clause
Pursuant to the Fourteenth Amendment of the United States Constitution
Against Defendants BOG Members, Rodrigues, and Diaz
(the "1983 Defendants")

252.   Plaintiffs hereby incorporate by reference the allegations set forth in all of the above paragraphs as if fully set forth herein.

253.   The Equal Protection Clause of the Fourteenth Amendment provides as follows:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

254.   All Plaintiffs are born or naturalized citizens of the United States and enjoy the constitutional protections of the Equal Protection Clause of the Fourteenth Amendment.

255.   Pursuant to *Fordice*:

> If the State perpetuates policies and practices traceable to its prior *de jure* dual system that continue to have segregative effects – whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system – and such policies are without sound educational justification and can be practicably eliminated, the policies violate the Clause, even though the State has abolished the legal requirement that the races be educated separately and has established racially neutral policies not animated by a discriminatory purpose.

*Fordice*, 505 U.S. at 718-733.

256.   The 1983 Defendants have engaged in a pattern and practice of intentional discrimination with respect to FAMU in violation of the Equal Protection Clause of the Fourteenth Amendment and under *Fordice*.

257.   The 1983 Defendants have continued to operate a segregated system of higher education in Florida that stems from policies and practices traceable to Florida's prior *de jure* system of segregated higher education, and Defendants continue to take actions to perpetuate that segregated system in violation of the Equal Protection Clause and *Fordice*.

258.   The 1983 Defendants have failed in their duty to adequately and appropriately fund FAMU in violation of the Equal Protection Clause and *Fordice*.

259.   The 1983 Defendants have failed to adequately fund FAMU by: (1) failing to match FAMU's federal land grant funds at a one-to-one match; (2) chronically underfunding FAMU, which as a smaller institution, requires more per student funding due to economies of scale and due to its dependence on State funding from years or past underfunding and its competitive disadvantage in seeking funding from private gifts, grants and contracts; (3) funding FAMU at a per-student allocation less than Florida TWIs; and (4) implementing the PBFM, which relies on metrics skewed by *de jure* segregative practices, and unfairly compares schools that serve populations of different socioeconomic backgrounds, like FAMU.

260.   The 1983 Defendants have also both (1) failed to establish a meaningful number of unique and unique high demand programs at FAMU, and (2) have permitted Florida's TWIs to unnecessarily duplicate non-core unique programs and unique high-demand programs that were previously only offered at (and therefore

unique) to FAMU without sound educational justification, in violation of the Equal Protection Clause and *Fordice*.

261.   The 1983 Defendants have, and continue to, transfer, merge, combine, or otherwise eliminate previously unique non-core programs at FAMU to the benefit of geographically proximate TWIs, including FSU. The 1983 Defendants do so, among other ways, by creating cooperative, joint, or merged programs between FAMU and Florida's public TWIs, which is harmful to FAMU as it eliminates non-core (and in some cases high demand) programs that were previously only offered at (unique to) FAMU. This includes, among other examples, Defendants' elimination of the FAMU law school, the creation of the Joint College in Engineering shared with FSU (which was previously unique to and in high demand at FAMU, but is now shared with FSU) and the downsizing of the College of Agriculture at FAMU and restructuring it into a department while giving UF primary control over many of the research, education, and extension services in the State. Defendants' actions in this regard are in violation of the Equal Protection Clause and *Fordice.*

262.   The 1983 Defendants have also failed to fund improvements in FAMU's campus, facilities, and infrastructure; failed to diversify FAMU's student body, staff and faculty boards; and broaden FAMU's brand beyond its race-based identity.

263.   The 1983 Defendants have thus perpetuated a segregated system of higher education in Florida in violation of the Equal Protection Clause of the Fourteenth Amendment and *Fordice*.

264.   The 1983 Defendants have also thus violated the equal protection rights of Plaintiffs and the Class, and the 1983 Defendants acted with intent or with deliberate indifference to the rights of Plaintiffs and the Class.

265.   As a direct and proximate result of the 1983 Defendants' violation of the Equal Protection Clause, Plaintiffs and the Class, as students of FAMU, were denied and continue to be denied equal educational opportunities and are subjected to discrimination in a segregated educational environment, in violation of the Fourteenth Amendment to the United States Constitution, all because of their race.

266.   Plaintiffs and all Class members similarly situated will suffer irreparable harm in the absence of injunctive relief.

267.   The balance of equities tips in the favor of Plaintiffs and the Class, and an injunction is in the public's best interest.

## COUNT III
## Violation of the Equal Protection Clause: Disparate Impact Discrimination
Against Defendants BOG Members, Rodrigues, and Diaz
(the "1983 Defendants")

268.   Plaintiffs hereby incorporate by reference the allegations set forth in all of the above paragraphs as if fully set forth herein.

95

269.   The Fourteenth Amendment to the U.S. Constitution, enforceable pursuant to 42 U.SC. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

270.   Under the Equal Protection Clause of the Fourteenth Amendment, discrimination on the basis of race is presumptively unconstitutional, subject to heightened scrutiny, and may be established by a "totality of the circumstances."[79]

271.   Plaintiffs are Black students currently attending FAMU, the only public HBCU in the State of Florida.  Plaintiffs are therefore members of a protected class under the Equal Protection Clause of the Fourteenth Amendment.

272.   The 1983 Defendants have acted under the color of state law in discriminating against Black students in Florida by maintaining unlawful funding practices which adversely impact FAMU's ability to: attract a diverse student population (unconstitutionally preserving a racially segregated university); cultivate unique, non-core programs (preventing FAMU from creating its own distinct identity separate from race); competitively compensate faculty (inhibiting FAMU from attracting diverse and prestigious faculty, raising student retention and graduation rates, and increasing the number of research grants awarded), and fund

---

[79] *Wash. v. Davis*, 426 U.S. 229, 240 (1976) ("an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it be true, that the law bears more heavily on one race than another"); *Common Cause Fla. v. DeSantis*, No. 4:22-CV-109-AW-MAF, 2022 WL 19978293, at *4 (N.D. Fla. Nov. 8, 2022) (considering a host of factors, such as the historical background, legislative history, and discriminatory impact, in finding that plaintiffs had established a prima facie case of disparate impact under the Equal Protection Clause).

the development of capital enhancements and renovations to its campus, facilities, and infrastructure. These adversities faced by FAMU today are the direct result of Florida's longstanding practice of underfunding its only public HBCU.

273.   FAMU, the first college to admit Black students in the state of Florida, was founded just three years after UF, as one of Florida's two land-grant universities (UF was Florida's first land-grant university). Until 1956, FAMU, UF, and FSU remained the only public universities in Florida. Today, FAMU remains severely underfunded when compared to both UF and FSU.

274.   Between the years 1887 (FAMU's founding) and 1956 (the *Brown* decision), Florida failed to equally divide federal land-grant funds between its two land grant universities, allowing UF to prosper at the expense of FAMU. Following the *Brown* decision and the ensuing 1964 Civil Rights Act, Florida continued its disproportional distribution of State funds between FAMU, UF, and FSU, as alleged, *supra*, in Section III.[80]

275.   Despite knowing the State's longstanding history of segregation and underfunding of its only public HBCU, and despite the availability of less

---

[80] Andrew Skerritt, *FAMU President Robinson Joins Legislative Issues Conference HBCU Panel,* FAMU News (Nov. 22, 2022), https://www.famunews.com/2022/11/famu-president-robinson-joins-legislative-issues-conference-hbcu-panel/ (discussing FAMU's need for continued funding for its infrastructure, student scholarships, and faculty salaries and stating that FAMU's need is "eight times as high" as the amount of funding it received as recent as 2022).

discriminatory practices,[81] the 1983 Defendants fail in the present day to take "affirmative efforts" to recruit non-minority students, cultivate unique, non-core programs, competitively compensate faculty, or fund the development of capital enhancements and renovations to its campus, facilities, and infrastructure at FAMU.[82] Instead, the 1983 Defendants in the present day have perpetuated unnecessary duplication of FAMU's non-core programming at geographically proximate Florida TWIs, failed to create a meaningful number of unique non-core programs and unique high demand programs at FAMU, failed to provide adequate funding to FAMU, failed to match at 100 % the federal funds granted to FAMU, failed to make improvements in FAMU's facilities, failed to diversify FAMU's student body, staff and faculty boards, and limited FAMU's academic mission statement to be defined exclusively on the basis of race.

276.   As a direct and proximate result of the conduct of the 1983 Defendants, Plaintiffs and the Class, as Black students of FAMU, have been and continue to be denied equal educational opportunities and are subjected to a de facto system of

---

[81] *See Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1322 (11th Cir. 2021) (relevant considerations for a disparate impact claim include the foreseeability of the disparate impact, the knowledge of that impact, and the availability of less discriminatory alternatives).

[82] *Cf. Wash. v. Davis*, 426 U.S. 229, 242, 246 (1976) (noting that "the discriminatory impact… may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds" but deciding that defendants' showing of their "affirmative efforts" in changing the racial composition of a historically-segregated group were sufficient in escaping liability).

present-day segregation, in violation of the Equal Protection Clause of the U.S. Constitution.

277.   Plaintiffs and all Class members similarly situated will suffer irreparable harm in the **absence** of injunctive relief.

278.   The **balance** of equities tips in the favor of Plaintiffs and the Class, and an injunction is in the public's best interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray the Court award the following relief:

A.   Certify the proposed Class pursuant to the Federal Rules of Civil Procedure Rule 23(a) and (b)(2);

B.   Designate Plaintiffs as representatives of the proposed Class and Plaintiffs' counsel as Class counsel;

C.   Declare that Defendants' conduct violates Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment;

D.   Permanently enjoin Defendants and all of their agents, representatives, and officers from continuing the abuses described herein, including acting in a manner inconsistent with the U.S. Constitution, the Florida Constitution, the 1998 Partnership Agreement, and the State of Florida's equal education opportunity obligations under state and federal law, including Title VI, the Equal Protection Clause of the Fourteenth Amendment, and *Fordice*;

E.   Appoint a special referee or mediator in order to craft and recommend a remedy to the Court in order to correct the Title VI and the constitutional violations as alleged herein;

F.  Award Plaintiffs the costs of this action together with their reasonable attorneys' fees; and,

G.  Grant Plaintiffs such other and further relief as may be appropriate or necessary, including injunctive relief as necessary.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs, individually and on behalf of the proposed Class, respectfully request a trial by jury as to all matters so triable.

Respectfully submitted this 3rd day of July, 2023.

Respectfully submitted,

/s/ *Barbara J. Hart*
Jay W. Eisenhofer, Esq.
Barbara J. Hart, Esq.
Karin E. Fisch, Esq.
Braynard Brown, Esq.
Irene R. Lax, Esq.
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Fl.
New York, NY 10017
646-722-8500

Samuel Mukiibi, Esq.
Pooja Mehta, Esq.
**GRANT & EISENHOFER P.A.**
123 Justison Street, 7th Fl.
Wilmington, DE 19801
302-622-7119

Josh Dubin, Esq.
**JOSH DUBIN, P.A.**
201 S. Biscayne Blvd, Suite 1210
Miami, FL 33181
FL Bar Number 48865
*Attorneys for Plaintiffs*

APPENDIX A

**Unique (Not Offered at FSU) Non-Core FAMU Programs and Unique/High-Demand FAMU Programs**

| **CIP** | **CIP Title** | **Level** |
|---|---|---|
| 01.0000 | Agriculture | Bachelor's |
| 01.0000 | Agriculture | Master's |
| 01.0102 | Agribusiness/Agriculture Business | Bachelor's |
| 01.1001 | Food Science | Bachelor's |
| 03.0103 | Environmental Science | Master's |
| 03.0103 | Environmental Science | Doctorate |
| 04.0201 | Architecture | Bachelor's |
| 04.0201 | Architecture | Master's |
| 09.0401 | Journalism | Bachelor's |
| **09.0902** | **Public Relations/ Image Management** | **Bachelor's  (High-Demand)** |
| 11.1003 | Computer and Info. Systems Security/Auditing/Info | Master's |
| 13.1199 | Student Counseling & Personnel Services | Masters |
| 14.0301 | Agricultural Engineering | Bachelor's |
| 15.0303 | Electrical, Electronic, &  Communication Engineering Technology | Bachelor's |
| 15.1001 | Construction Engineering Technology/Tech | Bachelor's |
| 26.0702 | Entomology | Doctorate |
| 31.0501 | Sports/Kinesiology & Physical Ed/Fitness | Bachelor's |
| 42.2802 | Community Psychology | Masters |
| **44.0701** | **Social Work** | **Master's  (High-Demand)** |

| | | |
|---|---|---|
| 50.0409 | Graphic Design | Bachelor's |
| 51.0701 | Health/ Health Care Administration | Bachelor's |
| 51.0701 | Health/ Health Care Administration | Master's |
| 51.0706 | Health Info/Medical Records | Bachelor's |
| 51.0908 | Respiratory Care Therapy/ Therapy | Bachelor's |
| **51.2001** | **Pharmacy** | **Doctorate   (High-Demand)** |
| 51.2099 | Pharmacy/Pharmaceutial Sciences, & Administration | Bachelor's |
| 51.2099 | Pharmacy/Pharmaceutial Sciences, & Administration | Master's |
| **51.2099** | **Pharmacy/Pharmaceutial Sciences, & Administration** | **Doctorate  (High-Demand)** |
| 51.2201 | Public Health | Doctorate |
| 51.2306 | Occupational Therapy/ Therapist | Master's |
| 51.2308 | Physical Therapy/ Therapist | Master's |
| 51.2308 | Physical Therapy/ Therapist | Doctorate |
| 50.0203 | Logistics, Materials, and Supply Chain Management | Bachelor's |
| 50.0203 | Logistics, Materials, and Supply Chain Management | Master's |

2

APPENDIX B

## Unique (Not Offered at FAMU) Non-Core FSU Programs and Unique/High-Demand Programs at FSU

| CIP | CIP Title | Level | |
|---|---|---|---|
| **03.0101** | **Natural Resources/Conservation** | **Bachelor's** | **(High-Demand)** |
| 04.0301 | City/Urban, Community, Regional Planning | Master's | |
| 04.0301 | City/Urban, Community, Regional Planning | Doctorate | |
| 05.0105 | Asian Studies/Civilization | Bachelor's | |
| 05.0105 | Asian Studies/Civilization | Master's | |
| 05.0105 | Russian, Central European, East European and Eurasian Studies | Bachelor's | |
| 05.0105 | Russian, Central European, East European and Eurasian Studies | Master's | |
| 05.0108 | Near and Middle Eastern Studies | Bachelor's | |
| 05.0126 | Italian Studies | Master's | |
| 05.0134 | Latin American and Caribbean Studies | Bachelor's | |
| 09.0199 | Communication and Media Studies | Bachelor's | |
| **09.0702** | **Digital Communication and Media/Multimedia** | **Bachelor's** | **(High-Demand)** |
| 09.0702 | Digital Communication and Media/Multimedia | Master's | |
| 09.0900 | Public Relations, Advertising, and Applied Communication | Bachelor's | |
| 09.0900 | Public Relations, Advertising, and Applied Communication | Master's | |
| **11.0101** | **Computer and Information Sciences** | **Doctorate** | **(High-Demand)** |
| 11.0103 | Information Technology | Master's | |
| 11.0401 | Information Science | Master's | |
| 11.0401 | Information Science | Doctorate | |
| **13.0301** | **Curriculum and Instruction** | **Doctorate** | **(High-Demand)** |
| 13.0406 | Higher Education/Higher Ed. Administration | Master's | |
| 13.0406 | Higher Education/Higher Ed. Administration | Doctorate | |

| | | |
|---|---|---|
| 13.0501 | Educational/Instructional Technology | Master's |
| 13.0501 | Educational/Instructional Technology | Doctorate |
| 13.0603 | Educational Statistics and Research Methods | Master's |
| 13.0603 | Educational Statistics and Research Methods | Doctorate |
| **13.1001** | **Special Education and Teaching** | **Bachelor's    (High-Demand)** |
| 13.1009 | Education/Teaching of Individuals with Vision Impairment, Including Blindness | Bachelor's |
| 13.1101 | Counselor Education/School Counseling and Guidance Services | Master's |
| **13.1101** | **Counselor Education/School Counseling and Guidance Services** | **Doctorate    (High-Demand)** |
| 13.1205 | Secondary Education and Teaching | Master's |
| 13.1302 | Art Teacher Education | Master's |
| 13.1302 | Art Teacher Education | Doctorate |
| 13.1305 | Art Teacher Education | Bachelor's |
| 13.1312 | Music Teacher Education | Master's |
| 13.1312 | Music Teacher Education | Doctorate |
| 13.1314 | Physical Education Teaching and Coaching | Master's |
| 13.1317 | Social Science Teacher Education | Bachelor's |
| 16.0399 | East Asian Languages, Literatures, and Linguistics | Bachelor's |
| 16.0399 | East Asian Languages, Literatures, and Linguistics | Master's |
| 16.0402 | Russian Language and Literature | Bachelor's |
| 16.0501 | German Language and Literature | Bachelor's |
| 16.0501 | German Language and Literature | Master's |
| 16.0901 | French Language and Literature | Bachelor's |
| 16.0901 | French Language and Literature | Master's |
| 16.0901 | French Language and Literature | Doctorate |

2

| | | |
|---|---|---|
| 16.0902 | Italian language and Literature | Bachelor's |
| 16.0905 | Spanish Language and Literature | Master's |
| 16.0905 | Spanish Language and Literature | Doctorate |
| 16.1200 | Classic and Classical Languages, Literatures, And Linguistics | Master's |
| 16.1200 | Classic and Classical Languages, Literatures, and Linguistics | Doctorate |
| 16.1202 | Ancient/Classical Greek Language and Literature | Bachelor's |
| 16.1202 | Ancient/Classical Greek Language and Literature | Master's |
| 16.1203 | Latin Language and Literature | Bachelor's |
| 16.1203 | Latin Language and Literature | Master's |
| 19.0101 | Family and Consumer Sciences/Human Sciences | Doctorate |
| 19.0701 | Human Development and Family Studies | Bachelor's |
| 19.0701 | Human Development and Family Studies | Master's |
| 19.0901 | Apparel and Textiles, General | Bachelor's |
| 19.0901 | Apparel and Textiles, General | Master's |
| 22.0201 | Advanced Legal Research | Master's |
| 22.0202 | Programs for Foreign Lawyers | Master's |
| 22.0207 | Energy, Environment, and Natural Resources Law | Master's |
| 23.0101 | English Language and Literature | Master's |
| 23.0101 | English Language and Literature | Doctorate |
| 23.1302 | Creative Writing | Master's |
| 24.0102 | General Studies | Bachelor's |
| 24.0103 | Humanities/Humanistic Studies | Bachelor's |
| **26.0101** | **Biology/Biological Sciences** | **Doctorate    (High-Demand)** |
| 26.0102 | Biomedical Sciences | Master's |

3

| | | |
|---|---|---|
| 26.0102 | Biomedical Sciences | Doctorate |
| 26.0202 | Biochemistry | Bachelor's |
| 26.0908 | Exercise Physiology and Kinesiology | Bachelor's |
| 26.0908 | Exercise Physiology and Kinesiology | Master's |
| 26.0908 | Exercise Physiology and Kinesiology | Doctorate |
| 26.1102 | Biostatistics | Master's |
| 26.1102 | Biostatistics | Doctorate |
| 26.1104 | Computational Biology | Bachelor's |
| 26.1501 | Neuroscience | Bachelor's |
| 26.1501 | Neuroscience | Doctorate |
| 27.0101 | Mathematics | Master's |
| 27.0101 | Mathematics | Doctorate |
| 27.0501 | Statistics, General | Bachelor's |
| 27.0501 | Statistics, General | Master's |
| 27.0501 | Statistics, General | Doctorate |
| 20.3001 | Computational Science | Bachelor's |
| 20.3001 | Computational Science | Master's |
| 20.3001 | Computational Science | Doctorate |
| 30.7001 | Data Science General | Master's |
| 30.7102 | Business Analytics | Master's |
| 31.0301 | Parks, Recreation and Leisure, Facilities Management | Bachelor's |
| 38.0201 | Religion/Religious Studies | Bachelor's |
| 38.0201 | Religion/Religious Studies | Master's |
| 38.0201 | Religion/Religious Studies | Doctorate |
| 40.0401 | Chemistry | Doctorate |
| 40.0509 | Chemistry, Others | Bachelor's |

| | | |
|---|---|---|
| 38.0201 | Religion/Religious Studies | Master's |
| 38.0201 | Religion/Religious Studies | Doctorate |
| 40.0607 | Oceanography | Master's |
| 40.0607 | Oceanography | Doctorate |
| 40.1001 | Materials Science | Master's |
| 42.0101 | Psychology | Master's |
| 42.0101 | Psychology | Doctorate |
| 42.2806 | Educational Psychology | Master's |
| 42.2806 | Educational Psychology | Doctorate |
| 43.0104 | Criminal Justice/Safety Studies | Master's |
| 43.0104 | Criminal Justice/Safety Studies | Doctorate |
| 43.0107 | Criminal Justice/Police Science | Bachelor's |
| 43.0403 | Cyber/Computer Forensics and Counterterrorism | Bachelor's |
| 43.0408 | Law Enforcement Intelligence Analysis | Master's |
| 44.0401 | Public Administration | Master's |
| **44.0401** | **Public Administration** | **Doctorate   (High-Demand)** |
| **44.0701** | **Social Work** | **Doctorate   (High-Demand)** |
| 45.0101 | Social Sciences, General | Bachelor's |
| 45.0201 | Anthropology | Master's |
| 45.0201 | Anthropology | Doctorate |
| 45.0602 | Applied Economics | Master's |
| 45.0603 | Econometrics and Quantitative Economics | Bachelor's |
| 45.0603 | Econometrics and Quantitative Economics | Master's |
| 45.0603 | Econometrics and Quantitative Economics | Doctorate |
| 45.0701 | Geography | Master's |

| | | |
|---|---|---|
| 45.0701 | Geography | Doctorate |
| 45.0702 | Geographic Information Science and Cartography | Master's |
| 45.0901 | International Relations and Affairs | Bachelor's |
| 45.0901 | International Relations and Affairs | Master's |
| 45.1001 | Political Science and Government | Master's |
| 45.1001 | Political Science and Government | Doctorate |
| 45.1101 | Sociology | Master's |
| 45.1101 | Sociology | Doctorate |
| 50.0301 | Dance, General | Bachelor's |
| 50.0301 | Dance, General | Master's |
| 50.0408 | Interior Design | Bachelor's |
| 50.0408 | Interior Design | Master's |
| 50.0501 | Drama and Dramatics/Theater Arts | Master's |
| 50.0501 | Drama and Dramatics/Theater Arts | Doctorate |
| 50.0504 | Playwriting and Screenwriting | Master's |
| 50.0602 | Cinematography and Film/Video Production | Bachelor's |
| 50.0602 | Cinematography and Film/Video Production | Master's |
| 50.0702 | Fine/Studio Arts | Master's |
| 50.0901 | Music | Master's |
| 50.0903 | Music Performance | Bachelor's |
| 50.0903 | Music Performance | Master's |
| 50.0903 | Music Performance | Doctorate |
| 50.0904 | Music Theory and Composition | Bachelor's |
| 50.0904 | Music Theory and Composition | Master's |
| 50.0904 | Music Theory and Composition | Doctorate |
| 50.0905 | Musicology and Ethnomusicology | Bachelor's |

6

| | | |
|---|---|---|
| 50.0905 | Musicology and Ethnomusicology | Master's |
| 50.0905 | Musicology and Ethnomusicology | Doctorate |
| 50.0908 | Voice and Opera | Master's |
| 51.0204 | Audiology/Audiologist and Speech-Language Pathology/Pathologist | Bachelor's |
| 51.0204 | Audiology/Audiologist and Speech-Language Pathology/Pathologist | Master's |
| 51.0204 | Audiology/Audiologist and Speech-Language Pathology/Pathologist | Doctorate |
| 51.0912 | Physician Assistant | Master's |
| 51.0913 | Athletic Training/Trainer | Bachelor's |
| 51.1505 | Marriage and Family Therapy/Counseling | Doctorate |
| 51.2201 | Public Health | Bachelor's |
| 51.2301 | Art Therapy/Therapist | Master's |
| 51.2305 | Music Therapy/Therapist | Bachelor's |
| 51.2305 | Music Therapy/Therapist | Master's |
| 51.3101 | Dietetics/Dietitian | Bachelor's |
| 51.3101 | Dietetics/Dietitian | Master's |
| 51.3804 | Nurse Anesthetist | Doctorate |
| 51.3818 | Nursing Practice | Doctorate |
| 52.0101 | Business/Commerce | Bachelor's |
| 52.0101 | Business/Commerce | Master's |
| **52.0101** | **Business/Commerce** | **Doctorate  (High-Demand)** |
| 52.1201 | Management Information Systems | Bachelor's |
| 52.1201 | Management Information Systems | Master's |
| 52.1301 | Management Science | Master's |
| 52.1401 | Marketing/Marketing Management | Bachelor's |

7

| | | |
|---|---|---|
| 52.1501 | Real Estate | Bachelor's |
| 52.1701 | Insurance | Bachelor's |
| 52.1701 | Insurance | Master's |
| 54.0101 | History | Master's |
| 54.0101 | History | Doctorate |

8

APPENDIX C

## **FAMU Programs Unnecessarily Duplicated by One or More TWIs**
### **(\*FAMU programs that are not duplicated are also noted)**

| | | | |
|---|---|---|---|
| 01.0000 | Agriculture | ***NOT DUPLICATED*** | Bachelor's (FAMU) |
| 01.0000 | Agriculture | ***NOT DUPLICATED*** | Master's (FAMU) |
| 01.0102 | Agribusiness/Agriculture Business | ***NOT DUPLICATED*** | Bachelor's (FAMU) |
| 01.1001 | Food Science | University of Florida | Bachelor's (FAMU) |
| 03.0103 | Environmental Science | Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Masters (FAMU) |
| 04.0201 | Architecture | U. of Central Florida (UCF)<br>U . of Florida (UF) | Bachelor's (FAMU) |
| 04.0201 | Architecture | U. of  Florida (UF)<br>U. of South Florida (USF) | Master's (FAMU) |
| 09.0401 | Journalism | U. of Central Florida (UCF)<br>U. of Florida (UF) | Bachelors (FAMU) |
| 09.0902 | Public Relations/ Image Management | U of Florida (UF) | Bachelor's (FAMU)<br>**(High-Demand)** |
| 11.0101 | Computer and Information Sciences | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL International (FIU)<br>FL Polytechnic (FPU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of West Florida (UWF) | Master's FAMU)<br>**(High-Demand)** |
| 11.0103 | Information Technology | Florida State (FSU)<br>FL International (FIU)<br>U. of Central Florida (UCF) | Bachelor's   (FAMU) |

|  |  |  |
|---|---|---|
|  | U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) |  |
| 11.1003 Computer and Information<br>Systems Security/<br>Auditing/Information<br>Assurance | FL International (FIU)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Bachelor's  (FAMU) |
| 11.1003 Computer and Info.<br>Systems Security/<br>Auditing/Information | FL International (FIU)<br>U. of Central Florida (UCF) | Master's  (FAMU) |
| 13.0301 Curriculum & Instruction | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Master's (FAMU)<br>**(High-Demand)** |
| 13.0401 Educational Leadership &<br>Instruction | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Master's (FAMU)<br>**(High-Demand)** |
| 13.0401 Educational Leadership &<br>Instruction | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF) | Doctorate (FAMU)<br>**(High-Demand)** |
| 13.1199 Student Counseling &<br>Personnel Services | ***NOT DUPLICATED*** | Master's (FAMU) |
| 13.1202 Elementary Education &<br>Teaching | Florida State (FSU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of West Florida (UWF) | Bachelor's  (FAMU)<br>**(High-Demand)** |

2

| | | | |
|---|---|---|---|
| 13.1205 | Secondary Education & Teaching | Florida State (FSU)<br>FL Gulf Coast (FGCU)<br>U. of Central Florida (UCF)<br>U. of North Florida (UNF) | Bachelor's (FAMU)<br>**(High-Demand)** |
| 13.1312 | Music Teacher Education | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF) | Bachelor's (FAMU) |
| 14.0301 | Agricultural Engineering | ***NOT DUPLICATED*** | Bachelor's (FAMU) |
| 14.0501 | Bioengineering & Biomedical Engineering | Florida State (FSU)<br>FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Florida (UF)<br>U. of South Florida (USF) | Bachelor's (FAMU)<br>**(High-Demand)** |
| 14.0501 | Bioengineering & Biomedical Engineering | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of South Florida (USF) | Master's  (FAMU) |
| 14.0501 | Bioengineering & Biomedical Engineering | Florida State (FSU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of South Florida (USF) | Doctorate (FAMU)<br>**(High-Demand)** |
| 14.0701 | Chemical Engineering | Florida State (FSU)<br>U. of Florida (UF)<br>U. of South Florida (USF) | Bachelor's (FAMU) |
| 14.0701 | Chemical Engineering | Florida State (FSU)<br>U. of Florida (UF)<br>U. of South Florida (USF) | Master's (FAMU) |
| 14.0701 | Chemical Engineering | Florida State (FSU)<br>U. of Florida (UF)<br>U. of South Florida (USF) | Doctorate (FAMU) |
| 14.0801 | Civil Engineering | Florida State (FSU)<br>Florida Atlantic (FAU) | Bachelor's (FAMU)<br>**(High-Demand)** |

|  | FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF) |  |
| --- | --- | --- |
| 14.0801 Civil Engineering | Florida State (FSU)<br>FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF) | Master's (FAMU) |
| 14.0801 Civil Engineering | Florida State (FSU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of South Florida (USF) | Doctorate (FAMU) |
| 14.0901 Computer Engineering | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL International (FIU)`<br>FL Polytechnic (FPU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Bachelor's (FAMU)<br>**(High-Demand)** |
| 14.1001 Electrical and Electronics<br>Engineering | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL International (FIU)<br>FL Polytechnic (FPU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Bachelor's (FAMU)<br>**(High-Demand)** |
| 14.1001 Electrical and Electronics<br>Engineering | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF) | Master's (FAMU)<br>**(High-Demand)** |

4

| | | |
|---|---|---|
| 14.1001 Electrical and Electronics Engineering | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of South Florida (USF) | Doctorate (FAMU)<br>**(High-Demand)** |
| 14.1901 Mechanical Engineering | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL International (FIU)<br>FL Polytechnic (FPU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Bachelor's (FAMU)<br>**(High-Demand)** |
| 14.1901 Mechanical Engineering | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL International (FIU)<br>FL Polytechnic (FPU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF) | Master's  (FAMU)<br>**(High-Demand)** |
| 14.1901 Mechanical Engineering | Florida State (FSU)<br> Florida Atlantic (FAU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of South Florida (USF) | Doctorate (FAMU)<br>**(High-Demand)** |
| 14.2701 Systems Engineering | Florida State (FSU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF) | Master's (FAMU)<br>**(High-Demand)** |
| 14.3501   Industrial Engineering | Florida State (FSU)<br>U. of Central Florida (UCF)<br>U. of South Florida (USF) | Bachelor's (FAMU) |
| 14.3501   Industrial Engineering | Florida State (FSU)<br>U. of Central Florida (UCF)<br>U. of South Florida (USF) | Master's (FAMU) |
| 14.3501   Industrial Engineering | Florida State (FSU)<br>U. of Central Florida (UCF) | Doctorate (FAMU)<br>**(High-Demand)** |

5

U. of South Florida (USF)

| | | | |
|---|---|---|---|
| 15.0303 | Electrical, Electronic, & Communication Engr Technology | ***NOT DUPLICATED*** | Bachelor's (FAMU) |
| 15.1001 | Construction Engineering Technology/Tech | FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of West Florida (UWF) | Bachelor's (FAMU) |
| 22.0101 | Law | Florida State (FSU)<br>FL International (FIU)<br>U. of Florida (UF) | Doctorate (FAMU)<br>**(High-Demand)** |
| 24.0102 | General Studies | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>FL International (FIU)<br>FL Polytechnic (FPU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Master's (FAMU) |
| 26.0101 | Biology/Biological Sciences | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Bachelor's (FAMU) |
| 26.0101 | Biology/Biological Sciences | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Master's (FAMU)<br>(High-Demand) |
| 26.0702 | Entomology | U. of Florida (UF) | Doctorate (R) (FAMU) |

| | | | |
|---|---|---|---|
| 31.0501 | Sports/Kinesiology & Physical Ed/Fitness | U. of West Florida (UWF) | Bachelor's (FAMU) |
| 31.0504 | Sport and Fitness Admin./ Management | Florida State (FSU) U. of Central Florida (UCF) U. of Florida (UF) U. of South Florida (USF) | Master's  (FAMU) |
| 40.0501 | Chemistry | Florida State (FSU) Florida Atlantic (FAU) FL International (FIU) U. of Central Florida (UCF) U. of Florida (UF) U. of South Florida (USF) | Master's (FAMU) |
| 40.0801 | Physics, General | Florida State (FSU) Florida Atlantic (FAU) FL International (FIU) U. of Central Florida (UCF) U. of Florida (UF) U. of South Florida (USF) | Master's (FAMU) |
| 40.0801 | Physics, General | Florida State (FSU) Florida Atlantic (FAU) FL International (FIU) U. of Central Florida (UCF) U. of Florida (UF) U. of South Florida (USF) | Doctorate (FAMU) |
| 40.1001 | Materials Science | Florida State (FSU) | Doctorate (FAMU) |
| 42.2802 | Community Psychology | ***NOT DUPLICATED*** | Master's (FAMU) |
| 43.0104 | Criminal Justice/Safety | Florida State (FSU) Florida Atlantic (FAU) FL Gulf Coast (FGCU) FL International (FIU) U. of Central Florida (UCF) U. of North Florida (UNF) U. of West Florida (UWF) | Bachelor's  (FAMU) |
| 44.0701 | Social Work | Florida State (FSU) Florida Atlantic (FAU) FL Gulf Coast (FGCU) FL International (FIU) U. of Central Florida (UCF) U. of North Florida (UNF) U. of South Florida (USF) U. of West Florida (UWF) | Bachelor's (FAMU) **(High-Demand)** |

| | | |
|---|---|---|
| 44.0701 Social Work | FL Gulf Coast (FGCU)<br>U. of Central Florida (UCF)<br>U. of South Florida (USF) | Master's (FAMU)<br>**(High-Demand)** |
| 45.0101 Social Sciences | ***NOT DUPLICATED*** | Master's  (FAMU) |
| 50.0409   Graphic Design | U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF) | Bachelor's (FAMU) |
| 50.0501 Drama and Dramatics/<br>          Theater | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Bachelor's (FAMU) |
| 50.0702  Fine/Studio Arts | Florida State (FSU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Bachelor's (FAMU)<br>**(High-Demand)** |
| 51.0000  Health Services, Allied<br>          Health, Health Sciences | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Bachelor's (FAMU) |
| 51.0701  Health/Health Care<br>          Administration | Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF) | Bachelor's  (FAMU) |
| 51.0701  Health/Health Care<br>          Administration | Florida Atlantic (FAU)<br>FL International (FIU)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF) | Master's (FAMU) |

8

|  |  |  |
|---|---|---|
|  | U. of West Florida (UWF)<br>U. of Central Florida (UCF) |  |
| 51.0706  Health Info/Medical<br>Records | U. of Central Florida (UCF) | Bachelor's (FAMU) |
| 51.0908 Respiratory Care Therapy/<br>Therapy | ***NOT DUPLICATED*** | Bachelor's (FAMU) |
| 51.2001 Pharmacy | U. of Florida (UF)<br>U. of South Florida (USF) | Doctorate (FAMU)<br>**(High-Demand)** |
| 51.2099  Pharmacy/Pharmaceutial<br>Sciences, & Administration | ***NOT DUPLICATED*** | Bachelor's (FAMU) |
| 51.2099  Pharmacy/Pharmaceutial<br>Sciences, & Administration | U. of Florida (UF)<br>U. of South Florida (USF) | Master's (FAMU) |
| 51.2099  Pharmacy/Pharmaceutial<br>Sciences, & Administration | ***NOT DUPLICATED*** | Doctorate (FAMU) |
| 51.2201 Public Health | Florida State (FSU)<br>FL International (FIU)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Master's  (FAMU) |
| 51.2201 Public Health | FL International (FIU)<br>U. of Florida (UF)<br>U. of South Florida (USF) | Doctorate  (FAMU)<br>**(High-Demand)** |
| 51.2306 Occupational Therapy/<br>Therapist | FL Gulf Coast (FGCU)<br>FL International (FIU) | Master's  (FAMU) |
| 51.2308  Physical Therapy/<br>Therapist | ***NOT DUPLICATED*** | Master's (FAMU) |
| 51.2308  Physical Therapy/<br>Therapist | FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF) | Doctorate (FAMU) |
| 51.3801 Registered Nursing/<br>Registered Nurse | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU) | Bachelor's (FAMU)<br>**(High-Demand)** |

|  |  |  |  |
|---|---|---|---|
|  |  | FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) |  |
| 51.3801 | Registered Nursing/<br>Registered Nurse | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Master's (FAMU) |
| 52.0201 | Business Administration &<br>Management | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Bachelor's (FAMU)<br>**(High-Demand)** |
| 52.0201 | Business Administration &<br>Management | Florida State (FSU)<br>Florida Atlantic (FAU)<br>FL Gulf Coast (FGCU)<br>FL International (FIU)<br>U. of Central Florida (UCF)<br>U. of Florida (UF)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Master's  (FAMU) |
| 52.0203 | Logistics, Materials, and<br>Supply Chain Management | FL Gulf Coast (FGCU<br>FL International (FIU)<br>U. of North Florida (UNF)<br>U. of South Florida (USF)<br>U. of West Florida (UWF) | Bachelor's (FAMU) |
| 52.0203 | Logistics, Materials, and<br>Supply Chain Management | Florida Atlantic (FAU)<br>FL International (FIU)<br>U. of North Florida (UNF)<br>U. of South Florida (USF) | Master's (FAMU) |
| 50.0301 | Accounting | Florida State (FSU)<br>Florida Atlantic (FAU) | Bachelor's (FAMU) |

10

|  |  |  |
|---|---|---|
|  | FL Gulf Coast (FGCU) |  |
|  | FL International (FIU) |  |
|  | U. of Central Florida (UCF) |  |
|  | U. of Florida (UF) |  |
|  | U. of North Florida (UNF) |  |
|  | U. of South Florida (USF) |  |
|  | U. of West Florida (UWF) |  |
| 54.0101  History, General | Florida State (FSU) | Bachelor's (FAMU) |
| Florida State (FSU) | Florida Atlantic (FAU) |  |
|  | FL Gulf Coast (FGCU) |  |
|  | FL International (FIU) |  |
|  | U. of Central Florida (UCF) |  |
|  | U. of Florida (UF) |  |
|  | U. of North Florida (UNF) |  |
|  | U. of South Florida (USF) |  |
|  | U. of West Florida (UWF) |  |