# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

BRITNEY DENTON et al.,

      Plaintiffs,

v.                                CASE NO. 4:22cv341-RH-MAF

THE BOARD OF GOVERNORS
FOR THE STATE UNIVERSITY
SYSTEM OF FLORIDA et al.,

      Defendants.

_____/

## <u>ORDER OF DISMISSAL</u>

This case presents a challenge to Florida's treatment of its only public historically black university, Florida Agricultural and Mechanical University ("FAMU"). The case is before the court on a motion to dismiss. This order grants the motion.

## I. Background

Prior to *Brown v. Board of Education*, 347 U.S. 483 (1954), the State of Florida, like many states, mandated racial segregation of public schools. *Brown* held the practice unconstitutional. In *United States v. Fordice*, 505 U.S. 717 (1992), the Court addressed the application of *Brown* to public colleges and universities. The Court said a state "may not leave in place policies rooted in its

prior officially segregated system that serve to maintain the racial identifiability of its universities if those policies can practicably be eliminated without eroding sound educational policies." *Id*. at 743.

The Court did not, however, mandate the elimination of historically black colleges and universities, widely known as "HBCUs." FAMU opened in 1887. It suffered racial discrimination in funding and other respects through the years. But today FAMU is a widely respected, major research university. At least insofar as alleged in this action, FAMU hires professors and admits students without regard to race. It has turned out generations of graduates—for decades, only blacks, but now, of all races and ethnicities. With understandable pride, FAMU retains its heritage as a historically black university.

The plaintiffs in this action are FAMU students. They seek to represent a class of "all Black students at FAMU at any time during the 2021/2022 school year through the date of class certification." The proposed class does not include white students at FAMU or black students at other state universities.

The three-count second amended complaint—the pleading now before the court—asserts a *Fordice* claim under Title VI of the Civil Rights Act of 1964 (count I), a *Fordice* claim under 42 U.S.C. § 1983 and the Fourteenth Amendment (count II), and a claim of racial discrimination separate and apart from *Fordice*

under § 1983 and the Fourteenth Amendment (count III). The plaintiffs seek declaratory and injunctive relief, not damages.

The defendants are the Board of Governors of the State University System, its members in their official capacities, and the State of Florida itself. The Board and the State are named only in count I. The Board members are named only in counts II and III.

The defendants have moved to dismiss for lack of standing and failure to state a claim on which relief can be granted. The motion also asserts the State, when sued in its own name, has sovereign immunity. This order dismisses the second amended complaint for failure to state a claim.

## II.  Standing

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), the Supreme Court said the "irreducible constitutional minimum of standing contains three elements." First, the plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id*. (cleaned up). Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."

*Id*. (cleaned up). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. (cleaned up).

The plaintiffs allege their own educations are being adversely affected by the racial discrimination they say FAMU is currently suffering. This is a sufficient allegation of a concrete and particularized injury that is both actual and imminent, not conjectural or hypothetical. The alleged injury is traceable to the State of Florida, which implements the allegedly discriminatory actions through the Board of Governors. And the alleged injury, if proven, would be redressable through an injunction requiring the defendants to take appropriate action—to treat FAMU and thus in turn its students in a manner complying with Title VI and the Fourteenth Amendment.

An injunction would need to be specific—a requirement the plaintiffs have not fully come to grips with to this point—but racial discrimination in public education has led to specific injunctions in the past and could, if warranted on the facts, do so here. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971).

In asserting the plaintiffs nonetheless lack standing for claims related to funding, the defendants focus on redressability. They say the Florida Legislature, not the Board of Governors or its members, made the challenged funding decisions and would have to appropriate the funds needed for any remedy. But injunctions

against unconstitutional conduct can and often do issue against executive officers, *see, e.g.*, *Ex parte Young*, 209 U.S. 123 (1908), even if their actions were mandated by a legislature. *See, e.g.*, *Brown*, 347 U.S. at 486 n.1 (describing the procedural background of consolidated cases, including those where state statutes mandated segregation but school officials were sued); *see also Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299 (11th Cir. 2021) (holding that the plaintiffs had standing to sue the secretary of state to challenge a voting statute and rejecting the claim on the merits); *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) (holding that the plaintiffs had standing to sue the secretary of state and local supervisors of elections to challenge a state statute but rejecting the claim on the merits).

Compliance with such an injunction often requires expenditure of funds. This was surely the case in *Swann* and dozens of other school cases. *See, e.g.*, *Milliken v. Bradley*, 433 U.S. 267, 289 (1977). Segregation of the kind at issue— that is, segregation mandated by law or, using the common Latin description, "de jure segregation"—is, by definition, mandated by law, often by legislatures. Affected individuals have standing to challenge unconstitutional action of this kind. *Brown* itself was such a case. So was *Fordice*. If, as the defendants' argument here would establish, a state could insulate racial discrimination simply by having the state legislature mandate it, the schools might still be segregated.

This is not a case in which the named defendants have no role in carrying out the challenged legislative action, including by spending appropriated funds. The Florida Legislature appropriates funds, but the Board of Governors spends them. If, as the plaintiffs allege, the expenditures are unconstitutional, an injunction against the Board's members can redress the violation.

In short, the plaintiffs have standing to pursue this action. There may be discrete portions of the plaintiffs' claims on which standing could again become an issue going forward—any standalone, non-*Fordice* claim involving the FAMU College of Law, for example—but it is not clear the plaintiffs assert any such standalone claim, and this is not a basis for dismissing any of the three counts at this time.

## III. Sovereign immunity

The State of Florida says it has sovereign immunity from the Title VI claim asserted in count I—the only claim asserted against the State in its name. The assertion is incorrect.

A state sued in its own name has Eleventh Amendment immunity, regardless of the relief sought, unless the immunity has been waived or validly abrogated by Congress. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996). The same is true of sovereign immunity. *See Alden v. Maine*, 527 U.S. 706 (1999). But Congress has explicitly abrogated immunity from Title VI claims. *See Alexander v.*

*Sandoval*, 532 U.S. 275, 280 (2001) (recognizing that 42 U.S.C. § 2000d-7 "expressly abrogated States' sovereign immunity against suits brought in federal court to enforce Title VI").

As the defendants note, Title VI applies only to discrimination "under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. But the statute defines "program or activity" to include a "public system of higher education." *Id*. § 2000d-4a(2)(A). The defendants could hardly deny that the State University System receives federal financial assistance, as does the State of Florida itself.

Not surprisingly, the Eleventh Circuit has allowed relief against a state in its own name in a Title VI action of this very kind. *See Knight v. Alabama*, 14 F.3d 1534 (11th Cir. 1994).

To be sure, a state program or activity's receipt of federal funds does not abrogate the state's immunity from claims asserting discrimination in *unrelated* programs or activities; the abrogation of immunity applies only to the program or activity that receives federal funds. But when a state program or activity receives federal funds, the state is not immune from a Title VI action asserting discrimination in that very program or activity. In this respect Title VI is the same as Title VII, under which hundreds of actions have gone forward against states in their own names. *See, e.g.*, *Connecticut v. Teal*, 457 U.S. 440 (1982); *Tynes v. Fla.*

*Dep't of Juv. Just.*, 88 F.4th 939 (11th Cir. 2023); *Cross v. Alabama*, 49 F.3d 1490

(11th Cir. 1995); *Allen v. Ala. State Bd. of Educ.*, 816 F.2d 575 (11th Cir. 1987).

In asserting the contrary, the defendants rely on *McMullen v. Wakulla*

*County Board of County Commissioners*, 650 F. App'x 703 (11th Cir. 2016). There

the court addressed the Rehabilitation Act, which, like Title VI, applies to a

"program or activity" that receives federal funds. The plaintiff asserted the

defendant county received federal funds so could be held liable for disability

discrimination in the county's volunteer fire department, even though the fire

department itself received no federal funds. The Eleventh Circuit disagreed. The

holding is correct but inapplicable here, because here, unlike in *McMullen*, the

plaintiffs challenge conduct within a program or activity—the State University

System—that itself receives federal funds. The same analysis applies to the out-of-

circuit cases on which the defendants rely; like *McMullen*, they recognize only that

a state or county cannot be held liable for conduct within a program or activity that

does not itself receive federal funds. *See* Mot. to Dismiss, ECF No. 71, at 25–26.

It makes little if any practical difference whether count I proceeds against

the Board of Governors or the State of Florida in its own name or both. But the

plaintiffs have elected, and are entitled, to proceed against both.

### IV.  Standards on a motion to dismiss for failure to state a claim

To survive a motion to dismiss for failure to state a claim on which relief can be granted, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For purposes of a motion to dismiss, the complaint's factual allegations, though not its legal conclusions, must be accepted as true. *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must include "allegations plausibly suggesting (not merely consistent with)" the plaintiff's entitlement to relief. *Id.* at 557. The complaint must set out facts—not mere labels or conclusions—that "render plaintiffs' entitlement to relief plausible." *Id.* at 569 n.14.

A motion to dismiss is not the vehicle by which the truth of a plaintiff's factual allegations should be judged. Instead, it remains true, after *Twombly* and *Iqbal* as before, that "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168–69 (1993).

## V.  Merits

### A.  Fordice, Title VI, and the Fourteenth Amendment

*Fordice* requires elimination of vestiges of de jure segregation in a state's system of higher education. This means elimination of policies and practices that are (1) traceable to de jure segregation and (2) for which there is no sound educational justification. The requirement stems from both Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment. Binding circuit decisions applying *Fordice* include *Knight v. Alabama*, 14 F.3d 1534 (11th Cir. 1994), and *Ayers v. Fordice*, 970 F.2d 1378 (5th Cir. 1992).

Separate and apart from *Fordice*, the Fourteenth Amendment prohibits intentional racial discrimination in public education, without any requirement for a nexus to past de jure segregation.

### B.  Survival of HBCUs

States must eliminate the vestiges of de jure segregation, but de jure segregation happened, and the world will never be as it otherwise would have been. HBCUs must now be open to students of all races, but HBCUs are here to stay, and rightly so. *Fordice* does not require elimination of HBCUs or their merger with historically white institutions, even if HBCUs would not have come into existence at all absent de jure segregation.

Anyone familiar with the history of racial segregation in public education knows the important role HBCUs have played and the justifiable pride they have engendered. None more so than FAMU. In his *Fordice* concurrence, Justice Thomas explained it this way:

> [W]e do not foreclose the possibility that there exists "sound educational justification" for maintaining historically black colleges *as such*. Despite the shameful history of state-enforced segregation, these institutions have survived and flourished. Indeed, they have expanded as opportunities for blacks to enter historically white institutions have expanded. Between 1954 and 1980, for example, enrollment at historically black colleges increased from 70,000 to 200,000 students, while degrees awarded increased from 13,000 to 32,000.

505 U.S. at 748 (Thomas, J., concurring) (emphasis in original).

Justice Thomas noted that HBCUs "are both a source of pride to blacks who have attended them and a source of hope to black families who want the benefits of higher learning for their children." *Id*. (quoting Carnegie Commission on Higher Education, *From Isolation to Mainstream: Problems of the Colleges Founded for Negroes* 11 (1971)).

FAMU was founded in 1887. It has turned out graduates at all levels, from baccalaureate to doctoral degrees. Its current mission statement, while noting its commitment to diversity, also notes its heritage as an HBCU. That FAMU's history is rooted in Florida's shameful practice of de jure segregation enhances—it does not diminish—FAMU's justifiable pride in having survived that era and

having served a community in need, then as now. The plaintiffs seem to take issue with the mission statement, but their position on this rings hollow; few advocates of racial justice assert the solution is to whitewash the history of racial injustice.

The plaintiffs do not assert that when *Brown* ended de jure segregation, FAMU should have been closed or merged with its cross-town neighbor, Florida State University ("FSU"). To the contrary, the plaintiffs assert a merger was the "most damaging proposal" that surfaced at that time. Second Am. Compl., ECF No. 66 at 10 ¶ 12. Nor do the plaintiffs assert FSU should have been closed. At that time, Florida had three public universities—FAMU, FSU, and the University of Florida ("UF")—all with a broad array of degree programs at all levels.

This was a marked contrast with the Mississippi system of higher education at issue in *Fordice*. Mississippi, with a smaller population, had eight public universities, five white and three black. When *Brown* and later Title VI established that the universities could no longer be segregated by law, little changed. The state kept all eight universities open, complete with many unnecessarily duplicative programs, and all the universities remained almost entirely segregated. The Supreme Court said the duplication of programs was a vestige of the segregated system. In addition, the three black universities had limited missions; only three traditionally white, "comprehensive" universities had broad missions of the kind associated with most public universities across the country. Retaining that system

was unlikely to eliminate vestiges of de jure segregation, even when legal barriers to admission ended.

The same cannot be said of Florida's decision to maintain the three major public research universities serving Florida's larger and rapidly growing population. All three had existed since the 1800s. Far from having too many universities, Florida had, if anything, too few.

Florida's population has grown from 3.5 million in 1954 to more than 22 million today.[1] FAMU, FSU, and UF have all grown; each has a student body much larger than in 1954. At least insofar as alleged in the second amended complaint, they all admit students and hire faculty without regard to race and have done so for decades.

In addition, Florida has added nine new public universities, all comprehensive. None was ever segregated by law. The plaintiffs refer to the nine as traditionally white, but they are not; they are traditionally diverse. The second

---

[1] *See* U.S. Dep't of Commerce, Bureau of the Census, *Statistical Abstract of the United States* 14 (§ 1 chart no. 10) available at https://www2.census.gov/library/publications/1955/compendia/statab/76ed/1955-02.pdf#[0,{%22name%22:%22FitR%22},-174,105,580,537]; *see also* U.S. Bureau of the Census, *Annual Estimates of the Resident Population for the United States, Regions, States, District of Columbia, and Puerto Rico: April 1, 2020 to July 1, 2022*, data table available at https://www.census.gov/newsroom/press-kits/2022/2022-national-state-population-estimates.html.

amended complaint does not allege that any of the nine has ever discriminated based on race or ethnicity in the admission of students or hiring of faculty.

All twelve of Florida's public universities have racially diverse faculties and student bodies with substantial numbers of whites, blacks, and other minorities. The second amended complaint does not allege the contrary.

### C. Racial demographics

The twelve universities are not, however, demographically the same.

After *Brown*, racial demographics in public grade schools—kindergarten through twelfth grade—drew considerable attention. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971); *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430 (1968). This made sense: in states that were resisting *Brown*'s mandate, geographic boundaries could be drawn or other systems implemented to perpetuate segregation almost as effectively as prior law. Demographics—the comparative racial populations of individual schools—were a useful measure of a state's progress in eliminating vestiges of de jure segregation.

Even so, demographic differences were not necessarily a vestige of de jure segregation. In *Freeman v. Pitts*, 503 U.S. 467 (1992), an issue was whether a county school system had achieved unitary status on matters including the racial composition of the system's various schools—a subject on which residential demographics played a critical role. The Supreme Court recognized that a school

system can achieve unitary status even when racial imbalance in student bodies

persists. The Court said:

> In one sense of the term, vestiges of past segregation by state
> decree do remain in our society and in our schools. Past wrongs to
> the black race, wrongs committed by the State and in its name, are
> a stubborn fact of history. And stubborn facts of history linger and
> persist. But though we cannot escape our history, neither must we
> overstate its consequences in fixing legal responsibilities. The
> vestiges of segregation that are the concern of the law in a school
> case may be subtle and intangible but nonetheless they must be so
> real that they have a causal link to the de jure violation being
> remedied. It is simply not always the case that demographic forces
> causing population change bear any real and substantial relation to
> a de jure violation. And the law need not proceed on that premise.
> As the de jure violation becomes more remote in time and these
> demographic changes intervene, it becomes less likely that a
> current racial imbalance in a school district is a vestige of the prior
> de jure system. The causal link between current conditions and the
> prior violation is even more attenuated if the school district has
> demonstrated its good faith.

*Id.* at 495–96.

Demographics provide insight—but not nearly as much—for colleges and

universities. Unlike grade-school students, college applicants can and often do

choose schools far from home; geography is not as limiting. *See Fordice*, 505 U.S.

at 728–29. An applicant with a parent or sibling who went to college can choose

the same school or a different one, sometimes for that very reason. An applicant

who will be the first in the family to attend college can choose a school that has

educated a higher or lower proportion of such students, sometimes for that very

reason. An applicant can consider a school's cost and the average wealth of other

students. And an applicant can consider a school's demographics, perhaps choosing a school with more—or fewer—other students of the same race or ethnicity. These and myriad other factors affect a school's demographics.

That an HBCU has a disproportionate share of black students is hardly surprising and, without more, does not suggest a state currently maintains policies or practices traceable to de jure segregation.

The second amended complaint does not include systemwide demographic statistics of the kind addressed in most cases of this kind, including *Fordice*. *See id.* at 724–25. Instead, the second amended complaint has demographic statistics for FAMU and FSU. It alleges that FAMU's student body is 83.4% black and 8.1% white, with the balance consisting of other minorities or students whose race or ethnicity is unknown. It alleges FSU's student body is 56.3% white, 20.7% Hispanic, 10.3% Asian, and 9.2% black, with the balance consisting of other minorities or students whose race or ethnicity is unknown. These statistics show two things: first, that there is a significant difference in the race or ethnicity of students who choose to attend FAMU or FSU; and second, that both universities have racially diverse student bodies. This is worlds apart from the situation in Mississippi addressed in *Fordice*.

That FAMU has a far greater percentage of blacks does not suggest Florida currently maintains a policy or practice relating to admissions that is traceable to

de jure segregation. An equally or more plausible alternative explanation, in line with Justice Thomas's *Fordice* concurrence, is that FAMU is a source of pride and inspiration, especially among blacks, not only for its many educational accomplishments—it is a major research university with a record to match—but also for its role as a historically black university. As *Twombly* teaches, when the facts alleged in a complaint are as consistent with an innocent explanation as with an actionable one, the complaint fails to state a claim on which relief can be granted. *See Twombly*, 550 U.S. at 554; *Doe v. Samford Univ.*, 29 F.4th 675, 685–86, 698 (11th Cir. 2022); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010).

The plaintiffs fare no better based on their allegations about retention and graduation rates. As the plaintiffs themselves note, FAMU draws a disproportionate share of students from challenging socio-economic or educational backgrounds. The second amended complaint does not allege facts adequately tracing this to de jure segregation. And the second amended complaint does not allege facts inconsistent with the alternative explanation that FAMU draws a disproportionate share of such students because of FAMU's willingness to accept them and its success through the years in educating them. That FAMU's retention and graduation rates are lower suggests neither that FAMU has done a poor job

educating its students nor that FAMU has suffered intentional racial discrimination.

The plaintiffs also fare no better based on their allegations about the racial composition of faculties and the Board of Governors. The second amended complaint alleges no facts that would support a finding that any of Florida's twelve public universities have intentionally discriminated in the selection of their current faculty members. Or that members of the Board of Governors have been selected based on race. The second amended complaint's allegations on these matters do not suggest any failure to eliminate vestiges of de jure segregation.

In sum, there are demographic differences in the student bodies and faculties of Florida's twelve public universities. But the second amended complaint does not adequately trace the differences to de jure segregation, exclude alternative explanations, or allege facts that would support a finding that the differences result from intentional racial discrimination. The second amended complaint does not state a claim on this basis.

### D. The funding formula

In 2014—now ten years ago—Florida adopted the funding formula that still applies to all twelve state universities. *See* Fla. Stat. § 1011.905; *see also* Second Am. Compl., ECF No. 66 at 68 ¶ 167. As the second amended complaint

acknowledges, the formula is facially neutral, relying on measurable criteria

including such things as retention and graduation rates and employment results.

The plaintiffs assert the formula is unfair to FAMU, which draws a

disproportionate share of students with educational and socio-economic

backgrounds making it more difficult to succeed in college. The assertion is not

without force. But the second amended complaint alleges no facts that would

support a finding that the formula is either (1) traceable to the de jure segregation

that ended decades ago or (2) a result of intentional racial discrimination.

The formula may have a racially disparate impact. This is so because, at

least according to the second amended complaint, the formula allocates less

funding per student to FAMU than to universities with a lower percentage of black

students. But the Supreme Court has squarely held that Title VI does not create a

private right of action based on disparate impact. *See Alexander v. Sandoval*, 532

U.S. 275 (2001). And the same is true under the Fourteenth Amendment and 42

U.S.C. § 1983. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429

U.S. 252, 266 (1977); *Greater Birmingham Ministries v. Sec'y of State for Ala.*,

992 F.3d 1299, 1321 (11th Cir. 2021).

If the funding formula was a vestige of de jure segregation, it would be the

defendants' burden to show the formula is sound educational policy, and dismissal

would not be appropriate. But the second amended complaint alleges no facts that

would support a finding that the formula is a vestige of de jure segregation. The

plaintiffs cannot prevail on this basis.

### E.  Private contributions

It is an unfortunate fact that racial discrimination in society persists,

including in, among other things, pay. On average, whites are and long have been

paid more than blacks. The second amended complaint does not allege—but one

can reasonably posit—that on average, FSU and UF graduates have been paid

more through their careers than FAMU graduates, often for no reason other than

race. And FSU and UF have always had larger student bodies and thus more

graduates. It is hardly surprising that, as the plaintiffs allege, FSU and UF have

amassed larger endowments from private contributions through the years.

At least historically, the State of Florida has had a part in perpetuating the

racial discrimination that persists in society. But *Fordice* addresses policies and

practices governing a state's colleges and universities, not discrimination in society

at large. *See Ayers v. Fordice*, 111 F.3d 1183, 1223 (5th Cir. 1997) (stating the

focus under *Fordice* is "on the traceability of policies and practices that result in

funding disparities rather than the traceability of the disparities themselves."). A

state could reasonably choose to true-up financial support for universities to

account for differences in private contributions, past or present. But *Fordice*, Title

VI, and the Fourteenth Amendment do not require a state to do so.

### F.  Comparative programs

Florida's twelve public universities are not clones of one another. There is substantial duplication—all have basic studies of a kind traditionally part of any college education, and all have overlapping degree programs—but there are also differences. FAMU, for example, has a pharmacy school; FSU does not.

The plaintiffs say program duplication is a vestige of de jure segregation. That was surely true at the outset; the very reason FSU and FAMU both existed in the same city was de jure segregation. *See Fordice*, 505 U.S. at 738 ("It can hardly be denied that such duplication was part and parcel of the prior dual system of higher education.") But *Fordice* did *not* say that all duplication *remains* a vestige of the dual system. *Fordice* instead focused on "*unnecessary* program duplication." *Id*. at 739, 741 (emphasis added). The burden of proving that a state has dismantled its dual system is on the state, *see id*. at 738–39, but that does not relieve a plaintiff of the obligation, at the pleading stage, to allege facts plausibly supporting a claim—including by alleging facts inconsistent with obvious alternative explanations for any program duplication.

As set out above, *Brown* and *Fordice* did not require merger of FSU and FAMU or the elimination of either. That now, 70 years after *Brown*, FSU and FAMU both offer basic math classes and degrees in accounting—and a host of other disciplines—can hardly be characterized as an impermissible vestige of de

jure segregation. These are standalone, major research universities with their own individual existence, course offerings, and degree programs.

The plaintiffs complain that FAMU has too few unique, high-demand programs—programs not available at any of the eleven other state universities. But asked at oral argument for an example of any program FAMU is lacking—any program the plaintiffs assert FAMU does not offer today because of the prior de jure segregation or current intentional discrimination—the plaintiffs could come up with none. *See* Hr'g Tr., ECF No. 82 at 27–30. FSU and UF have larger student bodies than FAMU and offer more courses, but the second amended complaint alleges no facts that would support a finding that this is traceable to de jure segregation or intentional racial discrimination.

There is substantial duplication among all twelve of Florida's public universities. And there are differences. Of critical importance, all twelve are open to students of all races and ethnicities. This has now been true for decades. An African American student who wishes to pursue a degree available at any of the twelve universities may do it, subject only to the same admission standards applicable to students of all races and ethnicities. Title VI and the Fourteenth Amendment protect students, not universities separate and apart from their students. FAMU is not a plaintiff in this action and has no standalone right to offer

as many courses of study—unique, high-demand, or otherwise—as the state's
other public universities.

### G. The College of Engineering

Prior to and continuing into 1982, FAMU offered degree programs in
engineering. FSU did not. In that year the universities established a joint College of
Engineering, replacing FAMU's separate program. The joint college is located
near, but not on, the campuses of FAMU and FSU. College of Engineering
students can enroll in, and obtain a degree from, either FAMU or FSU.

The plaintiffs assert this is somehow a vestige of de jure segregation. It is
not. The College of Engineering is a joint operation of universities that decades
ago were segregated. Merging previously segregated programs to create a single,
wholly integrated successor is one way to eliminate—not maintain—vestiges of de
jure segregation. This is precisely the opposite of the approach Mississippi took
and *Fordice* called into question—the approach of maintaining wholly separate,
persistently segregated institutions.

That FSU did not have its own engineering school when the joint college
was created does not change the analysis. FAMU had no vested interest in
precluding FSU from offering courses or degrees in engineering. Having a joint
college of engineering, rather than separate ones, was fully consistent with *Fordice*
and was nondiscriminatory, whether or not FSU previously had a college of

engineering. The plaintiffs' apparent contention that FSU should not have been allowed to have engineering students at all is inconsistent with this uncontested holding: neither *Fordice* nor the Fourteenth Amendment required the merger, elimination, or kneecapping of FAMU or FSU. Both were and are entitled to exist and thrive as major research universities.

The joint College of Engineering is not a vestige of de jure segregation. And the second amended complaint alleges no facts that would support a finding of intentional racial discrimination in the creation or operation of the College.

### H. The Colleges of Law

When *Brown* was decided, Florida had two public colleges of law, one at UF for whites only and one at FAMU for blacks only. Even after *Brown*, the Florida Supreme Court refused to order admission of a qualified black applicant to the UF College of Law. *See State ex rel. Hawkins v. Bd. of Control*, 83 So. 2d 20 (Fla. 1955). The history is shameful. It is also past.

In the mid-1960s, Florida opened a new college of law at FSU and closed FAMU's. Even if not a vestige of de jure segregation, the closure of FAMU's college of law was caused, at least in part, by intentional racial discrimination. Or so a reasonable factfinder could conclude. This history, too, is past.

FAMU opened a new college of law in 2000—almost 24 years ago. For more than two decades, FAMU has again had a college of law. Even if the

plaintiffs could successfully challenge the closure of FAMU's college of law in this action, no further relief would be available—the closure has already been remedied.

Florida now has four public colleges of law—at FAMU, FSU, UF, and Florida International University. The second amended complaint does not allege that any of the four engages in racial discrimination in the hiring of faculty or admission of students or has done so in the last 60 years. To the contrary, all four have diverse faculties and student bodies. That there are four public colleges of law, up from two when *Brown* was decided, is not a vestige of de jure segregation or the result of intentional racial discrimination.

The plaintiffs also complain that FAMU's College of Law is in Orlando, remote from FAMU's main campus in Tallahassee. FAMU is not the only university whose law school is remote from its main campus—Stetson in Florida and Fordham in New York come to mind—and the second amended complaint alleges no facts suggesting the placement resulted from racial discrimination or was disadvantageous for FAMU. Orlando has no other law school, is larger than Tallahassee, and is closer to more of the state's other major cities—all circumstances the Legislature or FAMU administration could have viewed as good reasons to place the FAMU College of Law there.

To the extent the plaintiffs' complaint is that FSU has a law school at all, the complaint still falls short. The FSU College of Law came into existence after de jure segregation ended and, at least to the extent alleged in the second amended complaint, has never engaged in racial segregation in hiring faculty or admitting students. The existence of the FSU College of Law has caused the plaintiffs no harm.

## I.  *Land-grant funding*

Congress adopted Morrill Land-Grant Acts in 1862 and 1890. The 1862 Act provided public lands to states on the condition that the lands be sold and the proceeds used for universities teaching agricultural and mechanical arts. *See* 7 U.S.C. §§ 301, 304. The 1890 Act provided funds, not land, for the same purpose, but the "land grant" nomenclature was carried forward.  *See id.* § 322.

Acting under the 1862 Act, Florida established UF as its first land-grant institution. At that time, only whites could attend UF. The 1890 Act prohibited a state from using land-grant funds for a whites-only university unless the state established a second land-grant university not limited to whites. 7 U.S.C. § 323. So Florida designated FAMU as its second land-grant university.

The second amended complaint alleges, and the defendants apparently agree, that federal law now requires a state to match federal funding dollar-for-dollar for its first land-grant university—that is, for an 1862 institution—but allows the state

to match federal funding at just 50% for a second land-grant university—that is, for an 1890 institution. *See* Second Am. Compl., ECF No. 66 at 63–64 ¶ 150. The parties have not cited the statutes or rules imposing these requirements. The source of the requirement for a 100% match for an 1862 institution apparently is 7 U.S.C. § 361c(d). The sources of the requirement for at least a 50% match for an 1890 institution apparently are 7 U.S.C. § 3222d(c) (requiring a 100% match) and 7 U.S.C. § 3222d(d) (allowing a waiver above 50% if the United States Secretary of Agriculture "determines that the State will be unlikely to satisfy the matching requirement").

By rule, the criteria to obtain a waiver above 50% are impacts from a natural disaster, a financial crisis, or a lack of matching funds despite good-faith efforts to obtain them. *See* 7 C.F.R. § 3419.3(c). The second amended complaint does not explain how Florida meets these criteria, but Florida has apparently obtained a waiver. The second amended complaint alleges that since 2011, Florida has matched 100% of federal land-grant funding for UF but has matched only 50% of federal land-grant funding for FAMU.

The second amended complaint does not adequately trace this disparity to de jure segregation. First, the second amended complaint alleges no facts inconsistent with the defendants' assertion that the disparity simply reflects Florida's decision to match federal funding only to the extent required by federal law. Second, the

second amended complaint explicitly alleges that the current disparity has existed since 2011—decades after de jure segregation ended. Second Am. Compl., ECF No. 66 at 64 ¶ 152. Third, had there been no de jure segregation, FAMU likely would not be a land-grant institution at all and thus likely would receive no land-grant funding—just as ten other Florida public universities, including FSU, apparently receive no land-grant funding. Nothing in the second amended complaint is to the contrary.

The second amended complaint also does not state a land-grant claim on which relief can be granted separate and apart from *Fordice*. This is so because the second amended complaint alleges no facts that would support a finding that the difference in matching implemented in 2011 is the result of intentional racial discrimination. As set out above, disparate impact is not enough.

In sum, the plaintiffs' land-grant allegations do not state a claim on which relief can be granted.

## VI.    Conclusion

For these reasons,

IT IS ORDERED:

The motion to dismiss, ECF No. 71, is granted. The clerk must enter judgment stating, "The plaintiffs' claims are dismissed with prejudice." The clerk must close the file.

SO ORDERED on January 24, 2024.

s/Robert L. Hinkle
United States District Judge